CULLEN & DYKMAN, LLP
100 Quentin Roosevelt Boulevard
Garden City, NY  11530
(516) 357-3700
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.
Elizabeth M. Aboulafia, Esq.

Proposed Attorneys for Metroplex on the Atlantic, LLC

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                                    Chapter 11

METROPLEX ON THE ATLANTIC, LLC,                           Case No.:  15-42499 (CEC)

                              Debtor.
-----------------------------------------------------------x

## NOTICE OF MOTION

PLEASE TAKE NOTICE that beginning on September 9, 2015 at 10:00 a.m. and continuing on September 10, 2015 at 10:00 a.m., Metroplex on the Atlantic, LLC ("the Debtor"), by and through its proposed attorneys Cullen and Dykman LLP, will move (the "Motion") before the Honorable Carla E. Craig, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Eastern District of New York, located at 271 Cadman Plaza East, Brooklyn, New York 11201, or as soon thereafter as counsel can be heard, for an Order (i) authorizing the Debtor to incur post-petition debt on a secured basis under section 364(c) and 364(d) of the Bankruptcy Code and to enter into definitive loan documents pursuant to a DIP Loan and Security Agreement in the amount of up to $19 million with PSG Capital Partners, Inc. and/or its nominee, (ii) granting PSG superpriority claims and first priority liens on the Debtor's property to secure payment of the Loan Facility, (iii) granting existing secured creditors adequate protection, (iv) modifying automatic stay, and (v) directing turnover of property and an accounting by the Receiver.

PLEASE TAKE FURTHER NOTICE that pursuant to an agreed Scheduling Order, any responses or objections to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically in accordance with the Revised General Order (and Exhibit 1 to the Revised General Order, which can be found http://www.nyeb.uscourts.gov, the official website of the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and shall be served in accordance with  the Revised General Order upon (i) Cullen and Dykman LLP, 100 Quentin Roosevelt Blvd, Garden City, New York 11530, attention: Bonnie L. Pollack, Esq., (ii) counsel to DIP Lender, Ted A. Berkowitz, Esq., Farrell Fritz, P.C., 1320 RXR Plaza, Uniondale, NY 11556-0120, (iii) counsel to project sponsor, Frank A. Oswald, Esq., Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119-3395, and (iv) the Office of the United States Trustee, Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10004, in order that they be received no later than 4:00 p.m. on August 21, 2015.

Dated: Garden City, New York
      July 31, 2015

                                    CULLEN AND DYKMAN LLP

BY:    s/  Bonnie L. Pollack
              Mathew G. Roseman, Esq.
              Bonnie L. Pollack, Esq.
              100 Quentin Roosevelt Boulevard
              Garden City, New York 11530
              (516) 357-3700

              Proposed Attorneys for Metroplex on the Atlantic, LLC

CULLEN & DYKMAN, LLP
100 Quentin Roosevelt Boulevard
Garden City, NY  11530
(516) 357-3700
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.
Elizabeth M. Aboulafia, Esq.

Proposed Attorneys for Metroplex on the Atlantic, LLC

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                                        Chapter 11

METROPLEX ON THE ATLANTIC, LLC,                               Case No.:  15-42499 (CEC)

                                      Debtor.
-------------------------------------------------------------x

## DEBTOR'S MOTION FOR ENTRY OF ORDER (I) AUTHORIZING POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§105(a), 361, 362 AND 364, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§361 AND 364, (III) MODIFYING AUTOMATIC STAY AND (IV) DIRECTING TURNOVER OF PROPERTY AND ACCOUNTING BY RECEIVER PURSUANT TO 11 U.S.C. § 543

To the Honorable Carla E. Craig, Chief United States Bankruptcy Judge:

        Pursuant to sections 105, 361, 362, 364 and 543 of title 11 of the United States Code (the

"Bankruptcy Code") and Rules 4001 and 7062 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), Metroplex on the Atlantic, LLC (the "Debtor"), through its proposed

counsel Cullen and Dykman LLP, hereby moves for entry of a final order, a proposed copy of

which is annexed hereto as Exhibit "A" (the "Final Order"), (i) authorizing the Debtor to incur

post-petition debt on a secured basis under section 364(c) and 364(d) of the Bankruptcy Code

and to enter into definitive loan documents pursuant to a DIP Loan and Security Agreement (the

"Loan Agreement") in the amount of up to $19 million (the "Loan Facility") with PSG Capital

Partners, Inc. and/or its nominee ("PSG"), a copy of which is annexed hereto as Exhibit "B", (ii)

granting PSG superpriority claims and first priority liens on the Debtor's property to secure

payment of the Loan Facility, (iii) granting existing secured creditors adequate protection, (iv) modifying automatic stay, and (v) directing turnover of property and an accounting by the Receiver (as defined below) pursuant to section 543 of the Bankruptcy Code, and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtor seeks approval of $19 million in debtor-in-possession financing for the purpose of rehabilitating and stabilizing the Property (as defined below).  The evidence, by way of appraisal attached hereto, establishes that the value of the Property once rehabilitated is well in excess of existing liens against the Property and, if given the opportunity through approval of the financing, the Debtor will be able to confirm a chapter 11 plan that will pay all allowed claims in full.  Without approval of the financing, however, this case immediately fails, the Property will be foreclosed, DOF (as defined below) will be the only entity that benefits and the blight upon Far Rockaway because of the existence of a dilapidated building will unfortunately continue.  For the benefit of all creditors, and for the reasons set forth herein, the Court should afford the Debtor the opportunity to achieve a successful reorganization through approval of the requested financing.

## JURISDICTION

2.      The Court has jurisdiction over this Motion under 28 U.S.C. §1334.  This matter is a core proceeding with the meaning of 28 U.S.C. §157(b)(2).  Venue of this proceeding is proper pursuant to 28 U.S.C. §§1408 and 1409.  The statutory predicates for this Motion are sections 105(a), 361, 362 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(c), 6004(h) and 7062.

## INTRODUCTION

3.      On May 28, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its affairs as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      The United States Trustee has not yet appointed an official unsecured creditors committee pursuant to section 1102 of the Bankruptcy Code.

5.      The Debtor is the owner of 126-unit condominium complex located at 120 Beach 26th Street, Far Rockaway, New York (the "Property").  The Property is encumbered by a mortgage presently held by DOF IV Metroplex, LLC ("DOF").  A detailed factual background of the Debtor's business and the Property, as well as the events leading to the filing of this chapter 11 case, are fully set forth in the Affidavit of Elsbieta Mielczarek, the Debtor's principal, filed in opposition to motions made by DOF to dismiss the Debtor's case and to vacate the automatic stay [Docket No. 24].  The extensive factual background set forth in that affidavit is incorporated herein by reference.

6.      As was detailed in the Affidavit, Joseph John Rissi, Esq., the receiver of the Property (the "Receiver"), his management company and other parties caused the utter destruction of the Property, and the Property now must be extensively renovated.  It is the current expectation that through the financing sought by this Motion, the Debtor will remediate and renovate the Property, converting same into a 300-bed assisted or independent living facility which would then either be sold or leased through a long-term lease to an operator of independent or assisted living facilities.  As further discussed below, with the value that will be added to the Property as a result of the renovation and completion of the project, the Debtor has the wherewithal to successfully emerge from bankruptcy.

## SUMMARY OF EXISTING SECURED INDEBTEDNESS

7.      The Property is presently encumbered by a mortgage held by DOF.  The mortgage was originally held by Community Preservation Corporation ("CPC") pursuant to a Building Loan Mortgage Modification, Consolidation, Extension, Assignment of Leases and Rents and Security Agreement dated as of August 16, 2007, executed by the Debtor in favor of CPC to secure a Consolidated, Amended and Restated Building Loan Note in the original principal amount of $22,825,000.  The loan documents with CPC were modified pursuant to a Modification Agreement dated December 11, 2009 to extend the maturity date of the loan.

8.      DOF has asserted that it is owed $37,734,103.11 from the Debtor in connection with the loan.  In addition to DOF, there are various mechanics' liens against the Property in the total amount of $253,358.62, all of which are disputed. [1]  Finally, there is a judgment lien in favor of Susan Anderson against the Property in the amount of $650,400.00.  Thus, there is total pre-petition secured indebtedness of $38,636,861.73 against the Property.  While the Debtor does not necessarily agree with the amount of the foregoing claims, for purposes of this Motion it is presumed that all such claims will be allowed.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

9.      Pursuant to, and in accordance with, Bankruptcy Rule 4001(c), Local Rule 4001-5 and the Guidelines for Financing Motions set forth in Administrative Order No. 558 of the United States Bankruptcy Court for the Eastern District of New York, the following is a concise statement of the material provisions of the Loan Facility, Loan Agreement and the proposed Final Order: [2]

---

[1]    While there were other mechanic's liens which had been filed against the Property, those liens were not properly perfected and the holders of same now simply hold unsecured claims against the Debtor.

[2] This concise statement is qualified in its entirety by reference to the applicable provisions of the Loan

4

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| **Parties**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | <u>Borrower</u>:    Metroplex on the Atlantic, LLC<br><br><u>Lender</u>:    PSG Capital Partners, Inc.<br><br>[Loan Agreement p. 1] |
| **Amounts**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(a)] | The Loan Facility will provide the Debtor with a post-petition loan facility in the aggregate principal amount of $19 million.<br><br>[Loan Agreement ¶ 2.1; Final Order ¶ 2(b)]<br><br>PSG will fund draw requests on a traditional monthly pay application process with and subject to deliveries of acceptable lien waivers, title endorsements and backup documentation, retainages and reserves, payment directions and certifications/verification of progress and construction compliance with applicable plans, requirements and other standards acceptable to Lender and its chosen construction monitors/engineers/inspectors/consultants.  Interest will be paid through an interest reserve as funds are drawn.  Draws will be subject to compliance with ongoing budget and Loan Facility requirements.  The final draw on the Loan Facility must be made on or before February 28, 2016 which final draw may exceed the funds then immediately needed to pay for construction costs then due (in order to disburse the balance of the original Loan Facility amount), provided that the excess shall be held for remaining construction costs in a control account subject to a control account control agreement.<br><br>[Loan Agreement ¶ 2.2] |

Agreement or the Final Order, as applicable.  To the extent there exists any inconsistency between this concise statement and the provisions of the Loan Agreement and the Final Order, the provisions of the Loan Agreement shall control over the concise statement, and the Final Order shall control over the Loan Agreement.  Any capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| **Purpose**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | To support the ongoing business activities of the Debtor including, without limitation the complete renovation and stabilization of the Property.<br><br>[Final Order ¶ 2(d)] |
| **Maturity & Termination**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(l)] | The Loan Facility matures one (1) year from initial funding with a one-year extension option.  Conditions to such an extension include no continuing default under the Loan Agreement, notice of not less than 60 but not more than 90 days prior to the maturity date, sufficient progress shall have been made on the renovation in the sole discretion of the Lender and its construction consultant, payment of an extension fee equal to 1% of the then-outstanding principal balance of the Loan Facility and payment of Lender's reasonable out-of-pocket closing costs related to such extension.<br><br>[Loan Agreement ¶¶ 1(kk), 4.7]<br><br>The Loan Facility may be prepaid in whole or in part with a penalty equal to the interest which would have accrued on the amount prepaid during the then-remaining term of the Loan Facility discounted by a rate equal to the 3-month U.S. Treasury rate.<br><br>[Loan Agreement ¶ 4.3] |
| **Events of Default and Effect on Financing Availability**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(o)]<br><br>[Guidelines §1(i)] | Events of default include, but are not limited to, (i) failure to pay and perform all obligations under the Loan Agreement, (ii) dismissal of the Chapter 11 case or conversion to a chapter 7 case, or the sale of substantially all of the assets of the Debtor without PSG's consent, (iii) granting of relief from the automatic stay to permit foreclosure or the exercise of other remedies on the material assets of the Debtor, (iv) the making of the motions referenced in (ii) and (iii) which are not contested by the Debtor in good faith, (v) granting of a lien or claim equal to or senior to those granted to PSG, (vi) failure of priming liens or super-priority claims granted with respect to the Loan Facility to be valid, perfected and enforceable in all respects, (vii) the filing of a Plan by the Debtor that is not approved by PSG, (viii) various operational defaults, and (ix) failure of the Final Order to be entered by September 15, 2015.<br><br>[Loan Agreement ¶ 9; Final Order ¶ 12] |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| | In the event of an uncured event of default, the Loan Facility may be terminated, the entire unpaid principal balance of the Loan Facility shall be accelerated, PSG may increase the interest rate to the default interest rate, PSG may take possession of its collateral and exercise its rights and remedies under the loan agreements, loan documents, uniform commercial code or other applicable law.  Seven (7) days after the service of a termination notice, the automatic stay shall be vacated to permit such relief.<br><br>[Loan Agreement ¶ 9.2; Final Order ¶ 13] |
| **Interest Rates**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(c)] | **Interest Rate**.  The loan will bear interest at the rate of 11% per annum. Payments of interest only shall be paid until maturity through the use of an interest reserve.<br><br>**Default Rate**:  13% per annum.<br><br>**Late Charges**:  2% per annum.<br><br>**Post-Judgment Interest Rate**:  13% per annum.<br><br>[Loan Agreement ¶ 3] |
| **Conditions**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(b)] | Material conditions to closing include, but are not limited to, (i) entry of the Final Order, (ii) receipt and review, with results satisfactory to the Lender and its counsel, of (a) appraisal of value of Property [Lender's receipt and review of appraisal imminent], (b) report by construction consultant on statement of anticipated construction costs and (c) report by consultant on mold remediation plan, (iii) the existence of a signed contract with a general contractor for the reconstruction of the Property, (iv) review and approval of the Lender's construction consultant of the budget as well as plan specifications with respect to the Project, and (v) payment of an origination fee in the amount of 2.75% of the Loan Facility.<br><br>[Loan Agreement ¶ 8] |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| **Liens and Priorities and Effect on <u>Existing Liens</u>**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(i)]<br><br>[Guidelines §1(d)] | The Debtor shall grant to PSG as security for all obligations of the Debtor to PSG under the Loan Facility (the "Loan Obligations") the following security interests and liens  pursuant to section 364(d) of the Bankruptcy Code:<br><br>(a)  Senior mortgage against the Property and all fixtures and improvements thereto;<br>(b)  Senior lien against any unencumbered property of the Debtor;<br>(c)  An assignment of all leases and/or contracts;<br>(d)  A first priority security interest in all related furniture, fixtures, equipment, inventory, machinery, systems, building material, and all other personal and intellectual property, if any; and<br>(e)  An assignment of all contract, management agreements, licenses, agreements and permits; and ongoing maintenance of insurance and tax payments, with the insurance coverages and assignment and inclusion of PSG as an insured all to be on terms acceptable to PSG.<br><br>Pursuant to section 364(c)(1) of the Bankruptcy Code, the Loan Obligations shall be authorized and allowed as superpriority administrative expense claims in the Debtor's case senior to any administrative expense claims in the Debtor's case, subject to the Carve-Out.<br><br>The superpriority administrative expense claim and post-petition liens shall not extend to the proceeds of avoidance actions.<br><br>[Loan Agreement ¶¶ 5.2, 5.3; Final Order ¶¶ 2(f), (g), (h)] |
| **<u>Carve-Out</u>**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(e)]<br><br>[Guidelines §4] | There shall be a carve-out and for the payment of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. §1930(a); and (ii) all reasonable and unpaid fees, costs, disbursements and expenses (the "Debtor Professional Fees") of any professionals retained or to be retained by the Debtor in this case (collectively, the "Debtor's Professionals") of $30,000 per month for services rendered prior to termination and up to $30,000 for services rendered after termination. There shall also be a carve-out for the fees and expense of a hypothetical chapter 7 trustee in an amount not to exceed $15,000.<br><br>[Loan Agreement ¶¶ 1.1(g), 14.17(c); Final Order ¶ 6]<br><br>No portion of the carve-out or proceeds of the Loan Facility may be |

| | |
|---|---|
| **MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING** | |
| | used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of PSG or its respective rights and remedies under the DIP Loan Documents or the Final Order, as applicable, including, without limitation, for the payment of any services rendered by professionals retained by the Debtor or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief; (ii) for invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Loan Facility; (iii) for monetary, injunctive, or other affirmative relief against PSG or its collateral; or (iv) for preventing, hindering, or otherwise delaying the exercise by PSG of any rights and/or remedies under the Final Order, the DIP Loan Documents, or applicable law or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court, or otherwise) by PSG upon any of its collateral; (b) to make any distribution under a plan of reorganization in the Chapter 11 Case; (c) to make any payment in excess of $10,000 in settlement of any claim, action, or proceeding, before any court, arbitrator, or other governmental body without the prior written consent of PSG; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor without the prior written consent of PSG; (e) to object to, contest, or interfere with in any way PSG's enforcement or realization upon any of its collateral once an Event of Default has occurred except as to any challenge as to the occurrence or continuation of such Event of Default; (f) to sell or otherwise dispose of PSG's collateral with a value in excess of $50,000 in the aggregate without the consent of PSG; (g) to use or seek to use any insurance proceeds constituting PSG's collateral without the consent of PSG; (h) to incur indebtedness outside the ordinary course of business without the prior consent of PSG; (i) to object to or challenge in any way the claims, liens, or interests (including interests in PSG's collateral) held by or on behalf of PSG; (j) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against PSG; (k) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Loan Facility, PSG's Liens, or any other rights or interests of PSG; or (l) to prevent, hinder or otherwise delay the exercise by PSG of any rights and remedies granted under the Final Order.<br><br>[Loan Agreement ¶ 8.21; Final Order ¶ 7]] |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| **Fees**<br><br>[Guidelines § 1(c)] | **Origination Fee**:  2.75% of amount of Loan Facility<br><br>[Loan Agreement ¶ 8.16]<br><br>**Extension Fee**:  1% of then-outstanding principal and accrued but unpaid interest on Loan Facility<br><br>[Loan Agreement ¶ 4.7]<br><br>All fees will be paid from Loan Facility. |
| **Waiver/Modification Of Automatic Stay**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(iv)]<br><br>[Guidelines §1(o)] | On termination of the Loan Facility after an uncured event of default, the automatic stay shall be modified so that seven (7) days after the date upon which the termination is declared, PSG shall be entitled to exercise all rights and remedies against the collateral in accordance with the loan documents and the Final Order.  During the first three (3) days of such seven-day period, the Debtor shall be entitled to continue to use cash on hand.  PSG may credit bid the amount due it under the Loan Agreement, including the Carve-Out, in the event of a sale of the Property.<br><br>[Final Order ¶ 13(b)]<br><br>The provisions of Bankruptcy Rules 4001(a)(3) and 7062 shall be waived and the Order shall be effective upon entry.<br><br>[Final Order ¶ 18(b)] |
| **506(c) Waiver**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(x)] | No costs or expenses of administration shall be charged against PSG's collateral under section 506(c) of the Bankruptcy Code except any unpaid costs and expenses associated with litigation against the Receiver, his management company and such other parties to such lawsuit may be charged against any recoveries obtained in such litigation.<br><br>[Loan Agreement ¶ 9.1(m); Final Order ¶ 9] |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| **Indemnification**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(ix)] | The Debtor shall indemnify and hold PSG and the other named indemnified parties harmless from any claims, damages, losses, liabilities and expenses that may be incurred by or asserted or awarded against any indemnified party arising out of or in connection with the Loan Facility, the loan documents in any of the transactions contemplated by the Loan Agreement or any actual or proposed use of the proceeds of the Loan Facility except to the extent such claim, damage, loss, liability or expense is found in a final judgment to have resulted from such indemnified party's gross negligence or willful misconduct.<br><br>[Loan Agreement ¶ 4.6] |

## LOAN NEGOTIATIONS

10.     The terms of the Loan Agreement and related documents have been negotiated in good faith and at arm's length among the Debtor, project sponsor and PSG, all of whom have separate, sophisticated counsel.  The terms reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are fair and reasonable under the circumstances.

11.     The Debtor currently lacks any capital to remediate and renovate the Property or to operate its business in the ordinary course of business without post-petition financing.  Before the Petition Date, the Debtor made several attempts to obtain financing on terms better than that being provided by PSG.  Given the Debtor's financial condition, debt structure and capital structure, it was turned down on all occasions.  The Debtor went to TD Bank, Citibank and JPMorgan Chase Bank as well as 12 to 15 private investors seeking financing to take out DOF and was unable to obtain financing from any of those sources.  In addition, the Debtor and other entities were in discussions for many years with CPC and/or DOF to buy the note held by those entities.  In fact, negotiations to buy the Note were underway up until the day before the

bankruptcy filing, but no agreement was reached.  After weeks of arm's length negotiations and financial analysis, the Debtor reach an agreement for financing from PSG, allowing the Debtor to confirm a plan that will pay its creditors in full at the end of the day.

**SUMMARY OF THE TERMS OF THE PROPOSED LOAN AGREEMENT**

12.      In accordance with the terms and conditions of the Loan Agreement, PSG has agreed to provide financing in the principal amount of $19 million to be used for the renovation and stabilization of the Property and conversion of same to an assisted or independent living facility, and the payment of administrative costs associated with this Chapter 11 case.  The disbursements of the proceeds of the Loan Facility will be in accordance with the budget attached to the Loan Agreement.  In accordance with section 7 of the Guidelines, the Debtor has a reason to believe that the budget will be adequate (inclusive of professional fees and disbursement) considering all available assets, to pay all administrative expenses due or accruing during the period covered by the budget.

13.      Pursuant to the Loan Agreement, the Loan Facility will be secured by a senior mortgage against the Property and all fixtures and improvements thereto, a senior mortgage against any unencumbered property of the Debtor and a first priority security interest in all furniture, fixtures, equipment, inventory, machinery, systems, building material and other personal or intellectual property, among other assets.

14.      The obligations of the Debtor to PSG under the Loan Facility shall constitute a superpriority administrative claim in the Debtor's case senior to any other administrative expense claim in the Debtor's case, subject only to the carve-outs discussed below.  The liens and superpriority administrative claims to be granted to PSG under the Loan Agreement shall not extend to avoidance actions or the proceeds thereof.

15.     PSG has consented to a carve-out from its post-petition liens and superpriority claim for (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a); (b) all reasonable and unpaid fees, costs, disbursements and expenses incurred by the Debtor's professionals of $30,000 per month for services rendered prior to termination of the Loan Facility, and up to $30,000 subsequent to the termination of the Loan Facility; and (c) all reasonable and unpaid fees, costs, disbursements and expenses incurred by hypothetical chapter 7 trustee in an amount not to exceed $15,000.

16.     No portion of the carve-out or proceeds of the Loan Facility may be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of PSG or its respective rights and remedies under the DIP Loan Documents or the Final Order, as applicable, including, without limitation, for the payment of any services rendered by professionals retained by the Debtor or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief; (ii) for invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Loan Facility; (iii) for monetary, injunctive, or other affirmative relief against PSG or its collateral; or (iv) for preventing, hindering, or otherwise delaying the exercise by PSG of any rights and/or remedies under the Final Order, the DIP Loan Documents, or applicable law or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court, or otherwise) by PSG upon any of its collateral; (b) to make any distribution under a plan of reorganization in the Chapter 11 Case; (c) to make any payment in excess of $10,000 in settlement of any claim, action, or proceeding, before any court, arbitrator, or other governmental body without the prior written consent of

PSG; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor without the prior written consent of PSG; (e) to object to, contest, or interfere with in any way PSG's enforcement or realization upon any of its collateral once an Event of Default has occurred except as to any challenge as to the occurrence or continuation of such Event of Default; (f) to sell or otherwise dispose of PSG's collateral with a value in excess of $50,000 in the aggregate without the consent of PSG; (g) to use or seek to use any insurance proceeds constituting PSG's collateral without the consent of PSG; (h) to incur indebtedness outside the ordinary course of business without the prior consent of PSG; (i) to object to or challenge in any way the claims, liens, or interests (including interests in PSG's collateral) held by or on behalf of PSG; (j) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against PSG; (k) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Loan Facility, PSG's Liens, or any other rights or interests of PSG; or (l) to prevent, hinder or otherwise delay the exercise by PSG of any rights and remedies granted under the Final Order.

17.     No costs or expenses of administration shall be charged against PSG's collateral under section 506(c) of the Bankruptcy Code except any unpaid costs and expenses associated with litigation against the Receiver, his management company and such other parties to such lawsuit may be charged against any recoveries obtained in such litigation.

18.     Under the Loan Agreement, the Debtor will be paying an origination fee of 2.75% of the amount of the Loan Facility, an extension fee to extend the maturity date of the loan, if required, of 1% of the then-outstanding principal and accrued but unpaid interest on the Loan Facility, as well as various fees and expenses.  All such fees will be paid from the Loan Facility.

19.     The Loan shall mature one (1) year after the initial funding but may be extended for an additional one (1) year period upon the payment of the extension fee and upon other conditions.  The Loan Facility may be prepaid in whole or in part with a penalty equal to the interest which would have accrued on the amount prepaid during the then-remaining term of the Loan Facility discounted by a rate equal to the 3-month U.S. Treasury rate.  Interest shall accrue at the rate of 11% per annum.  PSG will receive payments of interest only until maturity.  The default rate of interest being charged under the Loan Agreement is 13% per annum as is the post-judgment interest rate.  Additionally, late charges of 2% per annum are provided for in the Loan Agreement.

20.     Additional terms of the proposed Loan Agreement are set forth above in the Concise Statement Pursuant to Bankruptcy Rule 4001 and are incorporated herein by reference.

### REQUEST FOR FINAL APPROVAL
### OF THE LOAN AGREEMENT

21.     The Court should authorize the Debtor to enter into the Loan Facility as an exercise of the Debtor's sound business judgment.  Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, (c) obtain credit with specialized priority and (d) obtain secured credit by granting a secured lien on property of the estate.  If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt repayment of which is entitled to super-priority administrative expense status or which is secured by liens on the debtor's property.

22.     Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.

*See In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("the applicable factors can be synthesized as follows: (1) That the proposed financing is an exercise of sound and reasonable business judgment ....").

23.     The Debtor's execution of the Loan Agreement is an exercise of its sound business judgment that warrants approval by the Court.  The Debtor, project sponsor, PSG and their advisors undertook a detailed investigation as to the Debtor's projected financing needs and ultimately received committed financing from PSG.  The Debtor worked to secure financing that would support the Debtor's chapter 11 goals of rehabilitating the Property and maximizing value so all creditors with valid claims can be paid and claims in favor of the Debtor can be pursued. Accordingly, after extensive discussions between the Debtor and its advisors with both the Sponsor and PSG, the Debtor negotiated the Loan Agreement with PSG in good faith, at arm's-length to obtain the required postpetition financing on the best and only terms available to the Debtor.

24.     As noted above, the Loan Facility will provide the Debtor with access to $19 million which will be sufficient to renovate the Property, thereby achieving value for all creditors, and to pay the costs associated with reorganization.  Thus, the Debtor submits that

entry into the Loan Facility constitutes an exercise of the Debtor's sound business judgment that should be approved by the Court.

25.    Furthermore, section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. §364(c).

26.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117,

120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

27.     After extended, good faith and arm's length negotiations, PSG agreed to provide the Loan Facility on the terms provided in the Loan Agreement and as summarized above. Because the Loan Facility proceeds are critical to the Debtor's renovation of its property and success for reorganization, and because PSG would not have been amenable to provide financing without the protections afforded by the Loan Agreement including without limitation the senior liens against the Debtor's assets and a super-priority administrative claim, the Debtor believes that the terms of the loan facility are reasonable under the circumstances.

28.     As set forth above, various lenders were unwilling to provide financing to the Debtor.  The Debtor sought, but was unable to obtain the required funds in the form of unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, pursuant to section 364(a) or (b) of the Bankruptcy Code.  Additionally, any lending facility with a third party would have included a request for liens that would prime the liens of DOF.

29.     The Debtor cannot presently remediate the Property and reorganize without additional funds.  The Debtor's ability to restructure successfully and pay its creditors therefore depends upon the approval of the Loan Agreement.

30.     The Court should therefore grant the Debtor's repayment obligations under the Loan Agreement superpriority administrative expense status as provided for in section 364(c)(l) of the Bankruptcy Code and the granting of liens to the Lender on all property of the Debtor not otherwise subject to liens as provided in section 364(c)(2).

### The Debtor Should be Authorized to Obtain Post-Petition Financing Secured by First Priority Priming Liens

31.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain post-petition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).

32.     Here, the Debtor seeks authority to enter into the Loan Agreement, which will provide PSG with priming liens on the Property to the extent the Property is subject to valid, perfected and non-avoidable liens in favor of third parties, including but not limited to DOF, as of the Petition Date.

33.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets.  Courts consider a number of factors, including:

   a.    whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

   b.    whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business;

   c.    whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender;

   d.    whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

   e.    whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 879-80, *cited in* Transcript of Record at 733:3-7, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 1, 2009); *Barbara K. Enters.*, 2008 WL 2439649, at *10; *see also* 3 *Collier on Bankruptcy* ¶ 364.04[1] (15th ed. rev. 2008).

34.    The Loan Facility satisfies each of these factors.  First, as described above, before the Petition Date, the Debtor sought financing from several potential Lenders and ultimately, PSG offered the only option for obtaining the post-petition financing the Debtor requires. The Debtor conducted arm's-length negotiations with the Sponsor and PSG regarding the terms of the Loan Agreement, and those agreements reflect the most favorable terms on which PSG was willing to offer financing. No alternative financing is available to the Debtor, and the Debtor is not able to obtain financing from PSG without providing the Sponsor and PSG with first priority priming liens on the Property.  Even with the necessity of priming the liens, the Debtor believes that accessing the Loan Facility from PSG will best maximize estate value.

35.    Second, the Debtor needs the funds to be provided under the Loan Facility to preserve the value of its estate for the benefit of all creditors and other parties in interest. Absent the Loan Facility, the Debtor will be unable to renovate the Property to recapture its value for the benefit of all of its creditors, and only DOF has any chance of payment.  Providing the Debtor with the funds necessary to preserve the value of the Property is in the best interest of all stakeholders.

36.    Third, the terms of the Loan Agreement are reasonable and adequate to ensure the Debtor's ongoing ability to operate in chapter 11 while the Property is being renovated so that maximize value can be obtained for the benefit of all creditors.  All administrative costs are being paid through the Loan Facility.  Accordingly, the terms of the Loan Agreement are

reasonable and the Loan Facility is sufficient to support the Debtor's essential operations and property renovation.

37.     Fourth, the Debtor and PSG negotiated the Loan Agreement in good faith and at arm's-length, and the Debtor's entry into the Loan Agreement is an exercise of its sound business judgment and is in the best interests of its estate, creditors and other parties in interest.

38.     Finally, as described below, the Debtor will provide adequate protection for the existing liens on the Property.

39.     A debtor may obtain post-petition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B); *In re 354 E. 66th St. Realty Corp.*, 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995) ("The purpose or intent of granting adequate protection payments are to maintain the status quo for that creditor and to protect the creditor from diminution or loss of the value of its collateral during the ongoing Chapter 11 case."). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case…."); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

40.     Section 361 of the Bankruptcy Code provides that adequate protection for the purposes of certain sections of the Bankruptcy Code, including section 364, may be provided by (1) cash or periodic payments equal to the lessening of a senior lienholder's position; (2) an additional or replacement lien on property of value equivalent to the decrease in value of the primed position; or (3) the "indubitable equivalent" of the lessened position.  11. U.S.C. § 361. The "indubitable equivalent" part of section 361 is a "catch all" that gives the court flexibility when determining whether there is adequate protection. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

41.     Courts often hold that an equity cushion provides adequate protection for a secured debt. *See In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *Anchor Sav. Bank FSB*, 99 B.R. at 123; *In re Dunes Casino Hotel*, 69 B.R. 784, 795 (Bankr. D.N.J. 1986); *see also In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("The existence of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364." (citations and internal quotation marks omitted)). However, "[w]hile an equity cushion is generally considered prima facie evidence of adequate protection, the absence of an equity cushion does not establish the converse, i.e., that as a matter of law the creditor is not adequately protected." *In re Smithfield Estates, Inc.*, 48 B.R. 910, 914 (Bankr. D.R.I. 1985) ("The concept of adequate protection was not designed or intended to place an undersecured or minimally secured creditor in a better postfiling position than it was in before ….").

42.     Likewise, an anticipated increase in the collateral's value greater than the loan sought will adequately protect a secured party's interest. *See In re Vander Vegt*, 499 B.R. 631, 639 (Bankr. N.D. Iowa 2013), *aff'd sub nom.*, *First Sec. Bank & Trust Co. v. Vegt*, 511 B.R. 567

(N.D. Iowa 2014); *495 Cent. Park Ave. Corp.*, 136 B.R. at 63; *see also In re Mt. Olive Hospitality, LLC*, No. CIV. 13-3395 RBK, 2014 WL 1309953, at *4 (D.N.J. Mar. 31, 2014).

43.    Here, DOF and any other pre-petition secured creditors are adequately protected, notwithstanding the priming liens contemplated in the Loan Agreement.  First, DOF will be paid the contract interest to which it is entitled under its loan documents, amounting to $90,000 per month, from the Loan Facility, itself adequate protection under section 361 of the Bankruptcy Code.  Additionally, as adequate protection of the interest of the pre-petition secured creditors holding valid, pre-petition security interests in the Property against any diminution in value of their respective interests in such collateral, such the pre-petition secured creditors will be granted valid, binding, enforceable and automatically perfected post-petition security interests in and to the Property junior to the lien of PSG, to the same extent and priority as they existed prior to the Petition Date, as well as superpriority administrative expense claims junior to the superpriority claim being granted to PSG and the carve-outs therefrom.

44.    Finally, and importantly, upon completion of the renovation of the Property, the Property will have a value of between $64 million and $87 million and, with a stabilized income stream, a value of between $70 million and $95 million.  *See* Exhibit "C".  Existing liens together with the proposed Loan Facility amount, in total and before claim objections, to $57,636,861.73.  Thus, even at the lowest value achievable, such value is more than sufficient to satisfy the liens of PSG and the other existing liens against the Property.  Accordingly, the Court should find that the existing liens are adequately protected and the Loan Facility satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## THE TERMS OF THE LOAN FACILITY ARE REASONABLE

**A.    The Fees are Reasonable**

45.    As described above, the Debtor has agreed, subject to Court approval, to pay certain fees to PSG in exchange for its providing the Loan Facility.  Specifically, the Debtor will pay PSG an origination fee, extension fee, servicing fees and expense deposit described above. In addition, the Debtor has agreed to pay all fees and expenses of PSG related to the Loan Facility and this chapter 11 case, including PSG's professional fees.

46.    The fees, taken together with the other provisions of the Loan Agreement, represent the most favorable terms to the Debtor on which PSG would agree to make the Loan Facility available. The Debtor considered the fees described above when determining in its sound business judgment that the Loan Agreement constitutes the best option for obtaining the post-petition financing necessary to renovate the Property and continue with its chapter 11 cases.  The Debtor believes that paying these fees to obtain the Loan Facility is in the best interests of the Debtor's estate, creditors and other parties in interest.

47.    Courts routinely authorize debtors to pay fees similar to those the Debtor proposes to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtor's estate.  *See, e.g.*, *In re Metro Fuel Oil Corp.*, Case No. 12-46913 (ESS) (Bankr. E.D.N.Y. November 20, 2012) (approving 2% commitment fee, 2% upfront fee and all lender fees and expenses); *In re Global Aviation Holdings, Inc.*, Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. March 1, 2012) (approving 1% arranger fee and 2% upfront fee, among other fees); *In re Hostess Brands, Inc.*, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012) (approving annual $500,000 administration fee, unused commitment fee, and 3% non-refundable premium); *In re United Retail Inc.*, Case No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012) (approving 0.50% unused commitment fee and undisclosed closing fee); *In re MSR Resort Golf Course LLC*,

No. 11-10372 (SHL) (Bankr. S.D.N.Y. Jan. 25, 2012) [Docket No. 974] (approving commitment fees equal to 1.00% of the total commitment amount); *In re Sbarro, Inc.*, Case No. 11-11527 (SCC) (Bankr. S.D.N.Y. May 4, 2011) (approving 0.75% unused commitment fee, 2.0% underwriting fee, and 1.0% upfront fee); *In re Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 0.50% unused commitment fee and undisclosed underwriting, incentive, and other fees); *In re Insight Health Servs. Holdings Corp.*, Case No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.0% DIP closing fee); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee); *In re Reader's Digest Ass'n*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3% exit fee), *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0% up front fee and a 1.0% exit/conversion fee); *In re Gen. Growth Prop., Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); *In re Aleris Int'l. Inc.*, Case No. 09-10478 (BLS) (Bankr. D. Del. March 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Tronox Inc.*, Case No. 09-10156 (MFW) (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); *In re Lyondell Chem. Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%); *In re DJK Residential*, Case No. 08- 10375 (JMP) (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with post-petition financing).

48.    Accordingly, the Court should authorize the Debtor to pay the fees provided under the Loan Agreement in connection with entering into those agreements.

**B.    Modification of the Automatic Stay Is Warranted**

49.    The Loan Agreement contemplates that the automatic stay arising under section 362 of the Bankruptcy Code shall be modified to the extent necessary to permit the PSG to

exercise, upon the occurrence and during the continuation of any event of default, all rights and remedies provided for in the Loan Agreement, and to take various other actions without further order of or application to the Court.  As described above, the Final Order provides that the automatic stay is modified to permit PSG to enforce remedies against its collateral by providing seven days' notice.

50.    The Debtor believes that the provisions of the Final Order permitting PSG to enforce remedies against its collateral are justified under the circumstances.  The Debtor and PSG negotiated in good faith regarding the Loan Facility.  The Debtor would be unable to fund the chapter 11 case and ongoing operations without the Loan Facility.  Accordingly, the Debtor agreed to the notice terms and submits that they are justified under the circumstances.

51.    Stay modification provisions are ordinary features of DIP facilities and, in the Debtor's business judgment, are reasonable under the circumstances.  *See, e.g.*, *In re Hostess Brands, Inc.*, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012); *In re United Retail Inc.*, Case No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012); *In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Jan. 25, 2012); *In re Sbarro, Inc.*, Case No. 11-11527 (SCC) (Bankr. S.D.N.Y. May 4, 2011); *In re Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Insight Health Servs. Holdings Corp.*, Case No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010); *In re Reader's Digest Ass'n*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009); *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009); *In re Gen. Growth Prop. Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, Case No. 09-10156 (MFW) (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (REG) (Bankr. S.D.N.Y. April 23, 2009); *In re Wellman, Inc.*, Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. April 7,

2008); *In re Musicland Holding Corp.*, Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 21, 2006).

### PSG Should Be Deemed a Good Faith Lender Under §364(e) of the Bankruptcy Code

52.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loan or grant such lien is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incurred debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt or the granting of such priority or lien were stayed pending appeal.

11 U.S.C. §364(e).

53.     The Loan Agreement is the result of the Debtor's reasonable and informed determination that PSG offered favorable terms on which to obtain needed post-petition funding, and of extended arm's length good faith negotiations between the Debtor, the Sponsor and PSG. The terms and conditions of the Loan Agreement are fair and reasonable and the proceeds under the Loan Facility will only be used for purposes that are permissible under the Bankruptcy Code. According, the Court should find that PSG is a good faith lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to the protections afforded by that section.

### Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

54.     To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 4001(a)(3) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 7062 or otherwise.  The DIP Facility needs to

close expeditiously to allow for the payment of insurance, adequate protection payments to DOF and for construction to commence in order to progress within the timeframes contemplated by the Loan Agreement.  Given that PSG is entitled to the protection of section 364(e), waiver of such requirement is not prejudicial, but without waiver, the Debtor is prejudiced.

### THE RECEIVER SHOULD BE DIRECTED TO TURNOVER THE PROPERTY AND PROVIDE AN ACCOUNTING

55.    In the event that the Court authorizes the Debtor to enter into the Loan Facility, such order should also include a requirement that the Receiver turnover the Property and any other property of the Debtor in his possession, custody, or control as well as provide an accounting of any property of the Debtor that at any time came into the possession, custody, or control of the Receiver.  Section 543(b) of the Bankruptcy Code provides, in pertinent part, that

> A custodian shall (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and (2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property that, at any time, came into the possession, custody, or control of such custodian.

11 U.S.C. § 543(b).

56.    As defined in the Bankruptcy Code, a custodian includes a receiver of any property of the debtor appointed in a case or proceeding not under title 11.  11 U.S.C. §101(11); *see also In re Lizeric Realty Corp.*, 188 B.R. 499 (Bankr. S.D.N.Y. 1995); *In re Paren*, 158 B.R. 447 (Bankr. N.D. Ohio 1993); *In re Sundance Corp., Inc.*, 149 B.R. 641 (Bankr. E.D. Wash. 1993).

57.    Here, the Receiver has had possession of the Property as well as any proceeds, product, offspring, rents, or profits of the Property, since the Receiver was appointed in the State Court foreclosure action by Order entered on May 31, 2011.  In order to effectuate the Debtor's

plan to renovate and stabilize the Property and convert same to an assisted or independent living facility, it is necessary that the Property be turned over by the Receiver in the event that this Motion is granted, pursuant to section 543(b)(1) of the Bankruptcy Code.

58.     In addition to compelling the Receiver to turn over the Property and the proceeds and product therefrom, the Receiver should also be required to deliver to the Debtor an accounting of all of the Debtor's property and the proceeds of same in his possession, custody, or control at any time pursuant to section 543(b)(2) of the Bankruptcy Code.

59.     Accordingly, the Debtor requests in the event the Court grants the debtor-in-possession financing sought herein, that the Court also require the Receiver to turnover to the Debtor, and provide an accounting to the Debtor with respect to, the Property and the proceeds thereof, so that the Debtor can operate and maintain the Property during the period in which it is being renovated and stabilized.

### WAIVER OF MEMORANDUM OF LAW

60.     The Debtor submits that no new or novel issue of law is presented with respect to the matters contained herein, and respectfully requests that the requirement of a memorandum of law, pursuant to E.D.N.Y. LBR 9013-1(a) be waived.

### NO PRIOR REQUESTS

61.     No prior request for the relief sought in this Motion has been made to this or any other Court.

### NOTICE

62.     The Debtor has provided notice of the relief requested herein by serving a copy of the Motion and related pleadings by overnight mail upon (i) the United States Trustee, (ii) counsel to PSG, (iii) counsel to the Sponsor, (iv) the Receiver, (v) any other entity holding a secured interest in the Property, (vi) the Debtor's top twenty largest unsecured creditors, (vii) any

entity that filed a Notice of Appearance in the Debtor's case, (viii) the Attorney General of the

State of New York, (ix) the Internal Revenue Service, (x) the New York State Department of

Taxation and Finance, and (xi) the United States Department of Justice, Commercial Litigation

Division.

        **WHEREFORE**, the Debtor respectfully requests that the Court enter an Order:

A.      Finding that the notice of this Motion provided above is sufficient and appropriate in these circumstances;

B.      Authorizing the Debtor to obtain post-petition financing in the principal amount of $19,000,000 in accordance with the terms of the Loan Agreement;

C.      Authorizing the Debtor to grant PSG such protections and assurances as set forth in the Loan Agreement pursuant to section 364 of the Bankruptcy Code; and

D.      Granting such other and further relief as is just and proper.

Dated: Garden City, New York
      July 31, 2015

                      CULLEN AND DYKMAN LLP

           BY:    s/ Bonnie L. Pollack_____
                      Mathew G. Roseman, Esq.
                      Bonnie L. Pollack, Esq.
                      100 Quentin Roosevelt Boulevard
                      Garden City, New York 11530
                      (516) 357-3700

                      Proposed Attorneys for Metroplex on the Atlantic, LLC