## Exhibit B

DIP LOAN AND SECURITY AGREEMENT

By and Between

METROPLEX ON THE ATLANTIC, LLC, as Borrower

and

PSG CAPITAL PARTNERS, INC., and/or its nominee, as Lender

Dated: As of _____, 2015

# TABLE OF CONTENTS

1. **DEFINITIONS**. ...................................................................................1

  1.1 **Defined Terms** .....................................................................2

2. **THE DIP LOAN; USE OF PROCEEDS**. ................................................7

  2.1 **DIP Loan** ............................................................................7

  2.2 **Use of Proceeds** ..................................................................7

  2.3 **Disbursements**. ....................................................................8

  2.4 **Closing** ...............................................................................10

3. **INTEREST RATE** ..............................................................................10

  3.1 **Interest on the DIP Loan** ....................................................10

  3.2 **Default Interest** .................................................................10

  3.3 **Post Judgment Interest** .......................................................10

  3.4 **Calculation** ........................................................................10

  3.5 **Late Payment Charge**. ........................................................10

  3.6 **Limitation of Interest to Maximum Lawful Rate** ...................10

4. **PAYMENTS AND FEES**. ....................................................................11

  4.1 **Payments on the DIP Loan** .................................................11

  4.2 **Costs and Expenses**. ..........................................................11

  4.3 **Prepayment of DIP Loan**. ..................................................11

  4.4 **Reserved**. ...........................................................................11

  4.5 **Application of Payments** .....................................................11

  4.6 **Indemnity** ..........................................................................12

  4.7 **Extension Option**. ...............................................................12

5. **SECURITY; COLLECTION OF RECEIVABLES AND PROCEEDS OF COLLATERAL** ....................................................................................13

5.1    **Reserved.** ............................................................................................13

5.2    **Security.** ............................................................................................13

5.3    **General** ............................................................................................15

6.    **REPRESENTATIONS AND WARRANTIES** ............................................16

    6.1    **Valid Organization, Good Standing and Qualification** ........................16

    6.2    **Licenses** ............................................................................................16

    6.3    **Liens** ............................................................................................17

    6.4    **Due Authorization; No Legal Restrictions** ..........................................17

    6.5    **Enforceability** ............................................................................17

    6.6    **Title to Collateral** ........................................................................17

    6.7    **Current Compliance** ......................................................................17

    6.8    **Intellectual Property** ....................................................................17

    6.9    **Characterization of Obligations Post Entry Date** ..............................17

    6.10    **Bankruptcy Order.** ......................................................................18

    6.11    **Accuracy of Representations and Warranties.** ..................................18

    6.12    **Survival; Reliance.** ......................................................................18

7.    **GENERAL COVENANTS** ........................................................................18

    7.1    **Payment of Principal, Interest and Other Amounts Due** ....................18

    7.2    **Disposition of Assets** ....................................................................18

    7.3    **Merger; Consolidation; Business Acquisitions; Subsidiaries** ..............18

    7.4    **Taxes; Claims for Labor and Materials** ..........................................18

    7.5    **Liens** ............................................................................................19

    7.6    **Existence; Approvals; Qualification; Business Operations; Compliance with Laws** ........................................................................19

    7.7    **Maintenance of Properties, Intellectual Property** ..............................19

    7.8    **Insurance; Casualty.** ....................................................................19

7.9     **Amendment to Organizational Documents** ........................................................22

7.10    **Transactions with Affiliates** ........................................................23

7.11    **Restrictions on Transfer** ........................................................23

7.12    **Name; Address or State of Organization Change** ........................................23

7.13    **Notices** ........................................................23

7.14    **Additional Documents and Future Actions** ........................................23

7.15    **Material Adverse Contracts** ........................................................24

7.16    **Restrictions on Use of Proceeds** ........................................................24

7.17    **No Contest by Borrower**. ........................................................24

7.18    **Cooperation and Access** ........................................................24

7.19    **Sole Purpose.** ........................................................24

7.20    **Environmental Matters.** ........................................................26

7.21    **Bankruptcy.** ........................................................26

7.22    **Permits**. ........................................................27

7.23    **Financial Reporting**. ........................................................27

7.24    **Additional Financing**. ........................................................27

7.25    **Lien Law**. ........................................................27

7.26    **Condominium.** ........................................................28

8.      **CONDITIONS OF CLOSING** ........................................................28

8.1     **DIP Loan Documents** ........................................................28

8.2     **Representations and Warranties** ........................................................28

8.3     **No Default** ........................................................28

8.4     **Final Financing Order**. ........................................................28

8.5     **Review of Third Party Reports.** ........................................................29

8.6     **Reserved**. ........................................................29

8.7     **Consents**...........................................................................................29

8.8     **No Restriction**...................................................................................29

8.9     **Costs and Expenses**..........................................................................29

8.10    **No Material Adverse Change**..........................................................29

8.11    **Insurance**..........................................................................................29

8.12    **No Trustee or Examiner**...................................................................29

8.13    **Full Compliance With Final Financing Orders**...............................29

8.14    **Reserved**...........................................................................................30

8.15    **Priority of Security Interests**...........................................................30

8.16    **Origination Fee**...............................................................................30

8.17    **Construction Contract; Will Serve Letters**.....................................30

8.18    **Legal Opinion**..................................................................................30

8.19    **Construction Consultant**..................................................................30

8.20    **Definition**.........................................................................................30

8.21    **Restriction on Carve-Out**................................................................30

8.22    **Debtor In Possession of Property**....................................................31

9.      **DEFAULT AND REMEDIES**.........................................................31

9.1     **Events of Default**............................................................................31

9.2     **Remedies**.........................................................................................34

9.3     **Delay or Omission Not Waiver**......................................................34

9.4     **Remedies Cumulative; Consents**....................................................35

9.5     **Certain Fees, Costs, Expenses, Expenditures and Indemnification**...35

9.6     **Time is of the Essence**.....................................................................36

9.7     **Sale or Other Disposition of Collateral**...........................................36

9.8     **Set-Off**.............................................................................................36

9.9    **Turnover of Property Held by Lender**. ............................................37

10.    **COMMUNICATIONS AND NOTICES** ........................................37

10.1    **Communications and Notices** ........................................37

11.    **WAIVERS**. .........................................................................38

11.1    **Waivers** ........................................................................38

11.2    **Forbearance** ..................................................................38

11.3    **Limitation on Liability** ..................................................39

12.    **SUBMISSION TO JURISDICTION**. .....................................39

12.1    **Submission to Jurisdiction** ...........................................39

13.    **USA PATRIOT ACT PROVISIONS**. ....................................39

13.1    **USA Patriot Act Notice** .................................................39

14.    **MISCELLANEOUS**. ...........................................................40

14.1    **Brokers** ........................................................................40

14.2    **Use of Lender's Name** ...................................................40

14.3    **No Joint Venture** ..........................................................40

14.4    **Survival** ........................................................................40

14.5    **No Assignment by Borrower** ..........................................40

14.6    **Assignment or Sale by Lender**. ....................................40

14.7    **Binding Effect** ..............................................................40

14.8    **Severability** ..................................................................41

14.9    **No Third Party Beneficiaries** .........................................41

14.10    **Modifications** ..............................................................41

14.11    **Holidays** ......................................................................41

14.12    **Law Governing** ............................................................41

14.13    **Integration** ..................................................................41

14.14  **<u>Exhibits and Schedules</u>**........................................................................41

14.15  **<u>Headings</u>**.........................................................................................41

14.16  **<u>Counterparts</u>** ..................................................................................41

14.17  **<u>Effect of Final Financing Order</u>**.   ......................................................41

14.18  **<u>Waiver of Right to Trial by Jury</u>**.......................................................42

## DIP LOAN AND SECURITY AGREEMENT

**THIS DIP LOAN AND SECURITY AGREEMENT** (the **"Agreement"**) is made effective as of the _____ day of _____, 2015, by and between METROPLEX ON THE ATLANTIC, LLC, as **"Borrower,"** and PSG CAPITAL PARTNERS, INC., and/or its nominee, as **"Lender."**

## WITNESSETH

**WHEREAS,** on May 28, 2015 (the **"Filing Date"**), the Borrower commenced a voluntary Chapter 11 bankruptcy case under the Bankruptcy Code (as defined below), Case No. 15-42499 (CEC) (the "**Chapter 11 Case**"), in the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, in connection with the Chapter 11 Case, the Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as a debtor-in-possession;

**WHEREAS**, Borrower has requested that Lender lend to Borrower the DIP Loan, subject to and upon the terms and conditions hereinafter contained, which DIP Loan shall be evidenced by the Note (as defined herein);

**WHEREAS**, the DIP Loan is to be secured by the Collateral, all as more particularly defined in **Section 5** herein;

**WHEREAS**, the proceeds of the DIP Loan shall be used for completion of the rehabilitation of a 126-unit residential condominium building on the Property, or to improve the Property for any other legally permissible use, including without limitation, as an assisted living facility (the "**Project**"), Torchlight Interest Payments (as hereinafter defined), for general working capital purposes of the Borrower (including the payment of fees, costs, expenses, and disbursements) in accordance with the Final Financing Order and Budget (as defined herein) and to pay fees and expenses related to this Agreement;

**WHEREAS**, Lender has agreed to make the DIP Loan to Borrower on the terms and conditions of the DIP Loan hereinafter set forth;

**WHEREAS**, capitalized terms used herein will have the meanings set forth therefore in **Section 1** of this Agreement.

**NOW, THEREFORE**, in consideration of the terms and conditions contained herein, and of any extensions of credit now or hereafter made to or for the benefit of Borrower by Lender, the parties hereto, intending to be legally bound hereby, agree as follows:

1.        **DEFINITIONS**.

1.1 **Defined Terms**. The following words and phrases as used in capitalized form in this Agreement, whether in the singular or plural, shall have the meanings indicated:

(a) **"Affiliate"**, as to any Person, means (i) each other Person that directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person in question and (ii) any person who is an officer, director, member, manager or partner of (A) such Person, (B) any Subsidiary of such Person, or (C) any Person described in the preceding clause (i).

(b) **"Bankruptcy Code"** means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all official rules and regulations thereunder.

(c) **"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of New York.

(d) **"Borrower"** shall have the meaning given such term in the introductory paragraph of this Agreement and shall include all permitted successors and assigns of such Person.

(e) **"Business Day"** means any day except a Saturday, Sunday or other day on which banks in New York, New York are authorized by law to close.

(f) **"Budget"** shall mean that certain budget attached hereto as Exhibit B, setting forth the costs of all construction items necessary to complete the Project and the anticipated timing with respect thereto, expenses of the Borrower relating to the Chapter 11 Case, the Torchlight Interest Payments and expenses associated with the DIP Loan, as such Budget may be amended only by written consent of the Lender.

(g) **"Carve-Out"** shall have the meaning given such term in the Final Financing Order.

(h) **"Chapter 11 Case"** shall have the meaning given in the Recitals hereto.

(i) **"Collateral"** shall have the meaning given such term in **Section 5.3** of this Agreement.

(j) **"Conditions Precedent to Closing"** shall have the meaning given such term in **Section 8.17** of this Agreement.

(k) **"Conditions Subsequent to Closing"** shall have the meaning given such term in **Section 8.15** of this Agreement.

(l) **"Condominium"** shall have the meaning given such term in **Section 5.2(a)** hereof.

(m)        **"Condominium Act"** shall have the meaning given such term in **Section 7.26** hereof.

(n)        **"Condominium Consent Order"** shall have the meaning given such term in **Section 9.1(p)** of this Agreement.

(o)        **"Condominium Documents"** shall have the meaning given such term in **Section 7.26(a)** hereof.

(p)        **"Construction Consultant"** shall mean Metro Group New York, or Riverso Associates, Inc., or any other entity retained by the Lender at Borrower's expense to review all construction documents and otherwise oversee the Project on behalf of the Lender.

(q)        **"Construction Contract"** shall have the meaning given such term in **Section 8.18** hereof.

(r)        **"Corporation"** means a corporation, partnership, limited liability company, trust, unincorporated organization, association, joint stock company or joint venture.

(s)        **"Costs and Expenses"** shall have the meaning given such term in **Section 4.2** of this Agreement.

(t)        **"Declaration"** shall have the meaning given such term in **Section 7.26** hereof.

(u)        **"Default"** means any event which with the giving of notice, passage of time or both, could constitute an Event of Default.

(v)        **"Default Rate"** shall have the meaning given such term in **Section 3.2** hereof.

(w)        **"DIP Loan"** shall mean the Loan made by Lender to the Borrower in the amount of up to Nineteen Million Dollars ($19,000,000.00), together with all obligations of Borrower to Lender or any Affiliate of Lender, whether now or hereafter owing or existing, including, without limitation, all obligations under the DIP Loan Documents, all other obligations or undertakings now or hereafter made by or for the benefit of Borrower to or for the benefit of Lender or any Affiliate of Lender under any other agreement, promissory note or undertaking now existing or hereafter entered into by Borrower with Lender or any such Affiliate, together with all interest and other sums payable in connection with any of the foregoing.

(x)        **"DIP Loan Documents"** means this Agreement, the Note, and all other documents executed or delivered by Borrower or any other Person pursuant to this Agreement or in connection herewith, as they may be amended, modified or restated from time to time.

(y)          "**Event of Default**" means each of the events specified in **Section 9.1**.

(z)          "**Existing Liens**" shall have the meaning given such term in **Section 6.3** hereof.

(aa)          "**Extended Term**" shall have the meaning given such term in **Section 4.7** hereof.

(bb)          "**Extension Option**" shall have the meaning given such term in **Section 4.7** hereof.

(cc)          "**Filing Date**" shall have the meaning given to such term in the Recitals hereto.

(dd)          "**Final Financing Order**" means a financing order that is entered in the Chapter 11 Cases after notice and a final hearing pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure and applicable local rules.

(ee)          "**GAAP**" means generally accepted accounting principles in the United States of America, in effect from time to time, consistently applied and maintained.

(ff)          "**General Contractor**" shall have the meaning given such term in **Section 2.3(c)** hereof.

(gg)          "**Initial Term**" shall have the meaning given such term in the definition of Maturity Date.

(hh)          "**Indebtedness**", as applied to a Person, means:

(i)          all items (except items of capital stock or of surplus) which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of a balance sheet of such Person as at the date as of which Indebtedness is to be determined;

(ii)          to the extent not included in the foregoing, all indebtedness, obligations, and liabilities secured by any mortgage, pledge, lien, conditional sale or other title retention agreement or other security interest to which any property or asset owned or held by such Person is subject, whether or not the indebtedness, obligations or liabilities secured thereby shall have been assumed by such Person; and

(iii)          to the extent not included in the foregoing, all indebtedness, obligations and liabilities of others which such Person has directly or indirectly guaranteed, endorsed (other than for collection or deposit in the ordinary course of business), sold with recourse, or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire or in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

(ii)        **"Intellectual Property"** shall have the meaning given such term in Section 6.8 hereof.

(jj)        **"Interest Rate"** shall have the meaning given such term in **Section 3.1** hereof.

(kk)        **"Legal Requirements"** shall mean all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of governmental authorities affecting the Property or any part thereof, or the construction, use, alteration, ownership or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

(ll)        **"Lender"** shall have the meaning given such term in the introductory paragraph of this Agreement and shall include all permitted successors and assigns of such Person.

(mm)        **"Lender's Liens"** shall have the meaning given such term in **Section 5** hereof.

(nn)        **"Material Adverse Effect"** means a material adverse effect, as determined by Lender in its sole discretion (i) on the business, operations, assets, revenues, management, liabilities, prospects or financial condition of Borrower, (ii) in the value of or the perfection or priority of Lender's lien upon the Collateral, or (iii) in the ability of Borrower to perform its obligations under the DIP Loan Documents, or  (iv) on the rights and remedies of Lender under this Agreement, any security document, any other Loan Document or the Final Financing Order; provided, however, that any event or occurrence that would otherwise constitute a Material Adverse Effect as a consequence of (1) general economic, legal, regulatory or political conditions in the United States of America (provided that the impact on the Borrower is not materially disproportionate to the impact of similar entities), (2) conditions generally affecting the industries in which the Borrower operates (provided that the impact on the Borrower is not materially disproportionate to the impact of similar entities), (3) changes in the securities markets generally, or (4) changes in law or generally accepted accounting principles, or any interpretation thereof, shall not be a Material Adverse Effect notwithstanding anything set forth herein to the contrary.

(oo)        **"Maturity Date"** shall mean, unless otherwise accelerated pursuant to Article 9 hereof, the date that is the earlier to occur of (i) twelve (12) months from the date of the Closing (the "**Initial Term**"), subject to the Extension Option, (ii) the occurrence of the effective date of any plan of reorganization or liquidation in the Chapter 11 Case, or (iii) conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or (iv) any other Event of Default under this Agreement.  All obligations and liabilities of Borrower to Lender that remain outstanding or in existence on the Maturity Date shall be due and payable on the Maturity Date.

(pp)        **"Note"** shall have the meaning given such term in **Section 2.1** hereof.

(qq)        **"Person"** means an individual, a corporation, partnership, limited liability company or any other entity, or a government or any agency or subdivision thereof.

(rr)        **"Project"** shall have the meaning set forth in the recitals of this Agreement.

(ss)        **"Property"** shall mean the land, buildings and improvements located at 120 Beach 26th Street, Far Rockaway, New York, as more particularly described in Exhibit D annexed hereto.

(tt)        **"Request for Advance"** shall have the meaning set forth in **Section 2.2**.

(uu)        **"Retainage"** shall have the meaning set forth in **Section 2.2**.

(vv)        **"Subsidiary"** means a Corporation (i) which is organized under the laws of the United States or any State thereof, or any other county or jurisdiction, (ii) which conducts substantially all of its business and has substantially all of its assets within the United States and (iii) of which more than fifty percent (50%) of its outstanding voting stock of every class (or other voting equity interest) is owned by Borrower or one or more of its Subsidiaries.

(ww)        **"Torchlight Interest Payments"** shall have the meaning set forth in **Section 2.2**.

(xx)        **"Torchlight Loan"** shall mean that certain $22,825,000.00 loan evidenced by that certain Consolidated, Amended and Restated Building Loan Note (the "**Torchlight Loan Note**") dated August 6, 2007 made by Borrower to The Community Preservation Corporation ("**CPC**") in the amount of the Torchlight Loan, and secured by a certain Building Loan Modification, Consolidation, Extension, Assignment of Leases and Rents and Security Agreement (the "**Torchlight Loan Mortgage**"), dated as of August 6, 2007, encumbering the Property.  The Torchlight Loan Documents (as defined below) were modified pursuant to a Modification Agreement dated December 11, 2009.  CPC subsequently sold the Torchlight Loan to DOF IV Metroplex, LLC, c/o Torchlight Loan Services, LLC (the "**Torchlight Loan Lender**").

(yy)        **"Torchlight Lien"** shall mean, collectively, the lien against the Property created by (i) the Torchlight Loan Mortgage, and (ii) any assignments of rents and leases given as security for the Torchlight Loan (such mortgage and assignment of rents and leases, together with any Loan Agreement between Borrower and Torchlight Loan Lender with respect to the Torchlight Loan, the notes made by Borrower evidencing the Torchlight Loan and any and all other documents or instruments by Borrower and/or any guarantor in favor of Torchlight Loan  Lender evidencing and/or securing all or any part of the Torchlight Loan, are collectively referred to herein as the "**Torchlight Loan Documents**").

(zz)        **"Work"** shall have the meaning set forth in **Section 2.2**.

**Accounting Terms**.  As used in this Agreement, or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined elsewhere in this Agreement shall have the respective meanings given to them under GAAP.

**UCC Terms**.  All terms used herein and defined in the Uniform Commercial Code as in effect in the State of New York from time to time shall have the meanings given therein unless otherwise defined herein.

2.        **THE DIP LOAN; USE OF PROCEEDS**.

2.1        **DIP Loan**.  Provided all conditions in Section 8 are satisfied, Lender agrees, subject to the terms and conditions hereinafter set forth, to advance to Borrower up to [NINETEEN MILLION AND 00/100 DOLLARS] ($[19,000,000.00]).  Borrower's obligation to repay the DIP Loan shall be evidenced by Borrower's note (the **"Note"**), which shall be substantially in the form attached hereto as **Exhibit "A"**.

2.2        **Use of Proceeds**.

(a)        The DIP Loan proceeds shall be disbursed as follows and used only for the payment of expenses set forth in the Budget.  Provided there shall be no Default by Borrower under the DIP Loan Documents, and subject to satisfaction of the Conditions Subsequent to Closing, the proceeds of the DIP Loan shall be disbursed (1) in reimbursement to Borrower or, at Lender's option, in direct payment to third-party contractors and service providers in connection with the completion of the Project in accordance with the Budget (the "**Work**"), (2) future payments of interest at the contract interest rate set forth in the Torchlight Loan Documents ("**Torchlight Interest Payments**"), (3) other expenses of Borrower with respect to the Chapter 11 Case, and (4) expenses of the Borrower in connection with the DIP Loan.  Such balance shall be disbursed as requested by Borrower pursuant to itemized statements of Borrower setting forth the costs of the Work, in the form approved by Lender (a "**Request for Advance**").  Each Request for Advance shall (i) be duly executed by Borrower, (ii) be submitted to Lender and Construction Consultant not less than ten (10) days prior to the proposed date for the disbursement, (iii) specify the items and costs of Work performed by Borrower to be paid or reimbursed with the proceeds of the requested advance, or with respect to costs other than the costs of completing the Work, itemize the services provided or fees incurred pursuant to detailed invoices, (iv) include the documentation required to be included therewith under this Section 2.2, (v) constitute an affirmation that all of the representations and warranties set forth in this Agreement and the other DIP Loan Documents remain true and correct as of the date thereof and will be true and correct as of the date of the requested advance, and (vi) be accompanied by lien waivers for previous draws from applicable contractors and suppliers, acceptable to Lender in its sole discretion.  In no event shall the disbursement for any particular category of the Work exceed the maximum amount specified for such category of the Work on the Budget.  It is understood, however, that Lender's approval of the Budget is for Lender's own benefit, and Borrower may not rely on Lender's approval thereof, nor shall same be deemed a representation by Lender as to the adequacy or sufficiency thereof.

(b)        Subject to the prior written approval of the Lender, the Borrower may revise the Budget from time to time to reallocate amounts available under a Budget line to other Budget lines.  If there is a savings in a particular Budget line, and if such savings is substantiated by evidence reasonably satisfactory to the Lender, the Borrower shall have the right, upon prior reasonable approval of the Lender, to reallocate such savings to another Budget line with respect to which additional costs have been or may be incurred.

2.3        **Disbursements**.

(a)    Disbursements shall be made no more often than one (1) time per month and each disbursement relating to the Work shall be subject to administrative fees to Construction Consultant plus such reasonable out-of-pocket expenses (including travel expenses) that Lender or Construction Consultant may incur in connection with such Request for Advance. All of the fees and expenses in this Section shall be paid from the proceeds of the DIP Loan if and to the extent that sufficient reserved sums are available to pay such disbursement after calculating the amounts necessary to complete the Work taking into account such contingency factors as Construction Consultant may require.  Each disbursement shall be in the minimum amount of $25,000.00.

(b)    A ten percent (10%) retainage (the "**Retainage**") will be made from each disbursement relating to the Work.  The Retainage will be disbursed only upon the final completion of all renovations, a final inspection by Lender and Construction Consultant, receipt of final lien waivers from all contractors, subcontractors and suppliers, and receipt of all applicable permits and approvals with respect to the Work.

(c)    Each Request for Advance shall include a certification by Borrower's general contractor (who shall be approved by Lender and Construction Consultant) (the "**General Contractor**") of the total costs incurred in connection with the Work to the date of the Request for Advance in question, the estimated cost of completing the Work in accordance with the plans and specifications that shall have previously been submitted to and approved by Lender, that the Work that is the subject of the Request for Advance has been completed in accordance with the plans and specifications previously approved by Lender, that the remaining Work can be completed for an amount not greater than the aggregate amount of the undisbursed sums hereunder, including a contingency factor as shall be solely determined by Lender, and that the Work is on schedule to be completed within the required timeframe.  Such certificate shall be subject to the review and approval of Construction Consultant.  With each Request for Advance, Borrower shall certify that all Work has been completed in accordance with all applicable Legal Requirements, applicable insurance requirements and the plans and specifications previously approved by Lender, and Borrower shall provide Lender evidence satisfactory to Lender of completion. Each Request for Advance shall include copies of invoices for all items or materials purchased and all contracted labor or services provided.

(d)    The final disbursement of the DIP Loan must be made on or before February 28, 2016, the request for which may exceed the funds then immediately needed to pay the current costs of the Work due with respect to such draw request; provided, however, that the excess amount shall be held by Lender for remaining construction costs in a deposit account maintained and controlled by Lender (the "**Control Account**") pursuant to a control account

-8-

agreement acceptable to Lender in its sole discretion.  The Borrower hereby grants to the Lender a security interest in all amounts on deposit in the Control Account.  The granting of the security interest in and to the Control Account to the Lender is in addition to, and not in lieu of, any other security granted to the Lender pursuant to the DIP Loan Documents.

(e)    In addition to the foregoing conditions, Lender shall not be required to disburse the Retainage until thirty (30) days after Lender shall have received all of the following:

(i)    Evidence of all required approvals by the applicable governmental authority of the Work in its entirety, to the extent any such approval is a condition of the lawful use of the Property, including, without limitation, a valid certificate of occupancy from such governmental authority;

(ii)    A Certificate from Borrower dated at or about the date of completion of the Work certifying that (a) such Work has been satisfactorily performed in accordance with the approved plans and specifications, (b) no notices of any claimed violations of ordinances arising from the Work or operation of the Property which have not been cured were served on the party making such certification or any contractor or subcontractor or their respective agents or representatives, and (c) the party making such certification is not aware of any circumstances which could give rise to the issuance of any such notice of violation; and

(iii)    All final waivers of lien and sworn statements from contractors, subcontractors and material suppliers with respect to the Work.

(f)    In the event Lender determines, in its reasonable discretion, that any Work is not being performed or has not been completed in a workmanlike or timely manner, Lender shall have the option to withhold disbursement for such unsatisfactory Work.  *If Borrower shall not cure such unsatisfactory Work after notice from Lender thereof within the time periods specified in Section 9.1 below, or if the Work shall not be completed on or before [15 months from Closing] from the date hereof, such failure shall be an Event of Default, and, in addition to all other rights Lender may have under this Agreement upon an Event of Default and under the Note and the other DIP Loan Documents, Lender may proceed under existing contracts or contract with third parties to complete such Work and apply the balance of the DIP Loan proceeds toward the labor and materials necessary to complete such Work.*  In order to facilitate Lender's completion or making of such Work, Lender is hereby granted the right, but not the obligation, to enter onto the Property to perform such Work and/or employ watchmen to protect the Property from damage.  All sums so expended by Lender shall be deemed to have been advanced under the DIP Loan to Borrower and secured by the DIP Loan Documents.  For this purpose Borrower irrevocably constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution, which appointment shall be deemed to be coupled with an interest, to complete or undertake the Work in the name of Borrower.  Borrower specifically agrees that all power granted to Lender under this Agreement may be assigned by Lender to its successors or assigns as holder of the Note and, shall be superior to any and all other like or similar powers granted by Borrower to any third parties including, but not limited to, the Construction Consultant and/or the General Contractor.

(g)      Nothing in this Section shall be construed in such a way as to: (i) make Lender responsible for making or completing any Work; (ii) require Lender to expend its own funds to make or complete any Work; (iii) obligate Lender to proceed with any Work; or (iv) obligate Lender to demand from Borrower additional sums to make or complete any Work.  Lender's approval of any Plans and Specifications shall be for Lender's benefit and shall not be deemed a representation or warranty by Lender that same are adequate or in accordance with applicable law.

2.4      **Closing**.  The closing (the **"Closing"**) hereunder will take place at the offices of Farrell Fritz, P.C., 1320 RXR Plaza, Uniondale, New York  11556 as soon as practicable following the satisfaction of those Conditions Precedent to Closing set forth in Article 8 herein.

3.  **INTEREST RATE**.

3.1      **Interest on the DIP Loan**.  Interest on the entire outstanding principal balance of the DIP Loan will accrue at a rate per annum equal to eleven and 00/100 percent (11.00%)  (the **"Interest Rate"**).

3.2      **Default Interest**.  Interest will accrue on the principal balance of the DIP Loan after the occurrence of an Event of Default or expiration of the DIP Loan at a rate equal to the Interest Rate plus two percent (2%) (the **"Default Rate"**).

3.3      **Post Judgment Interest**.  Any judgment obtained for sums due hereunder or under the DIP Loan Documents will accrue interest at the applicable Default Rate set forth in **Section 3.2** above until paid.

3.4      **Calculation**.  Interest will be computed on the basis of a year of 360 days and paid for the actual number of days elapsed.

3.5      **Late Payment Charge**.  Unless waived by Lender in writing, if any principal, interest or other sum due under any Loan Document is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of two percent (2%) of such unpaid sum or the maximum amount permitted by applicable laws, in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Such amount shall be secured by the DIP Loan Documents.

3.6      **Limitation of Interest to Maximum Lawful Rate**.  In no event will the rate of interest payable hereunder exceed the maximum rate of interest permitted to be charged by applicable law (including the choice of law rules) and any interest paid in excess of the permitted rate will be refunded to Borrower.  Such refund will be made by application of the excessive amount of interest paid against any sums outstanding hereunder and will be applied in such order as Lender may determine.  If the excessive amount of interest paid exceeds the sums outstanding, the portion exceeding the sums outstanding will be refunded in cash by Lender.  Any such crediting or refunding will not cure or waive any default by Borrower.  Borrower agrees, however, that in determining whether or not any interest payable hereunder exceeds the highest rate permitted by law, any non-principal payment, including without limitation

-10-

prepayment fees and late charges, will be deemed to the extent permitted by law to be an expense, fee, premium or penalty rather than interest.

4.    **PAYMENTS AND FEES**.

4.1    **Payments on the DIP Loan**.    Borrower shall make monthly payments of interest only at the Interest Rate or the Default Rate, as applicable.  Such payments shall be paid to Lender out of the proceeds of the DIP Loan on a monthly basis.  Borrower shall also make payments to Lender in an amount equal to one hundred percent (100%) of the proceeds from the sale or recovery of any Collateral (including the receipt of any tax refunds).  Any sale of any portion of the Collateral shall be subject to Lender's prior written approval of such sale and the terms and conditions thereof.  Unless otherwise accelerated pursuant to the terms of this Agreement or the DIP Loan Documents, the entire outstanding principal amount of the DIP Loan, together with all accrued and unpaid interest and any other charges and sums due hereunder and under the other DIP Loan Documents, shall be due and payable on the Maturity Date.

4.2    **Costs and Expenses**.    All reasonable and documented fees, costs, expenses, and disbursements, including reasonable attorneys' fees, incurred by the Lender in connection with the negotiation, preparation, documentation, administration and enforcement of this Agreement and the DIP Loan, as well as reimbursement to Strategic Capital Holdings LLC for its payment of the Expense Deposit, as such term is defined in that certain term sheet by and between Borrower and Lender dated July 6, 2015, shall be due and payable by Borrower. Provided no Event of Default has occurred, such costs, fees and expenses shall be payable from proceeds of the DIP Loan in accordance with this Agreement.  Lender shall also require a monthly Project inspection and cost review.  Borrower shall be responsible for servicing fees, and reimbursement of Lender's and/or servicer's actual costs associated with enforcement of the DIP Loan and/or construction monitoring and administration, including costs of engineers, construction monitors, inspectors and consultants.  The costs, fees and expenses set forth in this Section 4.2 are herein called, collectively, the "**Costs and Expenses**."

4.3    **Prepayment of DIP Loan**.    Borrower may, upon at least three (3) Business Days' notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of the DIP Loan in whole or in part, together with (i) accrued interest to the date of such prepayment, plus (ii) an amount equal to the interest that would have accrued on the amount prepaid during the then-remaining Initial Term (or Extended Term, as applicable), discounted by a rate equal to the 3-month United States Treasury rate then in effect.  In the event that such prepayment is made during an Event of Default, the calculation set forth in (ii) above shall be made using the Default Rate.  All prepayments will be applied to the regularly scheduled payments in the inverse order in which they are due.

4.4    **Reserved**.

4.5    **Application of Payments**.    Any and all payments on account of the DIP Loan will be applied first, to pay any accrued but unpaid fees of Lender and any Costs and Expenses and other sums due hereunder as permitted under this Agreement or as approved by the

Bankruptcy Court; second to pay Interest on the DIP Loan; and third, to repay the principal amount of the DIP Loan; provided, however, that upon an Event of Default, such payments may be applied in such order as Lender, in its sole discretion, elects. If Borrower makes a payment or payments and such payment or payments, or any part thereof, are subsequently invalidated, declared to be fraudulent or preferential, set aside or are required to be repaid to a trustee, receiver, or any other person under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such payment or payments, the obligations or part thereof hereunder intended to be satisfied shall be revived and continued in full force and effect as if said payment or payments had not been made.

    4.6  **Indemnity**. Borrower shall indemnify and hold harmless the Lender and its affiliates and each of their respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives of each (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements to counsel, financial advisors and consultants), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Loan, the DIP Loan Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Loan, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation or proceeding is brought by the Borrower, any of their directors, security holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. The Borrower further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Borrower or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

    4.7  **Extension Option**. The Maturity Date may be extended for a period of one (1) year to [_____], 2017 (the "**Extended Term**"), provided that (i) no Event of Default shall have occurred and be continuing under this Agreement or any of the other DIP Loan Documents, either on the notice date or the first day of the Extended Term; (ii) the Borrower must give written notice to the Lender of its exercise of the option to extend at least sixty (60) days, but not more than ninety (90) days, prior to the Maturity Date; (iii) sufficient progress shall have been made on the Project toward the lien-free completion of the Property, in the sole discretion of the Lender and the Construction Consultant; (iv) Borrower shall pay to Lender an extension fee equal to one percent (1.0%) of the then-outstanding principal balance of the DIP Loan on or before the initial Maturity Date; and (v) the Borrower shall pay all of Lender's reasonable out-of-pocket closing costs related to such extension, including, without limitation, the Lender's reasonable attorneys' fees, appraisal and title charges.

5.    **SECURITY; COLLECTION OF RECEIVABLES AND PROCEEDS OF COLLATERAL**.

5.1    **Reserved.**

5.2    **Security.**    The DIP Loan shall be secured, (i) pursuant to Section 364(d) of the Bankruptcy Code, by a first priority security interest in and lien on all currently owned or hereafter acquired assets and property of the estate (as defined in the Bankruptcy Code), real and personal, of Borrower, and (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, by a perfected first priority lien on all property of Borrower that, as of the Filing Date, was not subject to the liens in favor of Lender. In confirmation of the foregoing, as further security for the full and timely payment and performance of the DIP Loan, Borrower hereby grants to Lender a mortgage, lien and security interest in all existing and after-acquired property of Borrower of any nature including, without limitation:

(a)    The Property, and all of Borrower's right, title and interest in and to the condominium known as the Metroplex on the Atlantic Condominium (the "**Condominium**") located at 120 Beach 26th Street, Far Rockaway, New York, and more particularly described in <u>Exhibit D</u> attached hereto and made a part hereof, and the buildings, structures, fixtures and other improvements now or hereafter located on the Property or comprising the Units (as hereinafter defined) (the "**Improvements**").

(b)    all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Property and the Improvements; and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Property, to the center line thereof; and all the estates, rights, titles, interests, dower and rights of dower, courtesy and rights of courtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Property and the Improvements and every part and parcel thereof, with the appurtenances thereto.

(c)    all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any extensions, renewals, modifications or amendments thereof (hereinafter collectively referred to as the "**Leases**") and all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a bankruptcy proceeding or in lieu of rent or rent equivalents), royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other

-13-

obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or the Improvements, or rendering of services by Borrower or any of its agents or employees, and proceeds, if any, from business interruption or other loss of income insurance (hereinafter collectively referred to as the "**Rents**"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Indebtedness.

(d)    all proceeds of, and any unearned premiums on, any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property.

(e)    the right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property.

(f)    All present and future accounts, contract rights, chattel paper, instruments and documents and all other rights to the payment of money whether or not yet earned, for services rendered or goods sold, consigned, leased or furnished by Borrower or otherwise, together with (i) all goods (including any returned, rejected, repossessed or consigned goods), the sale, consignment, lease or other furnishing of which shall be given or may give rise to any of the foregoing, (ii) all of Borrower's rights as a consignor, consignee, unpaid vendor or other lienor in connection therewith, including stoppage in transit, set-off, detinue, replevin and reclamation, (iii) all general intangibles related thereto, (iv) all guaranties, mortgages, security interests, assignments, and other encumbrances on real or personal property, leases and other agreements or property securing or relating to any accounts, (v) choses-in-action, claims and judgments, and (vi) any returned or unearned premiums, which may be due upon cancellation of any insurance policies.

(g)    All present and future inventory of Borrower (including but not limited to goods held for sale or lease or furnished or to be furnished under contracts for service, raw materials, work-in-process, finished goods and goods used or consumed in Borrower's business) whether owned, consigned or held on consignment, together with all merchandise, component materials, supplies, packing, packaging and shipping materials, and all returned, rejected or repossessed goods sold, consigned, leased or otherwise furnished by such Borrower and all embedded software related thereto.

(h)    All present and future general intangibles including, but not limited to, payment intangibles, tax refunds and rebates, manufacturing and processing rights, Intellectual Property, designs, domain names, service marks, business names, trade dress, slogans, utility models, websites, telephone numbers, patents, patent rights and applications therefor, trademarks and registration or applications therefor, tradenames, brand names, logos, inventions, copyrights and all applications and registrations therefore, licenses, permits, approvals, software and computer programs and software, including all source code, object code, firmware, development tools, files, records, data and all media on which the foregoing is recorded, license and/or franchise rights, royalties, trade secrets, methods, processes, know-how,

formulas, techniques, customer lists, databases and other know-how, drawings, specifications, descriptions, label designs, plans, blueprints, patterns and all memoranda, notes and records with respect to any research and development.

(i)       All present and future machinery, equipment, furniture, fixtures, motor vehicles, tools, dies, jigs, molds and other articles of tangible personal property of every type together with all parts, substitutions, accretions, accessions, attachments, accessories, additions, components and replacements thereof, and all manuals of operation, maintenance or repair, and all embedded software related thereto (collectively, the "**Equipment**").

(j)       All present and future general ledger sheets, files, books and records, customer lists, books of account, invoices, bills, certificates or documents of ownership, bills of sale, business papers, correspondence, credit files, tapes, cards, computer runs and all other data and data storage systems whether in the possession of Borrower or any service bureau.

(k)       All present and future letter of credit rights and supporting obligations, including without limitation, all letters of credit and letter of credit rights now existing or hereafter issued naming Borrower as a beneficiary or assigned to Borrower, including the right to receive payment thereunder, and all documents and records associated therewith.

(l)       All present and future deposit accounts of Borrower.

(m)       All present and future financial assets and investment property of Borrower.

(n)       All of Borrower's commercial tort claims.

(o)       All funds, instruments, documents, policies and evidence and certificates of insurance and rights thereunder, securities, chattel paper and other assets of Borrower or in which Borrower has an interest and all proceeds thereof, now or at any time hereafter on deposit with or in the possession or control of Lender or owing by Lender to Borrower or in transit by mail or carrier to Lender or in the possession of any other Person acting on Lender's behalf, without regard to whether Lender received the same in pledge, for safekeeping, as agent for collection or otherwise, or whether Lender has conditionally released the same, and in all assets of Borrower in which Lender now has or may at any time hereafter obtain a lien, mortgage, or security interest for any reason.

(p)       All products and proceeds of each of the items described in the foregoing **subparagraphs (a)-(o)** and all supporting obligations related thereto.

All of the security interests and liens granted to the Lender pursuant hereto with respect to the DIP Loan ("**Lender's Liens**") shall be first priority security interests and liens except that the Lender's Liens are subject and subordinate to the Carve-Out.  Notwithstanding the foregoing, Lender's Liens shall <u>not</u> attach to (1) claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively, "**Avoidance Actions**"); or (2) proceeds from Avoidance Actions.

5.3    **General**.

(a)       The collateral described above in **Section 5** is collectively referred to herein as the **"Collateral"**.  The above-described security interests, assignments and liens shall not be rendered void by the fact that no portion of the DIP Loan has been advanced as of any particular date, but shall continue in full force and effect until the DIP Loan has been repaid, Lender has no agreement or commitment outstanding pursuant to which Lender may extend credit to or on behalf of Borrower and Lender has executed termination statements or releases with respect thereto.  **IT IS THE EXPRESS INTENT OF THE BORROWER THAT ALL OF THE COLLATERAL SHALL SECURE NOT ONLY THE OBLIGATIONS UNDER THE DIP LOAN DOCUMENTS, BUT ALSO ALL FUTURE INDEBTEDNESS.**

The Borrower agrees that the obligations hereunder with respect to the DIP Loan shall constitute entitlement to superpriority administrative expense claim status in the Chapter 11 Case pursuant to Section 364(c)(i) of the Bankruptcy Code, superior to and having priority of payment over all administrative expenses of and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code (whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment), subject only to the Carve-Out, provided, however, that notwithstanding the foregoing, the  superpriority administrative expense claims shall not attach to the proceeds of Avoidance Actions.

(b)       The liens and security interests and the administrative priority granted pursuant hereto may be independently granted by the DIP Loan Documents and by other DIP Loan Documents hereafter entered into.  This Agreement, the Final Financing Order and such other DIP Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

(c)       The liens and security interests referred to in this Agreement shall be deemed valid and perfected by entry of the Final Financing Order, and entry of the Final Financing Order shall have occurred on or before the date of the DIP Loan made hereunder.  The Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the lien and security interest granted by or pursuant to this Agreement, the Final Financing Order or any other Loan Document.

6.       **REPRESENTATIONS AND WARRANTIES**.  Borrower represents and warrants as follows:

6.1       **Valid Organization, Good Standing and Qualification**.  Borrower is duly formed and in good standing under the laws of the state of New York, has full power and authority to execute, deliver and comply with the DIP Loan Documents, and to carry on its business as it is now being conducted

6.2       **Licenses**.  Borrower and its respective employees and agents have all rights, licenses, registrations, approvals and other authority as may be necessary to enable Borrower to own its properties, and to transact the businesses in which it is now engaged.

6.3    **Liens**.  Except for the Carve-Out and the prior liens as set forth on **Schedule 6.3** attached hereto (the **"Existing Liens"**), there are no liens, mortgages, security interests or encumbrances against any asset of Borrower, or against any of the Collateral.

6.4    **Due Authorization; No Legal Restrictions**.    The execution and delivery by Borrower of the DIP Loan Documents, the consummation of the transactions contemplated by the DIP Loan Documents and the fulfillment and compliance with the respective terms, conditions and provisions of the DIP Loan Documents have been duly authorized by all action of Borrower and, after entry of the Final Financing Order, there will be no legal restrictions on the Borrower's authority or power to enter into this Agreement or consummate the transactions contemplated hereby.

6.5    **Enforceability**.  The DIP Loan Documents have been duly executed by Borrower and delivered to Lender and, upon entry of the Final Financing Order, shall constitute legal, valid and binding obligations of Borrower, enforceable in accordance with their terms, except as enforceability may be limited by any bankruptcy, insolvency, reorganization, moratorium or other laws or equitable principles affecting creditors' rights generally.

6.6    **Title to Collateral**.  Except as otherwise set forth in **Schedule 6.3** attached hereto, the Collateral is and will be owned by Borrower free and clear of all liens and other encumbrances of any kind (including liens or other encumbrances upon properties acquired or to be acquired under conditional sales agreements or other title retention devices), excepting only (i) the Carve-Out; and (ii) liens in favor of the Lender.

6.7    **Current Compliance**.  Borrower is currently in compliance with all of the terms and conditions of the DIP Loan Documents.

6.8    **Intellectual Property**.   Except as otherwise disclosed in writing to Lender, Borrower owns or possesses the irrevocable right to use all of those items constituting the intellectual property including, but not limited to all patents, trademarks, service marks, trade names, domain names, copyrights, websites, licenses, franchises and permits and rights with respect to the foregoing necessary to own and operate the Borrower's properties and to carry on its business as presently conducted and presently planned to be conducted without conflict with the rights of others ("**Intellectual Property**").

6.9    **Characterization of Obligations Post Entry Date**.  After entry of the Final Financing Order by the Bankruptcy Court, the obligations of the Borrower pursuant hereto will constitute allowed administrative expenses in the Chapter 11 Case, having priority in payment over all other administrative expenses and secured or unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code (whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment) subject to the Carve-Out.   Upon entry of the Final Financing Order, the Lender's Liens shall be valid, perfected and of first priority except that the

Lender's Liens is subject and subordinate to the Carve-Out; and (b) except as otherwise provided in the Final Financing Order.

6.10    **Bankruptcy Order**.  No order has been entered in the Chapter 11 Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) to convert the Chapter 11 Case to a Chapter 7 case or to dismiss the Chapter 11 Case.

6.11    **Accuracy of Representations and Warranties**.  All information submitted by Borrower or its agents to Lender and in all financial statements, reports, certificates and other documents submitted in connection with the DIP Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects.  No representation or warranty by Borrower contained herein or in any certificate or other document furnished by Borrower pursuant hereto or in connection herewith contains any untrue statement or fails to contain any statement of material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made.  There is no material fact presently known to Borrower which has not been disclosed to Lender which adversely affects, nor as far as Borrower can reasonably foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower, except for the purported easement dispute with contiguous landowners to the Property, as previously disclosed to Lender.

6.12    **Survival; Reliance.**  Borrower agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower set forth in this Article 6 and elsewhere in this Agreement and in the other DIP Loan Documents shall survive for so long as any portion of the DIP Loan remains owing to Lender.  All representations, warranties, covenants and agreements made in this Agreement or in the other DIP Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

7.    **GENERAL COVENANTS**.  Borrower will comply with the following:

7.1    **Payment of Principal, Interest and Other Amounts Due**.  Borrower will pay all amounts due and payable by it hereunder and in accordance with the DIP Loan.

7.2    **Disposition of Assets**.  Borrower will not sell, lease, transfer or otherwise dispose of any of its property or assets, except for sales pursuant to an order of the Bankruptcy Court on prior notice to the Lender.

7.3    **Merger; Consolidation; Business Acquisitions; Subsidiaries**.  Borrower will not merge into or consolidate with any Person, acquire any material portion of the stock, ownership interests, assets or business of any Person, permit any Person to merge into it, or form any new Subsidiaries, except pursuant to an order of the Bankruptcy Court on prior notice to the Lender.

7.4    **Taxes; Claims for Labor and Materials**.  Borrower will pay or cause to be paid when due all taxes, assessments, governmental charges or levies imposed upon it or its

income, profits, payroll or any property belonging to it, including without limitation all withholding taxes.

### 7.5   **Liens**.

(a)      Borrower will not create, incur or permit to exist any additional mortgage, pledge, encumbrance, lien, security interest or charge of any kind (including liens or charges upon properties acquired or to be acquired under conditional sales agreements or other title retention devices) on its property or assets, whether now owned or hereafter acquired, or upon any income, profits or proceeds therefrom, except by order of the Bankruptcy Court on notice to the Lender; and

(b)      Borrower shall not enter into any agreement with any other Person which shall prohibit Borrower from granting, creating or suffering to exist, or otherwise restrict in any way (whether by covenant, by identifying such event as a default under such agreement or otherwise) the ability of the Borrower to grant, create or suffer to exist, any lien, security interest or other charge or encumbrance upon or with respect to any of its assets in favor of the Lender.

### 7.6   **Existence; Approvals; Qualification; Business Operations; Compliance with Laws**.  Borrower will (a) obtain, preserve and keep in full force and effect its separate existence and all rights, licenses, registrations and franchises necessary to the proper conduct of its business or affairs; and (b) continue to operate its business as presently operated and will not engage in any new businesses without the prior written consent of Lender. Borrower will comply and cause the Property to comply with the requirements of all applicable laws and all rules, regulations (including environmental regulations) and orders of regulatory agencies and authorities having jurisdiction over it.

### 7.7   **Maintenance of Properties, Intellectual Property**.  Borrower shall cause the Property to be maintained in a good, safe and insurable condition and in compliance with all applicable Legal Requirements, and shall promptly make all repairs to the Property, above grade and below grade, interior and exterior, structural and nonstructural, ordinary and extraordinary, unforeseen and foreseen.  Borrower will maintain, preserve, protect and keep or cause to be maintained, preserved, protected and kept its real and personal property used or useful in the conduct of its business in good working order and condition, reasonable wear and tear excepted, and will pay and discharge when due the cost of repairs to and maintenance of the same.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any insurance covering the Property, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security for the DIP Loan.

### 7.8   **Insurance; Casualty**.

(a)      The Borrower shall maintain commercial general liability insurance against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Property or the improvements in amounts not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate, with no deductible, plus umbrella coverage in an amount not

less than $10,000,000.00.  Lender hereby retains the right to periodically review the amount of said liability insurance being maintained by Borrower and to require an increase in the amount of said liability insurance should Lender deem an increase to be reasonably prudent under then existing circumstances.  The Borrower shall also keep the buildings on the Property, and all fixtures, chattels and articles of personal property now or hereafter attached to or used in connection with the Property, including the Equipment, insured for the benefit of the Lender (i) against loss by fire, and other hazards covered by an all-risk coverage insurance policy for the full insurable value thereof (which, unless the Lender shall otherwise agree in writing, shall mean the full repair and replacement value thereof without reduction for depreciation or co-insurance, but in no event less than the outstanding amount of the Indebtedness), with deductible from the loss payable for any casualty in amounts approved by Lender, in its sole discretion; all policies of insurance carried in accordance with this subparagraph shall contain a "Replacement Cost Endorsement" satisfactory to Lender; (ii) boiler and machinery insurance covering pressure vessels, air tanks, boilers, machinery, pressure piping, heating, air-conditioning and elevator equipment and escalator equipment, provided the Property contains equipment of such nature; (iii) against war risks as, when and to the extent such insurance is obtainable from the United States of America or an agency thereof; (iv) against loss by flood, if the Property or any part thereof are located in an area now or hereafter identified by the Secretary of Housing and Urban Development or other identifying agencies as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, as amended or replaced; (v) against loss of rentals due to any of the foregoing causes; and (vi) when and to the extent required by the Lender, against any other risk insured against by persons or parties operating like properties in the locality of the Property; that the Borrower will reimburse the Lender for any premiums paid for insurance made by the Lender on the Borrower's default in taking out such insurance, or in so assigning and delivering the policies, together with interest thereon at the rate per annum specified in Section 3.2 hereof, and the same (with interest thereon) shall be added to the DIP Loan secured by this Agreement.

(b)    Such insurance shall be provided by policies written in terms and by companies satisfactory to the Lender, and losses thereunder shall be payable to the Lender pursuant to a New York standard mortgagee endorsement.

(c)    Regardless of the types or amounts of insurance required and approved by the Lender, the Borrower will assign and deliver to the Lender all policies of insurance acquired by the Borrower to insure against any loss or damage to the Property or any part thereof, or evidence of coverage under a blanket policy which shall be satisfactory to the Lender as additional security for the DIP Loan.

(d)    Notwithstanding the provisions of Subdivision 4 of Section 254 of the New York Real Property Law, the Lender shall be entitled to retain and apply the proceeds of any insurance, whether against fire or other hazard, to the payment of the Indebtedness secured hereby, or, if the Lender in its sole discretion shall so elect, the Lender may, on terms it deems appropriate, hold any or all of such proceeds for application to payment of the cost of restoration.

(e)    Not less than thirty (30) days prior to the expiration date of each policy furnished by the Borrower pursuant to this Section 7.8, the Borrower will deliver to the Lender a

renewal policy or policies marked "premium paid" or accompanied by other evidence of payment satisfactory to the Lender.

(f)    All insurance policies and endorsements required hereunder shall be fully paid for and contain such provisions and expiration dates and be in such form and issued by insurance companies satisfactory to Lender and licensed to do business in the State of New York. Each policy shall provide that such policy may not be cancelled or materially changed except upon thirty (30) days' prior written notice to the Lender of the intention of non-renewal, cancellation or material change and that no act or thing done by the Borrower shall invalidate the policy as against the Lender. All policies of insurance required by the terms of this Agreement shall contain an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy, notwithstanding any act of negligence of Borrower which might otherwise result in forfeiture of said insurance and the further agreement of the insurer waiving all rights of set off, counterclaim, recoupment, deduction or subrogation against Borrower.

(g)    In the event of damage or destruction to the Property, whether insured or uninsured, the Borrower shall give prompt written notice thereof to the Lender and shall promptly commence and diligently continue to perform repair, restoration and rebuilding of the portion of the Property so damaged or destroyed (hereinafter referred to as the "**Restoration Work**") to restore the Property in full compliance with all Legal Requirements (as hereinafter defined) and so that the Property shall be at least equal in value and general utility as they were prior to the damage or destruction.

(h)    The Borrower immediately shall deliver to the Lender any proceeds of insurance paid on account of any damage or destruction to the Property, or any part thereof ("**Proceeds**") which are paid directly to the Borrower by the casualty insurance carrier with respect to any damage or destruction to the Property, or any part thereof. All Proceeds paid directly to the Borrower and delivered to the Lender as aforesaid, together with all Proceeds paid directly to the Lender on account of damage or destruction to the Property, shall, in the Lender's sole discretion, be applied by Lender either (a) to the payment of the DIP Loan, notwithstanding the fact that the DIP Loan may not then be due and payable, or (b) upon written request of Borrower to the payment of the cost of the Restoration Work referred to in subparagraph (g) above, subject to such conditions as the Lender may, in its sole discretion, impose. All proceeds which are applied, in the Lender's discretion, to the payment of the DIP Loan shall be applied as follows: first, to the payment of delinquency or "late" charges, if any; secondly, to accrued and unpaid interest on the DIP Loan; and thirdly, to the reduction of the principal sum of the DIP Loan; provided, however, that such application to the payment of the DIP Loan shall not release the Borrower from, or otherwise affect, the Borrower's obligations hereunder to repair and restore the Property and Equipment. It is intended that, anything contained in Subdivision 4 of Section 254 of the New York Real Property Law to the contrary notwithstanding, no trust shall be created by the receipt by the Lender of any proceeds of insurance, but only a debtor-creditor relationship between the Lender and the Borrower for an amount equal to but not in excess of such proceeds which the Lender shall be entitled to dispose of as herein provided, nor shall there be any obligations on the Lender to pay any interest thereon.

(i)      Any claims under any policy of insurance provided hereunder shall be settled or adjusted jointly by the Borrower and the Lender; provided, however, in the event that the Borrower and the Lender fail to agree, the decision of the Lender shall govern.

(j)      The Borrower, immediately upon obtaining knowledge of the institution of any proceedings for the condemnation of the Property or any portion thereof, shall notify the Lender of the pendency of such proceedings.  The Lender, at its election and in its discretion, may participate in any such proceedings, and the Borrower, from time to time, shall deliver to the Lender all instruments requested by it to permit such participation.  All awards, or other taking or purchase in lieu thereof, of the Property or any portion thereof (the "**Awards**") shall be paid in accordance with the provisions of this Section 7.8.  All Awards, or other taking or purchase in lieu thereof, of the Property or any part thereof are hereby assigned to and shall be paid to the Lender.  The Borrower, upon the request by the Lender, shall make, execute and deliver any and all instruments requested for the purposes of confirming the assignment of the aforesaid awards and compensation to the Lender, free and clear of any liens, charges or encumbrances of any kind or nature whatsoever.  The Borrower hereby authorizes the Lender to collect and receive such Awards, to give the proper receipts and acquittances therefor and, in the Lender's discretion, to apply the same as hereinafter provided.

(k)      Notwithstanding any taking by eminent domain or other governmental action causing injury to, or decrease in value of, the Property or any part thereof and/or creating a right to compensation therefor, including, without limitation, the change of the grade of any street, the Borrower shall continue to pay interest, computed at the rate per annum herein provided, on the entire unpaid principal amount secured by this Agreement, until the award or compensation for such taking or other action shall have been actually received by the Lender, and such award or compensation need not be applied by the Lender in reduction of principal but may be applied in such proportions and priority as the Lender, in the Lender's sole discretion, may elect, to the payment of principal, interest or other sums secured by this Agreement and/or to payment to the Borrower, on such terms as the Lender may, in its sole discretion, specify, for the sole purpose of altering, restoring or rebuilding any part of the Property which may have been altered, damaged or destroyed as a result of any such taking or other action; that if, prior to the receipt by the Lender of such award or compensation, the Property or any part thereof shall have been sold on foreclosure of this Agreement, the Lender shall have the right to receive said award or compensation to the extent of any deficiency found to be due upon such sale, with interest thereon at the Default Rate, whether or not a deficiency judgment on this Agreement shall have been sought or recovered or denied, together with counsel fees and any and all other costs and disbursements incurred by the Lender in connection with the collection of such award or compensation.

(l)      In the event that a portion of the Property is taken or condemned so that there is less than a complete taking, then, the Borrower promptly shall commence and diligently continue to repair, restore, replace or rebuild the Property substantially to its condition immediately prior to such taking or condemnation, or, if the foregoing is not possible, as to constitute the same a distinct and functional architectural unit.

7.9      **Amendment to Organizational Documents**.  Borrower shall not make any amendment to its operating agreement, articles of organization, or other formation or

organizational documents without providing Lender with thirty (30) day's prior notice thereof and obtaining Lender's prior written approval thereof.

7.10    **Transactions with Affiliates**.  Borrower will not enter into or conduct any transaction with any Affiliate except on terms that would be usual and customary in a similar transaction between Persons not affiliated with each other and except as disclosed to Lender, except as expressly permitted by Lender in writing, and subject to the approval of the Bankruptcy Court if such approval is required under the Bankruptcy Code.  Borrower will not make any loans or extensions of credit to any of its Affiliates, members, shareholders, directors or officers.

7.11    **Restrictions on Transfer**.  Borrower will not directly or indirectly issue, transfer, sell or otherwise dispose of, or part with control of, or permit the transfer of, any Collateral or equity interests in Borrower, *except with Lender's prior written consent and by order of the Bankruptcy Court on notice to the Lender*.

7.12    **Name; Address or State of Organization Change**.  Borrower will not change its name or change or add any address or location except upon thirty (30) days prior written notice to Lender and delivery to Lender of any items requested by Lender to maintain perfection and priority of Lender's security interests in and access to the Collateral.  Borrower shall not change its state of organization or take any action which would result in a change in Borrower's state of organization without Lender's prior written consent.

7.13    **Notices**.  Borrower will promptly notify Lender of (a) any action or proceeding brought against Borrower wherein such action or proceeding could, if determined adversely to Borrower have a Material Adverse Effect, or (b) the occurrence of any Default or Event of Default.

7.14    **Additional Documents and Future Actions**.  Borrower will, at its sole cost, take such actions and provide Lender from time to time with such agreements, financing statements and additional instruments, documents or information as the Lender may deem necessary or advisable to perfect, protect, maintain or enforce the security interests in the Collateral, to permit Lender to protect or enforce its interest in the Collateral, or to carry out the terms of the DIP Loan Documents.  Borrower shall at Borrower's expense cooperate fully with Lender with respect to any proceedings before any court, board or other governmental authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the other DIP Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.  Borrower hereby authorizes and appoints Lender as its attorney-in-fact, with full power of substitution, to take such actions as Lender may deem advisable to protect the Collateral and its interests thereon and its rights hereunder, to file at Borrower's expense financing statements, and amendments thereto, in those public offices deemed necessary or appropriate by Lender to establish, maintain and protect a continuously perfected security interest in the Collateral, and to execute on Borrower's behalf such other documents and notices as Lender may reasonably deem advisable to protect the Collateral and its interests therein and its rights hereunder.  Such power being coupled with an interest is irrevocable.

7.15    **Material Adverse Contracts**.  Borrower will not become or be a party to any contract or agreement which has or could have a Material Adverse Effect.  Borrower will deliver to Lender promptly after execution, copies of each new material lease, contract agreement or commitment to which it is a party and any amendment to any material lease, contract, commencement or agreement to which Borrower is a party, but nothing herein shall be deemed to constitute Lender's consent to any lease, contract, agreement or commitment which is not expressly permitted by the DIP Loan Documents.

7.16    **Restrictions on Use of Proceeds**.  Borrower will not carry or purchase with the proceeds of the DIP Loan any "margin security" within the meaning of Regulations U, G, T or X of the Board of Governors of the Federal Reserve System.

7.17    **No Contest by Borrower**.  Borrower shall not at any time seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Final Financing Order, except for modifications and amendments agreed to by the Lender, and, at any time suffer to exist any other secured claim or priority for any administrative expense or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code (whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment)) equal or superior to the priority of the Lender in respect of the obligations hereunder, subject only to the Carve-Out.

7.18    **Cooperation and Access**.  Borrower and its agents and representatives shall cooperate and provide information and documentation reasonably requested by Lender, including those related to the business and financial operations of Borrower. Lender, or such Persons as Lender may designate, may examine (either by Lender or by independent accountants) any of the Collateral or other assets of Borrower, including the books of account of Borrower, and discuss the affairs, finances and accounts of Borrower with its officers and with its independent accountants, at such times as Lender may reasonably request.

7.19    **Sole Purpose.**  Borrower will not:

(i)    engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto;

(ii)    acquire or own any assets other than (A) the Property, and (B) such incidental Personal Property as may be necessary for the operation of the Property;

(iii)    merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(iv)    fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents;

(v)      own any subsidiary, or make any investment in, any Person;

(vi)      commingle its assets with the assets of any other Person, or permit any Affiliate or constituent party independent access to its bank accounts;

(vii)      incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the DIP Loan, or (B) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (1) unsecured, (2) not evidenced by a note, (3) on commercially reasonable terms and conditions, and (4) due not more than sixty (60) days past the date incurred and paid on or prior to such date;

(viii)      fail to maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person;

(ix)      enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower, or any Affiliate of the foregoing, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(x)      maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xi)      assume or guaranty the debts of any other person, hold itself out to be responsible for the debts of any other person, or otherwise pledge its assets to secure the obligations of any other person or hold out its credit as being available to satisfy the obligations of any other person;

(xii)      make any loans or advances to any Person;

(xiii)      fail to (A) file its own tax returns separate from those of any other Person, except to the extent that Borrower is treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable Legal Requirements, and (B) pay any taxes required to be paid under applicable Legal Requirements;

(xiv)      fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

(xv)      fail to allocate shared expenses (including, without limitation, shared office space and services performed by an employee of an Affiliate) among the Persons sharing such expenses and to use separate stationery, invoices and checks; or

(xvi)      acquire obligations or securities of its partners, members, shareholders or other affiliates, as applicable.

7.20  **Environmental Matters.**

(a)  Borrower covenants and agrees that so long as Borrower owns, manages, is in possession of, or otherwise controls the operation of the Property:  (a) all uses and operations on or of the Property, whether by Borrower or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (b) there shall be no releases of Hazardous Materials in, on, under or from the Property; (c) there shall be no Hazardous Materials in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (ii) (A) in amounts not in excess of that necessary to operate the Property for the purposes set forth herein, or (B) fully disclosed to and approved by Lender in writing.  For purposes hereof, "**Environmental Law**" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act, that apply to Borrower or the Property and relate to Hazardous Materials or protection of human health or the environment; "**Hazardous Materials**" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material", "hazardous waste", "toxic substance", "toxic pollutant", "contaminant", or "pollutant" within the meaning of any Environmental Law.

(b)  The Borrower will defend, indemnify, and hold harmless the Lender, its employees, agents, officers, and directors from and against any and all claims, demands, penalties, causes of action, fines, liabilities, settlements, damages, costs, or expenses of whatever kind or nature, known or unknown, foreseen or unforeseen, contingent or otherwise (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, court costs, and litigation expenses) arising out of, or in any way related to:  (i) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Materials on, from or affecting the Property or any other property; (ii) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Materials; (iii) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Materials; or (iv) any violation of laws, orders, regulations, requirements, or demands of government authorities, or any policies or requirements of the Lender which are based upon or in any related to such Hazardous Materials, including, without limitation, attorney or consultant fees, investigation and laboratory fees, court costs and litigation expenses.  These obligations and liabilities of the Borrower shall survive the exercise of any remedies available to Lender hereunder, and any release or satisfaction of the DIP Loan.

7.21  **Bankruptcy.** The Borrower shall not seek or consent to, any of the following:

(a)    Without the prior written consent of the Lender, any modification, stay, vacation or amendment to any order of the Bankruptcy Court;

(b)    A priority claim or administrative expense or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature, including any administrative expense of the kind specified in Section 105, 326, 330, 331, 503(a), 503(b), 506(c), 507(b), 546(c), 546(d) or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender, except for the Carve-Out;

(c)    Any security interest or lien on any Collateral having a priority equal or superior to the security interest or lien of the Lender other than as permitted hereunder;

(d)    Any order seeking authority to take any action prior to the effectiveness of a plan of reorganization that is prohibited by the terms of this Agreement or the other DIP Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other DIP Loan Documents; or

(e)    Any plan of reorganization unless the DIP Loan is to be paid in full in cash or the Lender otherwise expressly agrees in writing, or other immediately available funds and the arrangements provided for herein terminated pursuant thereto.

7.22    **Permits**.  Borrower shall obtain all authorizations, consents, licenses, approvals and permits required for the construction, completion, occupancy and operation of the Project in accordance with all requirements of applicable law affecting the Property and the Project.

7.23    **Financial Reporting**.    The Borrower shall deliver to Lender the following:

(a)    A monthly Project status report in form and substance acceptable to Lender;

(b)    Quarterly operating statements with respect to the Borrower and the Project, in form and substance acceptable to Lender; and

(c)    Such other information with respect to the Borrower and/or the Project as Lender may reasonably request.

7.24    **Additional Financing**.  Borrower shall not incur any additional debt, secured or unsecured, including without limitation mortgage debt or entity interest debt, without the prior written approval of the Lender, which approval shall be in Lender's sole discretion.

7.25    **Lien Law**.    The Borrower will, in compliance with Section 13 of the New York Lien Law, receive the advances of the DIP Loan for line items under the Budget for labor and materials for the improvement of the Property, and will hold the right to receive such advances as a trust fund, to be applied first for the purpose of paying the cost of improvement,

and will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose.

7.26  **Condominium.**  The Condominium was created pursuant to Article 9-B of the Real Property Law of the State of New York (the "**Condominium Act**") by Declaration of Condominium dated December 1, 2009, and filed with the City Register's Office, New York County on April 26, 2010, as CRFN #2010000138095 (as same may have been subsequently amended, the "**Declaration**").

(a)  Borrower shall, to the extent permitted under the Condominium Consent Order:

(i)  not vote to terminate or amend, modify or supplement (in any respect adverse to the Lender) the Declaration, by-laws, rules and regulations of the Condominium and any other documents creating or governing the Condominium (collectively, the "**Condominium Documents**") without Lender's prior written consent.

(ii)  promptly deliver to Lender copies of any and all notices, correspondence and other communications sent to or received from the New York State Department of Law or other Governmental Authorities with respect to the Declaration from and after the date hereof.

(b)  To the extent permitted under the Condominium Consent Order, Borrower hereby grants to Lender and its successors and assigns, as its true and lawful attorney and proxy, with full power of substitution for and in its name, the right to vote and otherwise act with respect to the Property in connection with all matters concerning the Condominium.

8.  **CONDITIONS OF CLOSING**.  The obligation of Lender to make available the DIP Loan pursuant to the Final Financing Order is subject to the performance by Borrower of all of its agreements to be performed hereunder and to the following further conditions (any of which may be waived by Lender):

8.1  **DIP Loan Documents**.  Borrower and all other required persons shall have executed and delivered to Lender the DIP Loan Documents.

8.2  **Representations and Warranties**.  All representations and warranties of Borrower set forth in the DIP Loan Documents will be true at and as of the date hereof and at and as of the date of any funding of the DIP Loan.

8.3  **No Default**.  No condition or event shall exist or have occurred which would constitute a Default or Event of Default hereunder.

8.4  **Final Financing Order**.  The Final Financing Order, in a form acceptable to Lender in its sole and absolute discretion, shall have been entered by the Bankruptcy Court on or before September 15, 2015, the Lender shall have received a copy of such order, and such order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed.  The Final Financing Order shall (a) approve all aspects of the DIP Loan and DIP Loan Documents including, without limitation, the administrative expense super-priority of

and the existence and first priority of all liens securing the DIP Loan, and the rights, remedies and obligations thereunder; (b) provide for such other protections in favor of Lender and the liens securing the DIP Loan as Lender deems necessary; and (c) acknowledge Lender's right to credit bid the DIP Loan in any subsequent auction or sale.

8.5    **Review of Third Party Reports.**    Receipt and review, with results satisfactory to the Lender and its counsel, of (i) appraisal of value of Property [Lender's receipt and review of appraisal imminent], (ii) report by construction consultant on statement of anticipated construction costs and (iii) report by consultant on mold remediation plan.

8.6    **Reserved**.

8.7    **Consents**.    All governmental, shareholder, member, and third party consents and approvals necessary or desirable in connection with this Agreement and the other transactions contemplated hereby shall have been obtained (other than building permits, certificates of occupancy and other approvals which Borrower shall obtain in the ordinary course of the Project in accordance with Section 7.22 hereof); all such consents and approvals shall be in force and effect; and all applicable waiting periods shall have expired without any action being taken by any authority that could restrain, prevent, or impose any material adverse conditions on this Agreement or such other transactions or that could seek or threaten any of the foregoing, and no law or regulation shall be applicable which in the judgment of the Lender could have such effect.

8.8    **No Restriction**.    There shall not exist (a) any order, decree, judgment, ruling or injunction which restrains the consummation of this Agreement in the manner contemplated, or (b) any pending or threatened action, suit, investigation or proceeding, which, if adversely determined could materially and adversely affect Borrower, any transaction contemplated hereby or the ability of Lender to exercise its rights thereunder.

8.9    **Costs and Expenses**.    Payment to Lender of the Costs and Expenses set forth herein at the time of the closing of the DIP Loan.

8.10    **No Material Adverse Change**.    No Material Adverse Changes, in Lender's sole opinion, in the business assets, liabilities, operations or financial condition of Borrower after the date of this Agreement.

8.11    **Insurance**.    Borrower shall have delivered evidence of all required insurance, assuming the Closing of the Loan and the payment of the required premiums from the advances under the DIP Loan.

8.12    **No Trustee or Examiner.**    No trustee or examiner with expanded powers relating to the operation of the business of the Borrower shall have been appointed with respect to its business, properties or assets, including, without limitation, the Collateral and any other property which is security for the DIP Loan.

8.13    **Full Compliance With Final Financing Orders.**    The Borrower shall have complied in full with all other requirements as provided for under the Final Financing Order.

8.14    **Reserved.**

8.15    **Priority of Security Interests**.    All the liens granted under this Agreement to the Lender in the Collateral are, subject to the entry of the Final Financing Order, first priority security interests and liens.

8.16    **Origination Fee**.  Borrower shall have paid to Lender an origination fee in the amount of [$522,500.00].

8.17    **Construction Contract; Will Serve Letters**.  The Borrower shall enter into a construction contract (a "**Construction Contract**") with the General Contractor, which agreement shall be in form and substance acceptable to Lender in its sole discretion.  The Borrower shall also cause the General Contractor, as well as any architects, engineers and subcontractors, to each deliver to Lender a "will serve" letter substantially in the form annexed hereto as Exhibit E.

8.18    **Legal Opinion**.  Borrower shall deliver to Lender a legal opinion of counsel admitted to practice law in the State of New York with respect to the due formation and good standing/authority to do business of Borrower, and the due authority, execution and enforceability of the Loan Documents, in form and substance acceptable to Lender or its counsel.

8.19    **Construction Consultant**.  The Construction Consultant shall have reviewed and approved the Budget, all plans and specifications with respect to the Project, and the Construction Contract.

8.20    **Definition**.    The conditions set forth in Article 8 are the **"Conditions Precedent to Closing."**

8.21    **Restriction on Carve-Out**.  Notwithstanding anything herein to the contrary, no portion of the Carve-Out, or any other amounts may be used (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of the Lender or its respective rights and remedies under the DIP Loan Documents or the Final Financing Order, as applicable, including, without limitation, for the payment of any services rendered by professionals retained by the Borrower or any Committee (as defined in the Final Financing Order) in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief; (ii) for invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Loan; (iii) for monetary, injunctive, or other affirmative relief against the Lender or its collateral; or (iv) for preventing, hindering, or otherwise delaying the exercise by the Lender of any rights and/or remedies under the Final Financing Order, the DIP Loan Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Bankruptcy Court, or otherwise) by the Lender upon any of the Collateral; (b) to make any distribution under a plan of reorganization in the Chapter 11 Case; (c) to make any payment in excess of $10,000 in settlement of any claim, action, or proceeding, before any court, arbitrator, or other governmental body without the prior written consent of the Lender; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any

of the Borrower without the prior written consent of the Lender; (e) to object to, contest, or interfere with in any way the Lender's enforcement or realization upon any of the Collateral once an Event of Default has occurred, except as to any challenge as to the occurrence or continuation of such Event of Default ; (f) to sell or otherwise dispose of Collateral with a value in excess of $50,000 in the aggregate without the consent of the Lender; (g) to use or seek to use any insurance proceeds constituting Collateral without the consent of the Lender; (h) to incur indebtedness outside the ordinary course of business without the prior consent of the Lender; (i) to object to or challenge in any way the claims, liens, or interests (including interests in the Collateral) held by or on behalf of the Lender; (j) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Lender; (k) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Loan, Lender's Liens, or any other rights or interests of the Lender; or (l) to prevent, hinder or otherwise delay the exercise by the Lender of any rights and remedies granted under the Final Financing Order.

        8.22    **Debtor In Possession of Property**.  An order of the Bankruptcy Court shall be entered requiring the receiver appointed by the Supreme Court of the State of New York, County of Queens, on May 18, 2011, Joseph John Risi, Esq., to turn over all property of the Borrower's estate, including the Property, to the Borrower.

        9.      **DEFAULT AND REMEDIES**.

        9.1    **Events of Default**.  The occurrence of any one or more of the following events shall constitute an Event or Events of Default hereunder:

        (a)        The failure of Borrower to pay any amount of principal or interest on the Note, or any fee or other sums payable hereunder, on the date on which such payment is due, at the stated maturity or due date thereof, or by reason of any requirement for the prepayment thereof, by acceleration or otherwise;

        (b)        The failure of Borrower to duly perform or observe any obligation, covenant or agreement on its part contained herein or in any other Loan Document not otherwise specifically constituting an Event of Default under this Section 9.1 and such failure continues unremedied for a period of five (5) days after the earlier of (i) notice from Lender to Borrower of the existence of such failure, which notice shall be provided by email, or (ii) any officer or principal of Borrower knows or should have known of the existence of such failure, provided that, in the event such failure is incapable of remedy, or was willfully caused or permitted by Borrower, Borrower shall not be entitled to any notice or grace hereunder;

        (c)        The failure of Borrower to pay or perform any other obligation to Lender under any other agreement or note or otherwise arising, whether or not related to this Agreement, after the expiration of any notice and/or grace periods permitted in such documents;

        (d)        The indictment or threatened indictment of Borrower under any criminal statute, or the commencement or threatened commencement of criminal or civil proceedings against Borrower pursuant to which statute or proceedings the penalties or remedies

sought or available include forfeiture of any property of Borrower, or Borrower engages or participates in any "check kiting" activity regardless of whether a criminal investigation has been commenced.

(e)     Any representation or warranty of Borrower in any of the DIP Loan Documents is discovered to be untrue in any material respect or any statement, certificate or data furnished by Borrower pursuant hereto is discovered to be untrue in any material respect as of the date as of which the facts therein set forth are stated or certified;

(f)     An order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court appointing, or the Borrower shall file an application for an order with respect to the Chapter 11 Case seeking the appointment of (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(g)     An order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case;

(h)     An order shall be entered by the Bankruptcy Court confirming a plan of liquidation or reorganization in the Chapter 11 Case which does not (i) contain a provision for payment in full in cash of all obligations hereunder unless Lender agrees otherwise in writing, and under the other DIP Loan Documents on or before the effective date of such plan or plans upon entry thereof, and (ii) provide for the continuation of the liens and security interests granted to Lender and priorities until such plan effective date;

(i)     An order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case which does not contain a provision for payment in full in cash of all obligations hereunder, and under the other DIP Loan Documents upon entry thereof;

(j)     An order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender, (i) to revoke, reverse, stay, modify, supplement or amend the Final Financing Order, or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of the Lender in respect of the Obligations, or (iii) to grant or permit the grant of a lien on the Collateral;

(k)     An application for any of the orders described in clauses (f) through (i) above shall be made by a person other than the Borrower and such application is not contested by the Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal;

(l)     An order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of Borrower (including, without limitation, the Torchlight Loan Lender) with respect to any claim relating to the Collateral (including, without limitation, the Torchlight Loan Lender's right to foreclose on the Torchlight Lien) without the prior written consent of the Lender;

(m)       (i) Borrower shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the Lender, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code (provided, that, notwithstanding anything to the contrary in this Agreement, in the event there are any unpaid costs and expenses associated with litigation against the Receiver, his management company and such other parties to such litigation, those costs and expenses may be charged against any recoveries obtained in such litigation), (ii) any lien or security interest created by this Agreement or the Final Financing Order shall, for any reason, cease to be valid or (iii) any action is commenced by Borrower which contests the validity, perfection or enforceability of any of the liens and security interests of the Lender created by this Agreement, the Final Financing Order or the other DIP Loan Documents;

(n)       Any DIP Loan Documents for any reason shall cease to be in full force and effect, the liens on the Collateral purported to be created thereby shall cease to be or are not valid and perfected liens having priority over all other liens except any encumbrances specifically permitted under such DIP Loan Documents;

(o)       One or more judgments or decrees shall be entered against Borrower (not paid or fully covered by insurance) and all such judgments or decrees shall not have been vacated or discharged, stayed or bonded pending appeal within thirty (30) days from the entry thereof;

(p)       Borrower is enjoined, restrained, or in any way prevented by the order of any court or any administrative or regulatory agency, the effect of which order restricts such Borrower from conducting all any material part of its business, other than that certain Order and Judgment on Consent in the Matter of People of the State of New York v. Metroplex on the Atlantic LLC, et. al., Index No. 155945/2014, filed June 18, 2014 in the Supreme Court of the State of New York, County of New York (the "**Condominium Consent Order**");

(q)       Any material uninsured damage to, or loss, theft, or destruction of, any of the Collateral occurs;

(r)       The loss, suspension, revocation or failure to renew any license or permit now held or hereafter acquired by Borrower, which loss, suspension, revocation or failure to renew might have a Material Adverse Effect on the business profits, assets or financial condition of Borrower;

(s)       The occurrence of an Event of Default under any of the other DIP Loan Documents;

(t)       The validity or enforceability of this Agreement, or any of the DIP Loan Documents, is contested by the Borrower or any principal of Borrower, or Borrower denies that it has any or any further liability or obligation hereunder or thereunder;

(u)       if (i) the Policies are not kept in full force and effect, (ii) the Acord  28 (or similar) certificate is not delivered to Lender in accordance with Section 8.1, or

(iii) certified copies of the Policies are not delivered to Lender upon request, provided such copies are available;

(v)     if Borrower breaches any representation contained in Article 6 hereof or any covenant contained in Article 7 hereof;

(w)     if Borrower interferes with the duties and obligations of the Construction Consultant or otherwise causes the Construction Consultant to terminate its agreement with Lender.

(x)     if any representation or warranty of Borrower made herein in any other Loan Document, or in any certificate, report, financial statement or other instrument or document furnished to Lender at the time of the closing of the DIP Loan or during the term of the DIP Loan shall have been false or misleading in any material respect when made.

(y)     If the Construction Contract is terminated and a substitute Construction Contract in form and substance acceptable to Lender with a General Contractor acceptable to Lender is not entered into within a reasonable amount of time following such termination.

9.2     **Remedies**.  At the option of the Lender and subject to the terms and conditions of the Final Financing Order, upon the occurrence of an Event of Default or at any time thereafter:

(a)     The entire unpaid principal of the DIP Loan or any part thereof, all interest accrued thereon, all fees due hereunder and all other obligations of Borrower to Lender hereunder or under any other agreement, note or otherwise arising will become immediately due and payable without any further demand or notice; and

(b)     Lender may increase the interest rate on the DIP Loan to the applicable default rate set forth herein, without notice;

In addition, upon the termination of the Remedies Notice Period, as defined and provided in paragraph 13(b) of the Final Financing Order, or at any time thereafter:

(c)     Lender may take possession of the Collateral and any records relating thereto; and/or

(d)     Lender may exercise each and every right and remedy granted to it under (i) the DIP Loan Documents, (ii) the Final Financing Order and (iii) under the Uniform Commercial Code and under any other applicable law or at equity.

9.3     **Delay or Omission Not Waiver**.  Neither the failure nor any delay on the part of Lender to exercise any right, remedy, power or privilege under the DIP Loan Documents upon the occurrence of any Event of Default or otherwise shall operate as a waiver thereof or impair any such right, remedy, power or privilege.  No waiver of any Event of Default shall affect any later Event of Default or shall impair any rights of Lender.  No single, partial or full exercise of any rights, remedies, powers and privileges by the Lender shall preclude further

or other exercise thereof.  No course of dealing between Lender and Borrower shall operate as or be deemed to constitute a waiver of Lender's rights under the DIP Loan Documents or affect the duties or obligations of Borrower.

           9.4      **Remedies Cumulative; Consents**.  The rights, remedies, powers and privileges provided for herein shall not be deemed exclusive, but shall be cumulative and shall be in addition to all other rights, remedies, powers and privileges in Lender's favor at law or in equity.  Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise at such time and in such order as Lender may determine in Lender's sole discretion. Whenever Lender's consent or approval is required, such consent or approval shall be at the sole and absolute discretion of Lender.

           9.5      **Certain Fees, Costs, Expenses, Expenditures and Indemnification**. Borrower agrees to pay all costs and expenses of Lender, including without limitation:

           (a)      all losses, costs and expenses in connection with the enforcement, protection and preservation of the Lender's rights or remedies under this Agreement or in connection with legal advice relating to the rights or responsibilities of Lender in connection therewith (including without limitation court costs, attorney's fees and expenses of accountants and appraisers);

           (b)      all losses, costs and expenses in connection with Lender's defense of any action or proceeding commenced or threatened by a third party against Lender's rights in and to the Collateral securing the DIP Loan; and

           (c)      any and all stamp and other taxes payable or determined to be payable in connection with the execution and delivery of the DIP Loan Documents, and all liabilities to which Lender may become subject as the result of delay in paying or omission to pay such taxes.

           In the event Borrower shall fail to pay taxes, insurance, assessments, costs or expenses which it is required to pay hereunder, or fails to keep the Collateral free from security interests or liens (except as expressly permitted herein), or fails to maintain or repair the Collateral as required hereby, or otherwise breaches any obligations under the DIP Loan Documents, Lender in its discretion, may make expenditures for such purposes and the amount so expended (including attorney's fees and expenses, filing fees and other charges) shall be payable by Borrower on demand and shall constitute part of the DIP Loan.

           With respect to any amount required to be paid by Borrower under this Section, in the event Borrower fails to pay such amount on demand, Borrower shall also pay to Lender interest thereon at the highest default rate set forth herein.

           Borrower agrees to indemnify and hold harmless, Lender and Lender's officers, directors, shareholders, employees and agents, from and against any and all claims, liabilities, losses, damages, costs and expenses (whether or not such Person is a party to any litigation), including attorney's fees and costs and costs of investigation, document production, attendance at depositions or other discovery with respect to or arising out of this Agreement or any of the other DIP Loan Documents, the use of any proceeds advanced hereunder, the transactions

contemplated hereunder, or any claim, demand, action or cause of action being asserted against Borrower or any of its Affiliates.

Borrower's obligations under this Section shall survive termination of this Agreement and repayment of the DIP Loan.

9.6    **Time is of the Essence**.    Time is of the essence in Borrower's performance of its obligations under the DIP Loan Documents.

9.7    **Sale or Other Disposition of Collateral**.    The sale, lease or other disposition of the Collateral, or any part thereof, by Lender after an Event of Default may be for cash, credit or any combination thereof, and Lender may purchase all or any part of the Collateral at public or, if permitted by law, private sale, and in lieu of actual payment of such purchase price, may set-off the amount of such purchase price against the DIP Loan then owing. Any sales of the Collateral may be adjourned from time to time with or without notice. The Lender may cause the Collateral to remain on Borrower's premises or otherwise or to be removed and stored at premises owned by other persons, at Borrower's expense, pending sale or other disposition of the Collateral. Borrower, at Lender's request, shall assemble the Collateral consisting of inventory and tangible assets and make such assets available to Lender at a place to be designated by Lender. Lender shall have the right to conduct such sales on Borrower's premises, at Borrower's expense, or elsewhere, on such occasion or occasions as Lender may see fit. Any notice required to be given by Lender of a sale, lease or other disposition or other intended action by Lender with respect to any of the Collateral which is deposited in the United States mail, postage prepaid and duly addressed to Borrower at the address specified in **Section 10.1** below, at least ten (10) business days prior to such proposed action, shall constitute fair and reasonable notice to Borrower of any such action. The net proceeds realized by Lender upon any such sale or other disposition, after deduction for the expenses of retaking, holding, storing, transporting, preparing for sale, selling or otherwise disposing of the Collateral incurred by Lender in connection therewith and all other costs and expenses related thereto including attorney fees, shall be applied in such order as Lender, in its sole discretion, elects, toward satisfaction of the DIP Loan. Lender shall account to Borrower for any surplus realized upon such sale or other disposition, and Borrower shall remain liable for any deficiency. The commencement of any action, legal or equitable, or the rendering of any judgment or decree for any deficiency shall not affect Lender's security interest in the Collateral. Borrower agrees that Lender has no obligation to preserve rights to the Collateral against any other parties. Lender is hereby granted a license or other right to use, after an Event of Default, without charge, Borrower's labels, general intangibles, intellectual property, equipment, real estate, patents, copyrights, rights of use of any name, trade secrets, trade names, domain names, trademarks, service marks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale and selling any inventory or other Collateral and Borrower's rights under all contracts, licenses, approvals, permits, leases and franchise agreements shall inure to Lender's benefit. Lender shall be under no obligation to marshal any assets in favor of Borrower or any other party or against or in payment of any or all of the DIP Loan.

9.8    **Set-Off**.    Without limiting the rights of Lender under applicable law, Lender has and may exercise a right of set-off, a lien against and a security interest in all

property of Borrower now or at any time in Lender's possession in any capacity whatsoever, including but not limited to any balance of any deposit, trust or agency account, or any other bank account with Lender, as security for the DIP Loan. At any time and from time to time following the occurrence of an Event of Default, or an event which with the giving of notice or passage of time or both would constitute an Event of Default, Lender may without notice or demand, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by Lender to or for the credit of Borrower against any or all of the DIP Loan and the Borrower's obligations under the DIP Loan Documents.

9.9 **Turnover of Property Held by Lender**. Borrower irrevocably authorizes any Affiliate of Lender, upon and following the occurrence of an Event of Default, at the request of Lender and without further notice, to turnover to Lender any property of Borrower held by such Affiliate, including without limitation, funds and securities for such Borrower's account and to debit, for the benefit of Lender, any deposit account maintained by Borrower with such Affiliate (even if such deposit account is not then due or there results a loss or reduction of interest or the imposition of a penalty in accordance with law applicable to the early withdrawal of time deposits), in the amount requested by Lender up to the amount of the DIP Loan, and to pay or transfer such amount or property to Lender for application to the DIP Loan.

10. **COMMUNICATIONS AND NOTICES**.

10.1 **Communications and Notices**. All notices, requests and other communications made or given in connection with the DIP Loan Documents shall be in writing and, unless receipt is stated herein to be required, shall be deemed to have been validly given if delivered personally to the individual or division or department to whose attention notices to a party are to be addressed, or by private carrier, or registered or certified mail, return receipt requested, or by telecopy or electronic mail with the original forwarded by first-class mail, in all cases, with charges prepaid, addressed as follows, until some other address (or individual or division or department for attention) shall have been designated by notice given by one party to the other:

To Borrower:

Metroplex on the Atlantic, LLC
1 Bridal Path Drive
Old Westbury, New York 11568
Attn: Elzbieta Mielczarick
E-mail: _____

With a copy to:

Cullen & Dykman LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
Attn: Bonnie L. Pollack, Esq.

E-mail:  bpollack@cullenanddykman.com

To Lender:

PSG Capital Partners, Inc.
31878 Del Obispo Street, Suite 118
San Juan Capistrano, California 92675
Attn:  [_____]
E-mail:  _____

With a copy to:

Farrell Fritz, P.C.
1320 RXR Plaza
Uniondale, New York  11556
Attention:  Ted A. Berkowitz, Esq.
E-mail:  tberkowitz@farrellfritz.com

11.    **WAIVERS**.

11.1    **Waivers**.  In connection with any proceedings under the DIP Loan Documents, including without limitation any action by Lender in replevin, foreclosure or other court process or in connection with any other action related to the DIP Loan Documents or the transactions contemplated hereunder, Borrower waives:

(a)    all errors, defects and imperfections in such proceedings;

(b)    all benefits under any present or future laws exempting any property, real or personal, or any part of any proceeds thereof from attachment, levy or sale under execution, or providing for any stay of execution to be issued on any judgment recovered under any of the DIP Loan Documents or in any replevin or foreclosure proceeding, or otherwise providing for any valuation, appraisal or exemption;

(c)    presentment for payment, demand, notice of demand, notice of non-payment, protest and notice of protest of any of the DIP Loan Documents, including the Note;

(d)    any requirement for bonds, security or sureties required by statute, court rule or otherwise; and

(e)    any demand for possession of Collateral prior to commencement of any suit.

11.2    **Forbearance**.  Lender may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the DIP Loan Documents, without notice to Borrower.

11.3    **Limitation on Liability**.  Borrower shall be responsible for and Lender, solely in its capacity as Lender, is hereby released from any claim or liability in connection with:

(a)    Safekeeping any Collateral;

(b)    Any loss or damage to any Collateral;

(c)    Any diminution in value of the Collateral; or

(d)    Any act or default of another Person.

Lender, solely in its capacity as Lender, shall only be liable for any act or omission on its part constituting gross negligence or willful misconduct.  In the event that Lender breaches its required standard of conduct, Borrower agrees that its liability shall be only for direct damages suffered and shall not extend to consequential or incidental damages.  In the event Borrower brings suit against Lender in connection with the transactions contemplated hereunder and Lender is found not to be liable, Borrower will indemnify and hold Lender harmless from all costs and expenses, including attorney's fees, including, without limitation, attorney's fees incurred post-judgment incurred by Lender in connection with such suit.  This Agreement is not intended to obligate Lender to take any action with respect to the Collateral or to incur expenses or perform any obligation or duty of Borrower.

12.    **SUBMISSION TO JURISDICTION**.

12.1    **Submission to Jurisdiction**.  With respect to any actions that are not subject to the jurisdiction of the Bankruptcy Court, Borrower hereby consents to the exclusive jurisdiction of any state or federal court located in the City of New York or Nassau County or Suffolk County, and irrevocably agrees that, subject to the Lender's election, all actions or proceedings relating to the DIP Loan Documents or the transactions contemplated hereunder shall be litigated in such courts, and Borrower waives any objection which it may have based on lack of personal jurisdiction, improper venue or forum non conveniens to the conduct of any proceeding in any such court and waives personal service of any and all process upon it, and consents that all such service of process be made by mail or messenger directed to it at the address set forth in **Section 10.1**.  Nothing contained in this **Section 12.1** shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against Borrower or its property in the courts of any other jurisdiction.

13.    **USA PATRIOT ACT PROVISIONS**.

13.1    **USA Patriot Act Notice**.  Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the **"Patriot Act"**), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow Lender to identify the Borrower in accordance with the Patriot Act.

14. **MISCELLANEOUS**.

14.1  **Brokers**.  The transaction contemplated hereunder was brought about and entered into by Lender and Borrower acting as principals and without any brokers, agents or finders being the effective procuring cause hereof other than Gilbert Morales (the "**Broker**"). Borrower represents to Lender that Borrower has not committed Lender to the payment of any brokerage fee or commission in connection with this transaction.  If any such claim is made against Lender by any broker, finder or agent or any other Person other than Broker, Borrower agrees to indemnify, defend and hold Lender harmless against any such claim, at Borrower's own cost and expense, including Lender's attorneys' fees.  Borrower further agrees that until any such claim or demand is adjudicated in Lender's favor, the amount claimed and/or demanded shall be deemed part of the DIP Loan secured by the Collateral.

14.2  **Use of Lender's Name**.  Borrower shall not use Lender's name or the name of any of Lender's Affiliates in connection with any of its business or activities except as may otherwise be required by the rules and regulations of the Securities and Exchange Commission or any like regulatory body and except as may be required in its dealings with any governmental agency.

14.3  **No Joint Venture**.  Nothing contained herein is intended to permit or authorize Borrower to make any contract on behalf of Lender, nor shall this Agreement be construed as creating a partnership, joint venture or making Lender an investor in Borrower.

14.4  **Survival**.  All covenants, agreements, representations and warranties made by Borrower in the DIP Loan Documents or made by or on its behalf in connection with the transactions contemplated herein shall be true at all times this Agreement is in effect and shall survive the execution and delivery of the DIP Loan Documents, any investigation at any time made by Lender or on its behalf and the making by Lender of the loans or advances to Borrower.  All statements contained in any certificate, statement or other document delivered by or on behalf of Borrower pursuant hereto or in connection with the transactions contemplated hereunder shall be deemed representations and warranties by Borrower.

14.5  **No Assignment by Borrower**.  Borrower may not assign any of its rights hereunder without the prior written consent of Lender and any such assignment shall be void and of no force or effect. Lender shall not be required to lend hereunder except to Borrower as it presently exists.

14.6  **Assignment or Sale by Lender**.  Lender may sell, assign or participate all or a portion of its interest in the DIP Loan Documents, and, in connection therewith, may make available to any prospective purchaser, assignee or participant any information relative to Borrower in its possession.

14.7  **Binding Effect**.  This Agreement and all rights and powers granted hereby will bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

14.8    **Severability**.  The provisions of this Agreement and all other DIP Loan Documents are deemed to be severable, and the invalidity or unenforceability of any provision shall not affect or impair the remaining provisions which shall continue in full force and effect.

14.9    **No Third Party Beneficiaries**.    The rights and benefits of this Agreement and the DIP Loan Documents shall not inure to the benefit of any third party.

14.10   **Modifications**.  No modification of this Agreement or any of the DIP Loan Documents shall be binding or enforceable unless in writing and signed by or on behalf of the party against whom enforcement is sought.

14.11   **Holidays**.  If the day provided herein for the payment of any amount or the taking of any action falls on a Saturday, Sunday or public holiday at the place for payment or action, then the due date for such payment or action will be the next succeeding Business Day.

14.12   **Law Governing**.    This Agreement has been made, executed and delivered in the State of New York and will be construed in accordance with and governed by the laws of such State without regard to conflict of law principles.

14.13   **Integration**.    The DIP Loan Documents shall be construed as integrated and complementary of each other, and as augmenting and not restricting Lender's rights, powers, remedies and security.    The DIP Loan Documents contain the entire understanding of the parties thereto with respect to the matters contained therein and supersede all prior agreements and understandings between the parties with respect to the subject matter thereof and do not require parol or extrinsic evidence in order to reflect the intent of the parties. In the event of any inconsistency between the terms of this Agreement and the terms of the other DIP Loan Documents, the terms of this Agreement shall prevail.

14.14   **Exhibits and Schedules**.  All exhibits and schedules attached hereto are hereby made a part of this Agreement.

14.15   **Headings**.    The headings of the Articles, Sections, paragraphs and clauses of this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

14.16   **Counterparts**.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

14.17   **Effect of Final Financing Order**.    Subject to the terms and conditions of the Final Financing Order:

(a)    The liens and security interests referred to in this Agreement, and any other DIP Loan Documents with respect to the Borrower shall be deemed valid and perfected by entry of the Final Financing Order, in accordance with the terms thereof and subject to any challenge periods contained therein.

(b)    The liens, security interests, lien priorities, administrative priorities and other rights and remedies granted to Lender, pursuant to this Agreement, the other DIP Loan Documents and the Final Financing Order (specifically including but not limited to the existence, perfection and priority of the liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    except for the amounts included in the Carve-Out, the liens and security interests in favor of the Lender set forth herein, in the DIP Loan Documents, shall constitute valid and perfected first priority liens and security interests and shall be prior to all other liens and interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever, including, without limitation, the Existing Liens, and

(ii)    the security interests and liens upon the Collateral in favor of the Lender as set forth in this Agreement, the DIP Loan Documents shall constitute valid and perfected first priority security interests, without the necessity that the Lender file financing statements, record mortgages, or otherwise perfect its liens and security interests in the Collateral under applicable nonbankruptcy law.

(c)    the security interests of the Lender hereunder and under the other DIP Loan Documents shall be subordinate only to the payment of the Carve-Out; provided, that, (A) the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Borrower, any committee or any professional, in connection with the matters set forth in Section 8.21.

14.18    **Waiver of Right to Trial by Jury.**  **BORROWER AND LENDER WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER ANY OF THE DIP LOAN DOCUMENTS OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF BORROWER OR LENDER WITH RESPECT TO ANY OF THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. BORROWER AND LENDER AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF BORROWER AND LENDER TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.  BORROWER ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION, THAT IT FULLY UNDERSTANDS ITS TERMS, CONTENT AND EFFECT, AND THAT IT VOLUNTARILY AND KNOWINGLY AGREES TO THE TERMS OF THIS SECTION.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**BORROWER:**

**METROPLEX ON THE ATLANTIC, LLC**


By:_____
Name:  Elzbieta Mielczarek
Title:    Managing Member


**LENDER:**

**PSG CAPITAL PARTNERS, INC.,**
**or its nominee**


By:_____
Name: _____
Title: _____

**EXHIBIT "A"**

**Form of Note**

**DIP LOAN PROMISSORY NOTE**

$[19,000,000.00]                                                    [_____ __], 2015

FOR VALUE RECEIVED, **METROPLEX ON THE ATLANTIC, LLC,** having an address at 15 Division Place, Suite 200, Brooklyn, NY 11222 ("**Maker**"), promises to pay to the order of **PSG CAPITAL PARTNERS, INC.,** 31878 Del Obispo Street, Suite 118, San Juan Capistrano, California 92675 (together with its successors and assigns "**Payee**"), or at such place as the holder hereof may from time to time designate in writing, the principal sum of [NINETEEN MILLION AND 00/100] DOLLARS ($[19,000,000.00]), in lawful money of the United States of America, with interest on the unpaid principal balance from time to time outstanding to be computed in the manner, at the times and, subject to the provisions of <u>Sections 2 and 3</u> of the DIP Loan Agreement (as hereinafter defined), at the Interest Rate provided in that certain DIP Loan and Security Agreement (as amended, modified, restated, consolidated, replaced or supplemented from time to time, the *"DIP Loan Agreement"*) dated as of the date hereof between Maker and Payee.  Capitalized terms used but not defined herein shall have the respective meanings given such terms in the DIP Loan Agreement.

1.       **Payment Terms.**  Maker shall pay to Payee the monthly interest on the unpaid principal in the manner and at the times specified in Sections 2 and 3 of the DIP Loan Agreement, which payments shall be applied in the order of priority set forth in the DIP Loan Agreement.  Maker shall also pay to Payee interest at the Default Rate and all other amounts due and payable as and when provided for in the DIP Loan Agreement. The balance of the principal, together with all accrued and unpaid interest thereon, and all other amounts payable to Payee hereunder, under the DIP Loan Agreement and under the other DIP Loan Documents shall be due and payable on the Maturity Date.

2.       **DIP Loan Documents.**  This Note is evidence of that certain loan made by Payee to Maker contemporaneously herewith and is executed pursuant to the terms and conditions of the DIP Loan Agreement.  This Note is secured by and entitled to the benefits of, among other things, the DIP Loan Documents.  Reference is made to the DIP Loan Documents for a description of the nature and extent of the security afforded thereby, the rights of the holder hereof in respect of such security, the terms and conditions upon which this Note is secured and the rights and duties of the holder of this Note. All of the agreements, conditions, covenants, provisions and stipulations contained in the DIP Loan Documents to be kept and performed by Maker are by this reference hereby made part of this Note to the same extent and with the same force and effect as if they were fully set forth in this Note, and Maker covenants and agrees to keep and perform the same, or cause the same to be kept and performed, in accordance with their terms.

3.       **Loan Acceleration; Prepayment.** The Debt shall, without notice, become immediately due and payable at the option of Payee upon the happening of any Event of Default.  This Note

may not be prepaid except as otherwise expressly provided in, and subject to the terms and conditions of the DIP Loan Agreement.

4.       **Revival.**  To the extent that Maker makes a payment or Payee receives any payment or proceeds for Maker's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under the Bankruptcy Code or any other bankruptcy law, common law or equitable cause, then, to such extent, the obligations of Maker hereunder intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Payee.

5.       **Amendments.**  This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought. Whenever used, the singular number shall include the plural, the plural the singular, and the words "Payee" and "Maker" shall include their respective successors, assigns, heirs, executors and administrators.

6.       **Waiver.**  Maker and all others who may become liable for the payment of all or any part of the DIP Loan do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of acceleration except as otherwise expressly provided in the DIP Loan Documents.  No release of any security for the DIP Loan or any person liable for payment of the DIP Loan, no extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of the DIP Loan Documents made by agreement between Payee and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Maker, and any other person or party who may become liable under the DIP Loan Documents, for the payment of all or any part of the DIP Loan.

7.       **Notices.**  All notices or other communications required or permitted to be given pursuant hereto shall be given in the manner specified in the DIP Loan Agreement directed to the parties at their respective addresses as provided therein.

8.       **Joint and Several.**  If more than one Person constitutes Maker, each Person constituting Maker hereunder shall have joint and several liability for the obligations of Maker hereunder.

9.       **Governing Law.  THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA, WHICH LAWS OF THE UNITED STATES OF AMERICA SHALL, TO THE EXTENT THE SAME PREEMPT SUCH STATE LAWS, GOVERN AND BE CONTROLLING.**

**MAKER**:

**METROPLEX ON THE ATLANTIC, LLC**,
 a New York limited liability company


By:_____
      Name:
      Title:

**EXHIBIT "B"**

**Budget**

## EXHIBIT "C"

**Form of Final Financing Order**

**Exhibit D**

**Property Legal Description**

**Exhibit E**

**PROFESSIONAL'S CERTIFICATE**

_____, 2015

PSG Capital Partners, Inc., or its nominee
31878 Del Obispo Street, Suite 118
San Juan Capistrano, California 92675

Re:    120 Beach 26th Street, Far Rockaway, New York

Dear Sirs:

The undersigned (the **"Contractor"**) understands that PSG Capital Partners, Inc., or its nominee (the **"Lender"**) is about to make a certain loan (collectively, the **"Loan"**) to the borrower referred to in Exhibit A attached hereto (the **"Borrower"**), which Loan will be used, among other things, to finance the construction by the Borrower of the improvements described in Exhibit A (the **"Improvements"**) on the premises described in Exhibit A pursuant to the provisions of a DIP Loan and Security Agreement (the **"DIP Loan Agreement"**) to be entered into between the Lender and the Borrower and to fund certain soft costs in connection with the completion of the Improvements.  The Contractor has been engaged by the Borrower to act as the [_____] for the Improvements pursuant to the provisions of a certain contract described in Exhibit A, a copy of which is attached hereto as Exhibit B (the **"Contract"**).

The Contractor represents and warrants to the Lender that (i) the maximum contract price for performing all work under the Contract is $_____, subject to the performance of additional services at the request of Borrower, (ii) the Contract is in full force and effect and has not been modified or amended, except as specifically set forth in Exhibit A attached hereto, and (iii) the Contractor has not sent or received any notice of default or any notice for the purpose of terminating the Contract, nor is there any existing circumstance or event which, but for the lapse of time or otherwise, would constitute a default by the Contractor or the Borrower under the Contract.

In addition, the Contractor hereby agrees with the Lender as follows:

1.    The Contractor will not agree to any amendment, modification, release or discharge (in whole or in part) of the Contract, nor waive or claim any waiver in respect of any provision thereof, without first obtaining the prior written consent of the Lender, and no such

amendment, modification, release, discharge or waiver, without such consent, shall be binding upon the Lender.

2.    The Contractor will send to the Lender copies of all notices of default sent by the Contractor to the Borrower pursuant to the Contract, and no such notice shall be effective for any purpose unless and until a copy thereof shall have been received by the Lender.

3.    If the Borrower shall default under the Contract, the Contractor will not exercise any remedies, including, but not limited to, any right to terminate the Contract, until and unless the Contractor shall give notice of intention to do so to the Lender, and the Lender, for a period of 60 days after receipt of such notice, shall fail to either remedy the default of the Borrower or deliver to the Contractor an undertaking to remedy such default at the sole cost and expense of the Lender, within such reasonable time as may be appropriate, taking into account the nature of the default.

4.    If the Borrower defaults under the DIP Loan Agreement, or if there is a foreclosure of the mortgages securing the Loan, or if the Borrower becomes insolvent, the Contractor will, at the election and option of the Lender, and upon Lender curing any outstanding Borrower default under the Contract, complete its obligations under the Contract for a contract price calculated pursuant to the Contract for the benefit of and with no additional charge or expense to the Lender, its nominee or wholly owned subsidiary, it being agreed that such contract price shall in no event exceed the maximum price stipulated (as provided for in the first page of this letter) in the Contract.  The Contractor hereby consents to the assignment of the Contract given by the Borrower to the Lender in connection with the Loan.

The Contractor will send all notices to the Lender, as required by this letter, to the address of the Lender set forth above, by registered or certified mail, return receipt requested; copies of all such notices shall be sent in like manner, addressed to PSG Capital Partners, Inc., 31878 Del Obispo Street, Suite 118, San Juan Capistrano, California 92675, with a copy to Farrell Fritz, P.C., 1320 RXR Plaza, Uniondale, New York 11556, Attention:  Ted A. Berkowitz, Esq.

5.    The provisions set forth in this letter shall be binding upon the Contractor and its successors and assigns and shall inure to the benefit of the Lender and its successors and assigns.

Very truly yours,

[_____]

By:_____
      Name:
      Title:

## <u>EXHIBIT A</u>

**(Definitions of Terms)**

1.     <u>Borrower</u>:

     METROPLEX ON THE ATLANTIC, LLC

2.     <u>The Improvements</u>:

     The term **"<u>Improvements</u>"** as used in this letter shall mean construction, in accordance with the Plans of _____.

3.     <u>The Premises</u>:

     120 Beach 26th Street, Far Rockaway, New York.

4.     <u>The Contract</u>:

     Agreement dated _____. between the Borrower and _____ **[, *as amended by*_____]**.

# **SCHEDULES**

Schedule 6.3          Existing Liens