CULLEN & DYKMAN, LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
(516) 357-3700
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.

Attorneys for Metroplex on the Atlantic, LLC

Bryan Cave LLP
1290 Avenue of the Americas
New York, New York 10104
Lawrence P. Gottesman, Esq.

Attorneys for DOF IV Metroplex, LLC

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In Re:                                                        Chapter 11
                                                              Case No. 15-42499 (CEC)

Metroplex on the Atlantic, LLC

                              Debtor.
------------------------------------------------------------X

### DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN FILED BY METROPLEX ON THE ATLANTIC, LLC AND DOF IV METROPLEX, LLC

## IMPORTANT DATES

- Date by which Ballots must be received: _____, 201__ at 5:00 p.m. Eastern Time.

- Date by which objections to Confirmation of the Plan must be filed and served: _____, 201__ at 5:00 p.m. Eastern Time.

- Hearing on Confirmation of the Plan: _____, 201___ at ___ Eastern Time.

NY02DOCS\1901613.1

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................ 3

    A.    General ............................................................................................... 3

    B.    Voting ................................................................................................. 4

    C.    Confirmation Hearing ........................................................................ 5

    D.    Recommendations .............................................................................. 6

II. HISTORICAL INFORMATION ................................................................................ 7

    A.    The Debtor's Business and Pre-Petition Litigation with the Secured Lender ........ 7

    B.    Easement Claims ............................................................................... 8

III. THE REORGANIZATION CASE ........................................................................... 10

    A.    Overview ........................................................................................... 10

    B.    Employment of Professionals and Other Entities ............................. 10

    C.    Litigation with Secured Lender ........................................................ 11

    D.    Plan Support Stipulation and Term Sheet ........................................ 11

    E.    Claims Administration ...................................................................... 12

    F.    Litigation Claims .............................................................................. 13

    G.    Exclusivity ......................................................................................... 14

IV. SUMMARY OF THE PLAN .................................................................................. 14

    A.    General ............................................................................................... 14

    B.    Plan Overview/Plan Administrator ................................................... 15

    C.    Treatment of Claims and Interests ................................................... 15

    D.    Sale of Property/Waterfall ................................................................ 26

    E.    Litigation Trust ................................................................................. 32

    F.    Treatment of Executory Contracts and Unexpired Leases ............... 37

    G.    Summary of Distributions and Claims Resolution Provisions ......... 40

V. MEANS OF IMPLEMENTATION OF THE PLAN; EFFECT OF CONFIRMATION .........46

    A.    Funding of the Plan..............................................................................................46

    B.    Injunction ...........................................................................................................47

    C.    Release of Secured Lender Releasees, Plan Administrator Releasees and Litigation Trustee Releasees by Debtor's Party Releasors.............................................................................................................49

    D.    Release of Secured Lender Releasees by the Plan Administrator and Litigation Trustee...................................................................................................52

    E.    Release of Secured Lender Releasees, Plan Administrator Releasees and Litigation Trustee Releasees by Holders of Claim and Interests................................54

    F.    Release of Debtor Party Releasees by Secured Lender Parties, Plan Administrator and Litigation Trustee......................................................................56

    G.    Discharge ...........................................................................................................58

    H.    Exculpation.........................................................................................................58

    I.    Indemnification...................................................................................................60

    J.    Division Place Collateral.....................................................................................62

    K.    Post-Confirmation Management...........................................................................63

    L.    Post-Confirmation Jurisdiction of the Court.........................................................63

VI. CONFIRMATION OF THE PLAN .......................................................................65

    A.    Introduction........................................................................................................65

    B.    Conditions to Confirmation ................................................................................66

    C.    Conditions to the Effective Date ..........................................................................67

    D.    Voting Procedures and Standards ........................................................................68

    E.    Acceptance .........................................................................................................71

    F.    Confirmation and Consummation.........................................................................72

VII. CERTAIN RISK FACTORS TO BE CONSIDERED.............................................77

    A.    Risk That Distributions Will Be Less Than Estimated.........................................78

    B.    Bankruptcy Risks................................................................................................78

VIII. TAX CONSEQUENCES.......................................................................................79

IX. CONCLUSION ........................................................................................................79

NY02DOCS\1901613.1

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN, AND IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN OR ANY DOCUMENT FILED WITH THE PLAN SUPPLEMENT, BUT TO AID AND SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND THE PLAN SUPPLEMENT, AS APPLICABLE.  IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO CAREFULLY READ THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT

BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A

STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

# I. INTRODUCTION

## A.    General

Metroplex on the Atlantic, LLC (the "Debtor") and DOF IV Metroplex, LLC (the "Secured Lender"), jointly file this Disclosure Statement (the "Disclosure Statement") with respect to the Joint Chapter 11 Plan filed by them, dated December 23, 2015 (the "Plan").

This Disclosure Statement is provided pursuant to section 1125 of the Bankruptcy Code to all the known creditors (including holders of Easement Claims) and interest holders of the Debtor.  The purpose of this Disclosure Statement is to provide sufficient information to enable creditors and interest holders who are entitled to vote to make an informed decision on whether to accept or reject the Plan.

Most words or phrases used in this Disclosure Statement shall have their usual and customary meanings.  Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.

**THE DEBTOR AND THE SECURED LENDER ARE THE JOINT PROPONENTS OF THE PLAN (THE "PLAN PROPONENTS") AND SUPPORT CONFIRMATION OF THE PLAN.  THEY URGE CREDITORS (INCLUDING HOLDERS OF EASEMENT CLAIMS) AND INTEREST HOLDERS TO VOTE TO ACCEPT THE PLAN AS THE PLAN REPRESENTS THE BEST OPPORTUNITY FOR CREDITORS AND INTEREST HOLDERS TO OBTAIN ANY RECOVERIES IN RESPECT OF THEIR CLAIMS OR INTERESTS, AS APPLICABLE.  IN THE EVENT THE PLAN IS NOT CONFIRMED, THE PLAN SUPPORT STIPULATION PROVIDES FOR AN AUCTION SALE UNDER**

**WHICH CREDITORS WILL RECEIVE FAR LESS, AND PERHAPS NOTHING, THAN IF THE PROPERTY IS SOLD THROUGH THE PLAN.**

**B.      Voting**

With respect to Claims in Classes that are "impaired" (as defined below) under the Plan, but not deemed to have rejected the Plan, each holder of a Claim in such Classes will receive a copy of this Disclosure Statement, a Ballot for the acceptance or rejection of the Plan, and other related voting materials.  Any holder of a Claim or Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered "impaired."

Under the Plan, holders of Allowed Claims in Classes 3, 4, 5, 6 and 7 and holders of Interests in Class 8 are impaired, and are therefore entitled to vote on the Plan (the "Voting Classes").  Unliquidated and Disputed Easement Claims in Class 4 shall be provisionally allowed in the amount of $10.00 per Claim solely for the purpose of voting upon the Plan. For a description of the Classes of Claims and Interests and their treatment under the Plan, see Section IV(C) below.

The date of entry of the Disclosure Statement Order is fixed as the "Voting Record Date." Only Persons who hold Claims on the Voting Record Date are entitled to receive a copy of this Disclosure Statement and all of the related materials.  Only Persons who hold Claims on that date that are Impaired under the Plan and are not deemed to reject the Plan are entitled to vote on the Plan.

In voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement. Please complete and sign your Ballot and return it in the enclosed pre-addressed envelope to the Balloting Agent:

Cullen and Dykman LLP
Attn: Bonnie L. Pollack, Esq.
100 Quentin Roosevelt Boulevard
Garden City, NY 11530

ALL PROPERLY COMPLETED BALLOTS RECEIVED BY THE BALLOTING AGENT PRIOR TO _____, 2016 AT 5:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH CLASS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN HAS ACCEPTED THE PLAN. ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT. The Balloting Agent will prepare and file with the Court a certification of the results of the balloting with respect to the Plan.

Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired under a plan vote to accept such plan, unless the "cramdown" provisions of the Bankruptcy Code are employed. The Plan Proponents reserve the right to seek to "cramdown" the Plan on non-accepting Classes of Claims and Interest holders. See Section VI below.

**C.    Confirmation Hearing**

The Court will hold the Confirmation Hearing commencing at _____ (Eastern Time), on _____, 2016 at the United States Bankruptcy Court for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201-1800, before the Honorable Carla E. Craig, Chief United States Bankruptcy Judge. The Confirmation Hearing may be

adjourned from time to time without further notice.  At the Confirmation Hearing, the Court will (i) determine whether the requisite vote has been obtained from the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously settled, withdrawn or overruled, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, (iv) determine whether to confirm the Plan, and (v) grant such other and further relief as the Court deems reasonable and appropriate.

Any objection to confirmation of the Plan must be in writing and filed with the Court and served in a manner so as to be received on or before _____, 2016 at 5:00 p.m. Eastern Time by: (1) counsel to the Debtor, Cullen and Dykman LLP, 100 Quentin Roosevelt Boulevard, Garden City, New York 11530, Attn: Bonnie L. Pollack, Esq.; (2) counsel to the Secured Lender, Bryan Cave, LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Lawrence P. Gottesman, Esq.; and (3) the Office of the United States Trustee for the Eastern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014.

## D.    Recommendations

**THE PLAN PROPONENTS RECOMMEND THAT ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES VOTE TO ACCEPT THE PLAN AS THE PLAN REPRESENTS THE BEST OPPORTUNITY FOR CREDITORS AND INTEREST HOLDERS TO OBTAIN ANY RECOVERIES IN RESPECT OF THEIR CLAIMS OR INTERESTS, AS APPLICABLE. IN THE EVENT THE PLAN IS NOT CONFIRMED, THE PLAN SUPPORT STIPULATION PROVIDES FOR AN AUCTION SALE UNDER WHICH CREDITORS WILL RECEIVE FAR LESS, AND PERHAPS NOTHING, THAN IF THE PROPERTY IS SOLD THROUGH THE PLAN.**

## II. HISTORICAL INFORMATION

### A.    The Debtor's Business and Pre-Petition Litigation with the Secured Lender

The Debtor is the owner of a 126 unit condominium complex located at 120 Beach 26th Street, Far Rockaway, New York (the "Property"). Construction on the building of the Property began in 2007.

The Property is encumbered by a mortgage now held by the Secured Lender in the original principal amount of $22,825,000 (the "Mortgage"). During the time of delayed construction, on June 1, 2010, the Mortgage matured by its terms and without the sale of the condominium units, the Debtor was unable to pay the principal balance of, or other amounts due under, the Mortgage. On September 12, 2010, the Secured Lender's predecessor in interest commenced an action to foreclose the Mortgage in the Supreme of the State of New York, Queens County (the "Queens Foreclosure Action"). By order dated May 18, 2001, Joseph John Risi, Esq. (the "Receiver") was appointed as Receiver of the Property in the Queens Foreclosure Action. Walters and Samuels, Inc. ("W&S") was engaged to assist the Receiver with the management of the Property. By order dated December 18, 2015, the Court directed the Receiver to turn the Property over to the Debtor's estate.

By order entered February 5, 2013, the Court in the Queens Foreclosure Action granted the Second Lender summary judgment, which was the subject of a notice of appeal filed by the Debtor and its principal Elzbieta Mielczarek ("Mielczarek"). By final judgment of foreclosure and sale dated October 1, 2014, the Court in the Queens Foreclosure Action granted final judgment in favor of the Secured Lender, which was also the subject of an appeal by the Debtor and Mielczarek (together with the appeal of the grant of Summary Judgement, the "Appeals"). Neither of the Appeals have yet been decided. Pursuant to the Plan Support Stipulation further

discussed in Section III(D) below, the Appeals shall be withdrawn with prejudice upon approval of the Plan Support Stipulation by the Court.

Also as a result of the Debtor's default on its obligations under its loan documents with the Secured Lender, the Secured Lender also commenced an action to foreclose a collateral mortgage (the "Collateral Mortgage") received from Kew Gardens Property LLC ("Kew"), an entity in which Mielczarek is the sole member, against Kew's property located at 15 Division Place, Brooklyn, New York ("the Division Place Collateral").

By virtue of the looming foreclosure sale with respect to the Property and to prevent such a sale while the Debtor was prosecuting its Appeals in the Queens Foreclosure Action, on the Petition Date the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing its reorganization case.

**B.    Easement Claims**

Approximately thirty property owners are the alleged beneficiaries of an alleged easement running down the center of the block of property in Far Rockaway, New York bounded by Beach 25th and Beach 26th Street and Seagirt Avenue to the Atlantic Ocean (the "Easement Rights"), the lot on which the Debtor's Property is situated. Prior to the commencement of the Debtor's case, one of the alleged beneficiaries of the Easement Rights, Richard George ("George"), commenced an action against the Debtor seeking to enjoin the Debtor from construction of its building. That lawsuit was never resolved prior to the Petition Date.

In response to George's lawsuit, the Debtor brought an action to quiet title based on its conclusion that the Easement Rights were terminated in or around 1930. All thirty alleged holders of alleged Easement Rights (the "Easement Holders") were named as defendants in that lawsuit. One of those Easement Holders, Susan Anderson ("Anderson"), asserted counterclaims

against the Debtor seeking, among other things, specific performance of the Easement Rights. Based on the Debtor's default in pursuing that action and in defending the counterclaim because of a lack of funds to pay legal fees, Anderson was awarded a judgment in the amount of $650,400 (the "Anderson Judgment"). Only $155,000 of the judgment amount was attributable to the Easement Rights. The rest were actual damage to Anderson's property by virtue of the Debtor's construction and punitive damages in the amount of $500,000. Any alleged Easement Right held by Anderson was superseded by judgment, which is subordinate to the Secured Lender's Mortgage. As a result, the Plan Proponents believe that, at most, Anderson holds an unsecured claim. Furthermore, the Plan Proponents do not believe that the value attributable to the Easement Rights is even close to $155,000 since even if the Property had not been built, the Easement Rights are still obstructed by the Far Rockaway boardwalk, the Easement Holders have quick and easy access to the beach by walking on the sidewalks on either side of the Property and the value of the properties owned by the Easement Holders is little more than $155,000 per property.

Only Anderson and George filed proofs of claims against the Debtor. However, the other 28 alleged Easement Holders were inadvertently omitted from the Debtor's initial schedules, which have since been amended to include such Easement Holders. Moreover, the Court has established the supplemental Easement Bar Date of December 31, 2015 by which the Easement Holders must file any such Easement Claims against the Debtor's Estate. As of the date of this Disclosure Statement, no such Claims have been filed.

On or about December 15, 2015, George filed a complaint (the "Adversary Proceeding Complaint") commencing an adversary proceeding (the "Adversary Proceeding") in the Bankruptcy Court against the Debtor, Elzbieta Mielczarek, Jerzy Syzmczyk, American Dream

Production Corporation and Concord Renovation of New York, Inc., d/b/a American Dream Infinity Corporation (collectively, the "Adversary Proceeding Defendants"). The Adversary Proceeding Complaint alleges a variety of purported claims for relief, including claims for punitive damages, restoration of the alleged Easement and declaratory relief that the corporate veil with respect to the Debtor and the non-natural defendants may be pierced. As of the date hereof, none of the Defendants have responded to the Adversary Proceeding Complaint. The Plan Proponents believe that the Adversary Proceeding Complaint and the claims for relief alleged therein are without merit and that the Adversary Proceeding was commenced by George in order to obtain a perceived tactical advantage with respect to the Plan. The Plan Proponents intend to seek appropriate relief with respect to the foregoing from the Bankruptcy Court.

## III. THE REORGANIZATION CASE

### A.    Overview

As of the Petition Date, all actions and proceedings against the Debtor and acts to obtain property from the Debtor were stayed under section 362 of the Bankruptcy Code. During the administration of the Chapter 11 Case, the Debtor managed its affairs as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, subject to the control and supervision of the Court.

### B.    Employment of Professionals and Other Entities

The Debtor retained the law firm of Cullen and Dykman LLP as its counsel in connection with the Chapter 11 Case. The Debtor did not employ accountants.

By Motion dated December 1, 2015, the Debtor sought to engage the Plan Administrator, Broker and Property Manager as required by the Plan Support Stipulation discussed further in Section III(D) below. Orders authorizing those engagements were entered by the Court on

December 18, 2015. Pursuant to those orders, pre-confirmation the Plan Administrator shall act as the Chief Restructuring Officer of the Debtor.

**C.    Litigation with Secured Lender**

During the Pendency of the Chapter 11 Case, the Debtor and the Secured Lender, among other parties, engaged in highly contested motion practice. For its part, the Secured Lender filed a motion to dismiss the Debtor's case [Docket No. 13] as well as a motion for vacature of the automatic stay [Docket No. 19]. The Debtor filed objections to both of these motions [Docket No. 24] in which the Debtor asserted an ability to obtain debtor-in-possession financing which it believed would satisfy all claims in full. Thereafter, the Debtor filed a motion for authorization to obtain debtor-in-possession financing (the "DIP Motion") [Docket No. 36]. The Debtor, the Secured Lender, and other parties, participated in substantial and expedited discovery in connection with the DIP Motion. In this regard, significant document production was exchanged between the parties and approximately ten depositions were conducted, five of which were expert depositions, all within a three week period. On the eve of the evidentiary hearing on the DIP Motion, the parties agreed to adjourn same to permit for various settlement discussions. The DIP Motion was ultimately withdrawn without prejudice by the Debtor and the motions filed by the Secured Lender have been carried by the Court.

**D.    Plan Support Stipulation and Term Sheet**

After engaging in the aforementioned litigation, the Debtor and the Secured Lender began negotiations in attempt to reach a consensual resolution of the case and the various claims by and among all the parties. After significant negotiations, the parties executed the Plan Support Stipulation and the Term Sheet annexed thereto on November 19, 2015. A copy of the Plan Support Stipulation and Term Sheet is annexed hereto as Exhibit "A". As more particularly

set forth therein, the Plan Support Stipulation and the Term Sheet provide for a settlement of the disputes between the parties and for the consensual Joint Chapter 11 Plan pursuant to which the Debtor's Property will be sold. The Secured Lender will carve out of its liens certain amounts as more fully described below and the creditors will have an opportunity to be paid, which would not be possible in the event the Secured Lender continued with the Queens Foreclosure Action. The Plan Support Stipulation and Term Sheet were approved by the Court by Order dated December 14, 2015 and the terms of same are embodied herein.

**E.    Claims Administration**

**1.    Filing of Schedules and Statements**

On June 30, 2015, the Debtor filed its Schedules of Assets and Liabilities and its Statement of Financial Affairs. The Debtor's schedule of unsecured creditors (Schedule F) was amended on November 10, 2015 to add certain purported Easement Holders who were inadvertently omitted from the initial schedules.

**2.    Bar Dates for Pre-Petition Claims**

By order dated July 21, 2015, the Court established August 28, 2015 as the last day by which proofs of claims arising prior to the Petition Date must have been filed with the Court (the "Claims Bar Date"). By order dated November 17, 2015, the Court established December 31, 2015 as the last day by which holders of purported Easement Claims arising prior to the Petition Date must file such Claims with the Court (the "Easement Bar Date").

**3.    Bar Dates for Post-Petition Claims**

*Administrative Claims*

**Under the Plan, all holders of Administrative Claims arising subsequent to May 28, 2015 and before the Effective Date (not including Accrued Professional Compensation Claims (described below), and not paid prior to the Confirmation Date, must file with the**

Court proper requests for payment of such Administrative Claims, and serve copies upon the parties listed in Section 13.12 of the Plan, on or before the Administrative Claims Bar Date. Parties not complying with this deadline shall be forever barred from seeking payment of those Claims including, without limitation, against the Debtor, the Estate, the Secured Lender or their property, or commencing or continuing any action, employment of process or act to collect, offset or recover any such Administrative Claim. The notice of Confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will include notice of the Administrative Claims Bar Date.

*Accrued Professional Compensation Claims*

All parties requesting compensation or reimbursement of Accrued Professional Compensation Claims pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered or expenses incurred on behalf of the Debtor or prior to the Effective Date must file applications with the Court, with copies to the parties listed in Section 13.12 of the Plan, on or before the Accrued Professional Compensation Claims Bar Date or shall be forever barred from seeking payment of those Accrued Professional Compensation Claims. The notice of Confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will include notice of the Accrued Professional Compensation Claims Bar Date.

**F.  Litigation Claims**

As more further described below, under the Plan, a Litigation Trust will be established, which Trust shall hold any and all Litigation Claims. A Litigation Trustee (who shall be the Plan Administrator) shall have the option of commencing any Litigation Claims to recover the proceeds thereof for the Estate. To the extent any such Litigation Claims are commenced, the proceeds received in prosecution of such claims, net of any allowed costs and expenses incurred

in connection therewith (the "Net Litigation Recoveries"), shall be distributed as set forth in Section IV(C) below.  The Plan Proponents have not yet fully investigated whether there are any material litigation claims, but are not currently aware of any.

## G.    Exclusivity

The Debtor's initial exclusive period to file a Chapter 11 Plan in its case would have originally expired on September 25, 2015.  However, by Stipulation and Order entered by the Court on September 29, 2015, the Debtor's exclusive period to file a Chapter 11 Plan was extended through and including November 13, 2015.  Thereafter, and by further Stipulation and Order entered by the Court on October 30, 2015, the Debtor's exclusive period to file a Chapter 11 Plan was reduced so that the same would expire at 11:59 p.m. on November 2, 2015.  The Debtor did not file a Chapter 11 Plan on or before the expiration of the exclusivity period and, as a result, any creditor or party interest may file a Chapter 11 Plan with the Court.

## IV. SUMMARY OF THE PLAN

## A.    General

SET FORTH IN THIS SECTION IS A SUMMARY OF CERTAIN OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.  THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND CAREFUL READING OF THE PLAN.  STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BY THE DEBTOR BASED ON

AVAILABLE INFORMATION AND ARE NOT A REPRESENTATION AS TO THE

ACCURACY OF THESE AMOUNTS.

**B.**     **Plan Overview/Plan Administrator**

The Plan calls for the liquidation, rather than reorganization, of the Debtor, and is

premised upon the sale of the Property, as more further discussed in Section IV(D) below.

Pursuant to the Plan Support Stipulation and Term Sheet, the Debtor engaged Getzler Henrich &

Associates, LLC as Chief Restructuring Officer. Post-confirmation Getzler Henrich &

Associates, LLC shall act as Plan Administrator.  The Plan Administrator's duties shall include

(a) the marketing of the Property, including the supervision of the broker to be engaged by the

Debtor, (b) the negotiation of confidentiality agreements and the provision of due diligence

materials to potential purchasers of the Property, (c) the negotiation of a purchase and sale

agreement with one more potential purchasers of the Property, (d) the determination as to

whether a potential purchaser shall serve as a stalking horse bidder and, if so, the bid protections

and bid procedures in connection therewith, (e) the conduct of the auction, if any, of the

Property, (f) filing and prosecution and settlement of any objections to Claims that are not

Allowed Claims, (g) any other acts reasonably necessary to consummate the Plan or as provided

for in the Plan, the Plan Support Stipulation or Term Sheet, and (h) such other matters as

reasonably necessary and appropriate to accomplish the Plan Administrator's duties.

**C.**     **Treatment of Claims and Interests**

The Plan separates Claims and Interests into three (3) unclassified categories and eight

(8) Classes.  A Claim or Interest is placed in a particular unclassified category or Class only to

the extent that the Claim or Interest falls within the description of that category or Class.  A

Claim is also placed in a particular category or Class for the purpose of receiving Distributions

pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that category or

Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims,

Accrued Professional Compensation Claims and Priority Tax Claims have not been classified

and, subject to compliance with the Administrative Bar Date and Accrued Professional

Compensation Claims Bar Date, will be paid in full in Cash to the extent such Claims are

Allowed.   All other Claims and Interest have been classified.  Each holder of a Claim or Interest

should refer to Articles II and III of the Plan for a full description of the classification and

treatment of Claims and Interests provided under the Plan.

### 1.    Administrative Claims – Not Classified

Administrative Claims include a Claim for costs and expenses of administration of the

Debtor's Estate pursuant to Sections 503(b) or 507(a)(2) of the Bankruptcy Code, including:

(a) the actual and necessary costs and expenses of preserving the Estate incurred after the

Petition Date and through the Effective Date; (b) Claims of Professionals in the Chapter 11 Case;

(c) Claims, if any, of the Plan Administrator, the Litigation Trustee, the Property Manager and

any Broker retained by the Estate; and (d) fees and charges assessed against the Estate pursuant

to chapter 123 of the Judicial Code, including the U.S. Trustee Fees.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the

Plan Administrator, each Holder of an Allowed Administrative Claim (other than or an Accrual

Professional Compensation Claim), will receive in exchange for full and final satisfaction,

settlement, release, and compromise of its Administrative Claim an amount of Cash equal to the

amount of such Allowed Administrative Claim either:  (1) except as otherwise provided in the

Confirmation Order, on the Effective Date or as soon as practicable thereafter; (2) if the

Administrative Claim is not Allowed as of the Effective Date, no later than five (5) business days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of their business after the Petition Date, such Allowed Administrative Claims shall be assumed and paid by the applicable Purchaser and paid pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims and without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent sufficient funds are not available from the Net Sales Proceeds or the Net Litigation Recoveries, the foregoing payments shall be funded from the Exit Facility.  The Debtor estimates that any unpaid United States Trustee Fees will be minimal and believes that except as set forth below, no other Administrative Claims exist.

Also included within this category is the Allowed Secured Lender Administrative Claim, consisting of all amounts advanced or incurred by the Secured Lender to or for the benefit of the Debtor or the Estate on or after the Petition Date, including costs to manage the Property.  The Allowed Secured Lender Administrative Claim amounted to approximately $293,973.52 as of October 31, 2015.  On the Effective Date, the Allowed Secured Lender Administrative Claim will be higher than such amount.  The Holder of the Allowed Secured Lender Administrative Claim will receive in exchange for full and final satisfaction, settlement, release, and compromise of such Allowed Secured Lender Administrative Claim, an amount of Cash equal to the amount of such Allowed Secured Lender Administrative Claim, to be paid from the Net Sales Proceeds or the Net Litigation Recoveries in accordance with the Waterfall.

No Insider Administrative Claims shall be Allowed.

Estimated Percentage Recovery: 100% (see Section V(A))

## 2.    Accrued Professional Compensation Claims – Not Classified

Accrued Professional Compensation Claims are defined under the Plan as all Claims for accrued fees and expenses (including success fees, if any) for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to any order of the Bankruptcy Court or the Local Bankruptcy Rules and regardless of whether a fee application has been Filed for such fees and expenses. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses (including success fees, if any), then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

Each holder of an Allowed Accrued Professional Compensation Claim for services rendered through the Effective Date shall receive 100% of the Allowed amount of such Claim in Cash from the Net Sale Proceeds or the Net Litigation Recoveries (or, in the event of a Credit Bid, from the Secured Lender) on or as soon as reasonably practicable after the closing of the Property Sale Transaction or upon the entry of a Final Order allowing such Claim if subsequent to the closing.

It is anticipated that this Class will include Cullen and Dykman LLP, Debtor's counsel, the Plan Administrator and the Property Manager. It is anticipated that as of the Effective Date of the Plan, fees to Debtor's counsel will amount to approximately $375,000, fees to the Chief Restructuring Officer will amount to approximately $75,000 and that fees to the Property Manager will amount to approximately $25,000. All Professionals who incur fees and expenses in connection with the Chapter 11 Case, consummation of the Plan or the Property Sale Transaction subsequent to the Effective Date shall submit bills to the Plan Administrator for

payment without further notice to or action, order, or approval of the Bankruptcy Court, but subject to approval by the Secured Lender.

Estimated Percentage Recovery: 100%. (see Section V(A))

### 3. Priority Tax Claims-Not Classified

Priority Tax Claims are defined under the Plan as Claim of a Governmental Unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code. Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, in exchange for full and final satisfaction, settlement, release, and compromise of such Claim, Cash, payable on the latter of the Effective Date or as soon as reasonably practicable thereafter, or, if such Priority Tax Claim is not an Allowed Claim on the Effective Date, on the date such Allowed Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter, in an amount equal to the amount of such Allowed Priority Tax Claim. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Plan Administrator and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

The Debtor does not believe that there are any Allowed Priority Tax Claims and no such Claims were scheduled or filed on or before the Claims Bar Date.

Estimated Percentage Recovery: N/A

### 4. Allowed Other Priority Claims-Class 1

Class 1 consists of Allowed Other Priority Claims against the Debtor's estate, which includes any Claim against the Debtor entitled to priority in right of payment under Section 507 of the Bankruptcy Code, other than: (a) an Administrative Claim or (b) a Priority Tax Claim. Except to

the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, discharge and compromise of each and every Allowed Other Priority Claim against the Debtor, each holder of an Allowed Other Priority Claim shall, at the option of the Plan Administrator (i) be paid in full in Cash on such date as is provided in the Confirmation Order or the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practicable thereafter; or (ii) otherwise be treated in any other manner such that the Allowed Other Priority Claims shall be rendered unimpaired on such date as is provided in the Confirmation Order or the later of the Effective Date and on the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practicable thereafter.

The Debtor does not believe that there are any Allowed Other Priority Claims and none were scheduled or filed on or before the Bar Date.

Estimated Percentage Recovery: N/A

### 5.    Allowed Other Secured Claims – Class 2

Class 2 consists of Allowed Other Secured Claims, which consist of Allowed Secured Claims which prime the Secured Lender or which are secured by collateral in which the Secured Lender does not hold an interest.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, discharge and compromise of each and every Allowed Other Secured Claim against the Debtor, each Holder of such Claim shall, at the option of the Plan Administrator (i) be paid in full in Cash in an amount equal to such Allowed Other Secured Claim on the Effective Date; (ii) receive the collateral securing any such Allowed Other Secured Claim and be paid

interest required to be paid under section 506(b) of the Bankruptcy Code; or (iii) otherwise be treated in any other manner such that the Allowed Other Secured Claim shall be rendered unimpaired on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter or (iv) have its Allowed Other Secured Claim reinstated in accordance with Section 1124 of the Bankruptcy Code, which treatment may include the assumption of such Allowed Other Secured Claim by a Purchaser.

The Debtor does not believe that there are any Allowed Other Secured Claims and none were scheduled or filed on or before the Claims Bar Date.

Estimated Percentage Recovery: N/A.

6.    **Allowed Lender Secured Claim-Class 3**

Class 3 under the Plan consists of the Allowed Lender Secured Claim in the amount of $37,734,103.11 as of the Petition Date.  In exchange for full and final satisfaction, settlement, release, discharge, and compromise of the Allowed Secured Lender Secured Claim against the Debtor, the Holder of the Allowed Secured Lender Secured Claim shall receive the following: (a) the Net Sales Proceeds and the Net Litigation Recoveries allocated to the Holder of the Allowed Secured Lender Secured Claim pursuant to the Waterfall described in Section IV(B) above; (b) solely in the case of a Property Sale Transaction to a Third Party Purchaser that utilizes the Stapled Financing, the New Loan Documents and all ancillary and related documents; and (c) solely in connection with respect to a Property Sale Transaction pursuant to a Credit Bid, the Property (including all related personality and other property that is the property of the estate of the Debtor).  Nothing set forth herein or in the Plan shall operate to release, waive, impair, modify or reduce any Claim or Cause of Action or other right or remedy of the

Secured Lender against any other Entity, except to the extent expressly provided for in the Plan or the Plan Support Stipulation.

Estimated Percentage Recovery: unknown. (see Section V(A))

### 7.    Allowed Unliquidated and Disputed Easement Claims – Class 4

Class 4 consists of any Allowed Unliquidated and Disputed Easement Claims, excluding the Claim filed by Anderson whose Claim is included in Classes 5 and 7. Except to the extent that the Holder of an Allowed Class 4 Allowed Unliquidated and Disputed Easement Claim and the Plan Administrator agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Unliquidated and Disputed Easement Claim, shall receive its Pro Rata share of the Net Sales Proceeds and Net Litigation Recoveries allocated to Class 4 under the payment pool and Waterfall described in Section IV(D) below. The distribution to Holders of Allowed Unliquidated and Disputed Easement Claims shall be in full satisfaction of any such Claims and the Holders will release and discharge and be deemed to release and discharge any Easement Rights held by such Holders or which is appurtenant to any real property owned, leased or otherwise occupied by such Holders. To the extent such Holder (a) votes in favor of the Plan, (b) does not object to the Plan and/or (c) accepts any distribution under the Plan, such Holder shall be deemed to have consented to the transfer of the Property free and clear of any such Easement Rights pursuant to section 363(f)(2) of the Bankruptcy Code; provided, however, that whether or not such Holder (a) votes in favor of the Plan, (b) does not object to the Plan and/or (c) accepts any distribution under the Plan, the Property will be transferred free and clear of any such Easement Rights or Easement Claims pursuant to Section 363(f)(4) and (f)(5) of the Bankruptcy Code since the Easement Rights are in

bona fide dispute and the Easement Holders can be compelled in a legal or equitable proceeding to accept a money satisfaction of their Easement Rights.

This class consists of the filed unliquidated Easement Claim filed by George as well as any purported Easement Claims which may be filed on or before the Easement Bar Date by approximately 28 additional purported Easement Holders. The Debtor believes that little value, if any, should be attributed to the Unliquidated and Disputed Easement Claims as discussed above. All of the purported Easement Claims which may be included in this Class remain wholly unliquidated, each such Claim will be accorded one vote, valued at $10.00 dollars, solely for voting purposes under section 1126(c) of the Bankruptcy Code and not for any other reason.

Estimated Percentage Recovery: unknown  (see Section V(A))

**8.     Allowed Disputed Easement Judgment Claims – Class 5**

Class 5 includes the Allowed Disputed Easement Judgment, which consists of the compensatory damage portion only of the judgment held by Susan Anderson in the amount of $155,000. The Debtor does not believe that any other Allowed Disputed Easement Judgment Claim exists. Except to the extent that the Holder of an Allowed Class 5 Disputed Easement Judgment Claim and the Plan Administrator agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge and compromise of each Allowed Disputed Easement Judgment Claim, the Holder of an Allowed Disputed Easement Judgment shall receive its Pro Rata share of the Net Sale Proceeds and Net Litigation Recoveries allocated to Class 5 under the payment pool and Waterfall described in Section IV(D) below. The distribution to holders of Allowed Disputed Easement Judgment Claims shall be in full satisfaction of any such claims and the Holders will release and discharge and be deemed to release and discharge any Easement Rights held by such Holders or which is appurtenant to any

real property owned, leases or otherwise occupied by such Holders. To the extent such Holder

(a) votes in favor of the Plan, (b) does not object to the Plan and/or (c) accepts any distribution

under the Plan, such Holder shall be deemed to have contested to the transfer of the Property free

and clear of any such Easement Rights pursuant to section 363(f)(2) of the Bankruptcy Code;

provided, however, that whether or not such Holder (a) votes in favor of the Plan, (b) does not

object to the Plan and/or (c) accepts any distribution under the Plan, the Property will be

transferred free and clear of any such Easement Rights or Easement Claims pursuant to

section 363(f)(4) and (5) of the Bankruptcy Code since the Easement Rights are in bona fide

dispute and the Easement Holders can be compelled in a legal or equitable proceeding to accept a

money satisfaction of their Easement Rights.

Estimated Percentage Recovery: unknown (see Section V(A))

### 9.    Allowed General Unsecured Claims – Class 6

Class 6 consists of all Allowed General Unsecured Claims. Except to the extent that the

Holder of Allowed Class 6 General Unsecured Claim and the Plan Administrator agree to less

favorable treatment to such Holder, in exchange for full and final satisfaction, settlement,

release, discharge, and compromise of each Allowed General Unsecured Claim, the Holder of an

Allowed General Unsecured Claim shall receive its Pro Rata share of the Net Sale Proceeds and

Net Litigation Recoveries allocated to Class 6 under the payment pool and Waterfall described in

Section IV(D) below. The distribution to holders of Allowed General Unsecured Claims shall be

in full satisfaction of any such Claims.

Claims within this Class include all Holders of valid mechanics liens against the

Property, which liens are junior to that of the Secured Lender and therefore wholly unsecured in

this case, the Debtor's trade creditors, entities providing contracting services to the Debtor in the

initial construction of the building and utility creditors.    General Unsecured Claims do not include the holders of any Easement Claims including Anderson (other than that portion of the Anderson Judgment which awarded Anderson $35,400 for actual property damage) and George. Nineteen (19) creditors holding $8,661,489 in Claims were listed on the Debtor's Schedules as holding disputed claims, but did not file proof of such claim on or before the Bar Date.  As a result, none of those Claims will be Allowed in the Debtor's case.    Twenty-two (22)  General Unsecured Creditors hold Claims which were either listed on the Schedules as not being disputed or unliquidated, or which filed proofs of claim on or before the Bar Date.  Such Claims amount to $12,626,300, and are included within this Class. None of these claims have been reviewed to determine whether objections should be filed.

Estimated Percentage Recovery: unknown (see Section V(A))

**10.    Allowed Punitive Damage Claims-Class 7**

Class 7 consists of all Punitive Damage Claims. To the Debtor's knowledge, the only known Punitive Damage Claim is the punitive damage component of Susan Anderson's judgment in the amount of $500,000.   The Debtor does not believe that any other Punitive Damage Claims exist, and none were filed by the Claims Bar Date.  Except to the extent that the Holder of an Allowed Class 7 Punitive Damages Claim and the Plan Administrator agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Punitive Damage Claim, the Holder of a Punitive Damage Claim shall receive its Pro Rata share of the Net Sale Proceeds and Net Litigation Recoveries allocated to Class 7 under the payment pool and Waterfall described in Section IV(D) below.  The distribution to holders of Allowed Punitive Damages Claims shall be in full satisfaction of any such Claims.

Estimated Percentage Recovery: unknown (see Section V(A))

**11.    Interests – Class 8**

Class 8 includes equity securities, within the meaning of section 101(16) of the

Bankruptcy Code, in the Debtor, including but not limited to stock in the Debtor.

The Holders of Interests in Class 8 shall receive any remaining Net Sales Proceeds and

Net Litigation Recoveries after payment of all Allowed Claims in full.

Estimated Percentage Recovery: unknown (see Section V(A))

**D.    Sale of Property/Waterfall**

Under the Plan, the Property will be sold free and clear of all liens, claims and interests

including without limitation Easement Claims and Easement Rights (except to the extent that the

Secured Lender elects to provide Stapled Financing) pursuant to section 363(f)(2) and (4) of the

Bankruptcy Code.  The Property Sale Transaction may be with or without a Stalking Horse.  In

connection with a sale to a Third Party Purchaser, the Secured Lender may, in its sole and

absolute discretion, elect to offer Stapled Financing to a potential Third Party Purchaser.   The

Net Sales Proceeds, along the Net Litigation Recoveries, will be used to fund the Plan pursuant

to the payment pools and Waterfall, as more particularly described below.

It is anticipated by the Plan Proponents that the process to sell the Property will

commence prior to the Confirmation Date and that, to the extent necessary, such process will

continue on and after the Confirmation Date.  The sales process will be in accordance with any

Bid Procedures approved by the Bankruptcy Court pursuant to a Bid Procedures Motion, whether

before or after the Confirmation Date.  In furtherance of the foregoing, the Plan Proponents or

the Plan Administrator, as applicable, will take such steps as are necessary to effectuate the

foregoing, including the retention of the Broker (which is pending before the Court), the

selection of a Stalking Horse if feasible and advisable, the filing of a motion or application with the Bankruptcy Court to obtain the approval of Bid Procedures and, if necessary, the conduct of an auction.  Notwithstanding the foregoing, (i) the consummation of the Property Sale Transaction shall occur on, and shall be a condition to the occurrence of, the Effective Date and (ii) for purposes of 11 U.S.C. § 1146(a), the Property Sale Transaction shall occur pursuant to the Plan.

In the event that a Stalking Horse is selected, the Plan Administrator will negotiate a Stalking Horse APA with the Stalking Horse, which Stalking Horse APA may include customary bidder protections, including a breakup fee and/or expense reimbursement.  The selection of a Stalking Horse and the terms and conditions of any Stalking Horse APA (including bid procedures and bidder protections) will be subject to the approval of the Secured Lender in its sole and absolute discretion.

The Secured Lender may elect to offer Stapled Financing to one or more potential bidders.  The terms of such Stapled Financing and the decision of the Secured Lender to offer or not to offer Stapled Financing in general, and to any potential bidder in particular, shall be determined and made by the Secured Lender in its absolute and sole discretion.  In the event that the Secured Lender offers such Stapled Financing and such bidder is the Purchaser, such Purchaser shall execute and deliver the Stapled Financing Documents to the Secured Lender.

The sale of the Property pursuant to the Property Sale Transaction shall be free and clear of any Easement Claims or any Easement Rights pursuant to sections 363(f)(2), (4) and (5) of the Bankruptcy Code since the Easement Rights are in bona fide dispute and the Easement Holders can be compelled in a legal or equitable proceeding to accept a money satisfaction of their Easement Rights.  Without limiting the foregoing, any Holder of any Easement Claim or

Easement Right shall have no right to assert, and shall be barred and precluded from asserting, any Easement Claim or any Easement Right against the Debtor, the Estate or the Purchaser of the Property or maintain any action, *in rem* or otherwise, against the Property, with respect to the foregoing. Upon the Effective Date, any and all Easement Rights shall be deemed to be satisfied, terminated and discharged and, to the extent requested by the Purchaser, such Holder of an Easement Claim shall execute and deliver such document or documents as are reasonably necessary to reflect and effectuate the foregoing. In addition, the Purchaser may file a copy of the Confirmation Order or memorandum of same with the applicable recording office, confirming the foregoing, and the recorder shall be directed to accept the same for filing and recording without the requirement of the payment of any fees, transfer tax or similar amount.

Without limiting any of their obligations under the Plan Support Stipulation, the Debtor Parties shall fully and completely cooperate with the sales process and the Property Sale Transaction. Without limiting the foregoing, the Debtor Parties shall provide such information as may be reasonably requested by the Plan Administrator or a potential bidder regarding the Property or any matters reasonably related thereto and shall cooperate with the Plan Administrator with respect to objections to and the resolution of Disputed Claims.

At any sale of the Property, the Secured Lender may Credit Bid all or part of the Allowed Secured Lender Secured Claim. In the event that the Secured Lender submits a Credit Bid, is the winning bidder and the Property Sale Transaction closes, then the Secured Lender will be required to fund in Cash in an amount equal to the funding that would have been distributed under the Waterfall (other than distributions to the Secured Lender in respect of the Exit Facility, the Allowed Secured Lender Secured Claim and the Allowed Secured Lender Administrative Claim) in the event of a Cash purchase price in the amount of such Credit Bid.

Without limiting the foregoing, there is no cause to limit the Secured Lender's right to Credit Bid pursuant to Section 363(k) of the Bankruptcy Code and the Debtor Parties and any other Person shall be precluded, barred and estopped from asserting or alleging the existence of such cause or otherwise seeking to preclude, limit or restrict the right of the Secured Lender to Credit Bid.

The costs and expenses incurred in connection with the sale of the Property including broker commissions, will be paid from the proceeds of the sale. Since the Property is being sold pursuant to a Chapter 11 Plan, the sale will be exempt from transfer taxes in accordance with section 1146 of the Bankruptcy Code. The Net Sale Proceeds and Net Litigation Recoveries, if any, will be distributed in accordance with the following waterfall (the "Waterfall"):

- First, to repay all amounts due under the Exit Facility, if any, which Exit Facility shall be used to fund payments to holders of Administrative Claims, Accrued Professional Compensation Claims and Priority Tax Claims and Other Priority Claims and other amounts necessary to implement the Plan, and which will be secured by a first priority security interest in and lien against all of the Debtor's assets and will be entitled to all of the protections available to a debtor-in-possession lender under section 364 of the Bankruptcy Code;

- Second, to the extent such Claims are not paid from the Exit Facility, to pay all Allowed Administrative Claims, Allowed Accrued Professional Compensation Claims and Allowed Priority Tax Claims and Allowed Other Priority Claims;

- Third, the aggregate sum of $100,000.00 to fund: the Class 3 Payment Pool in the amount of $25,000.00, the Class 4 Payment Pool in the amount of $25,000.00 and the Class 5 Payment Pool in the amount of $50,000.00;

- Fourth, 100% of the Net Sales Proceeds and of the Net Litigation Recoveries to the Secured Lender, until the Secured Lender has received the aggregate amount of $27,500,000.00 in respect of the Allowed Secured Lender Secured Claim;

- Fifth, 90% of the Net Sales Proceeds and Net Litigation Recoveries to the Secured Lender and 10% of the Net Sales Proceeds and Net Litigation Recoveries to be allocated to the Class 3 Payment Pool, the Class 4 Payment Pool and Class 5 Payment Pool in the same proportion as the initial funding of such payment pools pursuant to "Third" above, until the Secured Lender has received the total aggregate amount of $29,500,000.00 in respect of the Allowed Secured Lender Secured Claim;

- Sixth, 75% of the Net Sales Proceeds and Net Litigation Recoveries to the Secured Lender and 25% of the Net Sales Proceeds and Net Litigation Recoveries to be allocated to the Class 3 Payment Pool, the Class 4 Payment Pool and Class 5 Payment Pool in the same proportion as the initial funding of such payment pools pursuant to "Third" above, until the Secured Lender has received the total aggregate amount of $33,500,000.00 in respect of the Allowed Secured Lender Secured Claim;

- Seventh, 50% of the Net Sales Proceeds and Net Litigation Recoveries to the Secured Lender and 50% of the Net Sales Proceeds and net proceeds of Net Litigation Recoveries to be allocated to the Class 3 Payment Pool, the Class 4 Payment Pool and Class 5 Payment Pool in the same proportion as the initial funding of such payment pools pursuant to "Third" above;

- Eighth, after payment in full of the Allowed Secured Lender Secured Claim and of all Allowed Claims in Class 3, Class 4 and Class 5, to the Class 6 Payment Pool; and

- Ninth, after payment in full of all Allowed Claims in Class 6, to the Class 7 Payment Pool.

Notwithstanding the foregoing, in no event shall any amount be allocated to the Class 4 Payment Pool, the Class 5 Payment Pool, the Class 6 Payment Pool and/or the Class 7 Payment Pool if all Allowed Claims entitled to payment from such Payment Pool have either been paid, or reserved for, in full and without interest, in which case any such amount that would otherwise have been allocated to such Payment will be reallocated to the Secured Lender and, upon payment in full of all the Allowed Secured Lender Secured Claim, to Class 8.

The sale contemplated above shall occur on or before February 1, 2016 (the "Sale Deadline"), time being of the essence; provided, however, that the Secured Lender in its discretion may elect to extend the sale Deadline in one or more thirty day increments. In the event that the sale does not occur on or before Sale Deadline (as such date may be extended in accordance with the foregoing), then the Secured Lender shall schedule a straight auction sale of the property, which sale may be without a "stalking horse." This sale may be pursuant to a plan or may be outside of a pursuant to section 363 of the Bankruptcy Code. The Secured Lender

shall have the right to credit bid all or a portion of the Allowed Secured Lender Secured Claim at such auction sale.

In the event of such an auction sale, the Net Sale Proceeds will be distributed in accordance with the following waterfall (the "Auction Waterfall"):

- First, to repay all amounts due under the Exit Facility, if any;

- Second, to the extent such Claims are not paid from the Exit Facility, payment in full of all Allowed Administrative, Accrued Professional Compensation, Priority Tax Claims and Other Priority Claims;

- Third, the aggregate sum of $100,000.00 to fund: the Class 3 Payment Pool in the amount of $25,000.00, the Class 4 Payment Pool in the amount of $25,000.00 and the Class 5 Payment Pool of $50,000.00;

- Fourth, 100% of the Net Sales Proceeds to the Secured Lender, until the Secured Lender has received payment in full of the Allowed Secured Lender Secured Claim and the Allowed Secured Lender Administrative Claim;

- Fifth, 100% to the Class 6 Payment Pool; and

- Sixth, any remaining amounts to the Class 7 Payment Pool.

Since the Auction Waterfall has already been approved through the Plan Support Stipulation, creditors should note that if the Plan is not confirmed and the Property is sold at an auction rather than through the Plan, creditors will receive far less of a distribution, if any.

At any sale, the Secured Lender may credit bid all or part of Allowed Secured Lender Secured Claim. In the event that the Secured Lender submits a credit bid, is the winning bidder and the sale closes, then the Secured Lender will be required to fund Allowed Administrative Claims, Allowed Accrued Professional Compensation Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims and Allowed Other Secured Claims, the Class 3 Payment Pool, the Class 4 Payment Pool and the Class 5 Payment Pool in an amount equal to the funding that would have been provided in the event of a cash purchase price in the amount of such credit bid.

The Secured Lender may also, in its discretion, permit a purchaser to assume all or a portion of its secured loan on terms to be determined by the Secured Lender in its discretion (the "Stapled Financing").

While the Secured Lender would ordinarily be entitled to the entire Net Sale Proceeds in payment of the Allowed Secured Lender Claim, it has agreed to carve out from the funds to which it is otherwise entitled, monies sufficient to pay the Exit Facility, all Allowed Administrative Claims, Professional Compensation Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and a carve out for Allowed Unliquidated and Disputed Easement Claims, Disputed Easement Judgment Claims, General Unsecured Claims and Punitive Damage Claims, all as described above.

**E.    Litigation Trust**

1.    Formation of the Litigation Trust

On the Effective Date, the Litigation Trust will be formed and shall have the power and authority to take any action necessary to liquidate the Trust Assets, including prosecution and, if appropriate, settlement of the Litigation Claims, including the authority to retain attorneys and consultants. Notwithstanding the foregoing, if the Plan Proponents determine, on or before the Confirmation Date, that the likely amount of any Net Litigation Recoveries is immaterial, then the Litigation Trust shall not be created and the other provisions of the Plan with respect to the Litigation Trust shall be inoperative.

2.    Trustee

The Plan Administrator will serve as the Litigation Trustee for the Litigation Trust. The compensation of the Litigation Trustee will be as provided for in the Litigation Trust Agreement. In the event of the death or incompetency (in the case of a Litigation Trustee that is a natural person), dissolution (in the case of a Litigation Trustee that is a corporation or other Entity),

bankruptcy, insolvency, resignation or removal of the Litigation Trustee, a successor trustee shall be appointed as set forth in the Litigation Trust Agreement.

3.    Purpose of the Litigation Trust; Reporting Duties

The Litigation Trust will be established for the primary purpose of liquidating the Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidation purpose of the Litigation Trust, to make distributions to Holders of Allowed Claims and Interests from the Net Litigation Proceeds in accordance with the Plan and the Waterfall, and to take such actions as are reasonably necessary to accomplish the foregoing, as more particularly set forth in the Plan and in the Litigation Trust Agreement.  Upon the transfer by the Debtor of the Trust Assets to the Litigation Trust, the Debtor will have no reversionary or further interest in or with respect to the Trust Assets or the Litigation Trust.  For all federal income tax purposes, the Beneficiaries of the Litigation Trust will be treated as the grantors and owners thereof and it is intended that the Litigation Trust be classified as a Litigation Trust under Section 301.7701 4 of the Treasury Regulations and that such Trust is owned by the Beneficiaries of the Litigation Trust. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries of the Litigation Trust be treated as if they had received a distribution of an interest in the Trust Assets and then contributed such interests to the Litigation Trust.  Accordingly, the Litigation Trust will, in an expeditious but orderly manner, liquidate the Trust Assets by litigating and/or settling the Litigation Claims, make timely distributions to the Beneficiaries of the Litigation Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration.  The Litigation Trust will not be deemed a successor in interest of the Debtor for any purpose other

than as specifically set forth in the Plan. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

The Litigation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries of the Litigation Trust treated as grantors and owners thereof for federal income tax purposes. The Litigation Trustee shall endeavor to ensure that the Litigation Trust files tax returns as a grantor trustee pursuant to Treasury Regulation Section 1.671-4(a) and shall comply with all requirements of any Governmental Unit in connection therewith. The Litigation Trustee shall file or shall cause to be filed any other statement, returns, or disclosures relating to the Litigation Trust that are required by any Governmental Unit. The Litigation Trustee shall send to each Beneficiary an annual statement setting forth such Beneficiary's share of items of income, gain, loss, deduction or credit and provide to all such parties information for reporting such items on their federal income tax returns, as appropriate.

4.    Transfer of Assets to the Litigation Trust; Trust Assets Available for Distribution

The Litigation Trustee will establish the Litigation Trust on behalf of the Beneficiaries, with the Beneficiaries of the Litigation Trust to be treated as the grantors and deemed owners of the Trust Assets. On the Effective Date, the Debtor will transfer to the Litigation Trust for the benefit of the Beneficiaries of the Litigation Trust the Trust Assets in accordance with the provisions herein, notwithstanding any prohibition of assignability under non-bankruptcy law. The Litigation Trust will agree to accept and hold the Trust Assets in the Litigation Trust for the benefit of the Beneficiaries of the Litigation Trust, subject to the terms of the Plan.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all Trust Assets shall vest in the Litigation Trust free and clear of all Liens, Claims, charges, mortgages, deeds of trust and

encumbrances, other than all Liens, Claims, charges, mortgages, deeds of trust and

encumbrances in favor of the Secured Lender or that secure the Allowed Secured Lender

Secured Claim.

5.      Prosecution of the Litigation Claims

The Litigation Trustee shall take such action as is reasonably necessary to maximize the

value of and liquidate the Litigation Claims, including the commencement and prosecution of

any adversary proceedings, contested matters, lawsuits, arbitrations or other proceedings

(including the prosecution or defense of any appeals, writs of mandamus, writs of certiorari,

discovery in aid of collecting or executing any judgment and the execution of any judgment, and

the posting of any bond required by a court in connection therewith), either in the Bankruptcy

Court or in such other appropriate venue having jurisdiction of such Litigation Claims.  In

connection with the foregoing, the Litigation Trust shall defend and, if appropriate, settle, any

counterclaims asserted or raised by a defendant to a Litigation Claim.  The Litigation Trust may,

if appropriate, settle any Litigation Claim.

6.      Distributions; Withholding

The Litigation Trust will make distributions at least annually to the Beneficiaries of all

Net Litigation Recoveries in accordance with the Plan; provided, however, the Litigation Trust

may retain such amounts reasonably necessary, as determined by the Litigation Trustee, (a) to

fund the operations of the Litigation Trust or (b) to maintain the value of the Litigation Trust.

The Litigation Trust may withhold from amounts distributable to any person or Entity any and

all amounts, determined in the sole discretion of the Litigation Trustee, to be required by any

law, regulation, rule, ruling, directive, or other governmental requirement.

7.     Investment Powers

The right and power of the Litigation Trustee to invest Litigation Trust funds, the

proceeds thereof, or any income earned by the Litigation Trust shall be limited to the right and

power to invest such assets (pending periodic distributions in accordance with Article IV.H.6) in

such assets as permitted by Revenue Procedure 94-45, 1994-2 C.B. 684, or as modified by

subsequent IRS guidance; provided however, that the Litigation Trustee may expend the assets

of the Litigation Trust as reasonably necessary to maintain the value of the assets of the

Litigation Trust or pay reasonable administrative expenses (including, but not limited to, any

taxes imposed on the Litigation Trust or reasonable fees and expenses in connection with any

Litigation Claim) necessary to further the purpose of the Litigation Trust.

8.     Insurance

The Litigation Trust will maintain customary liability insurance coverage, if appropriate

and available, for the protection of the Litigation Trustee on and after the Effective Date.  To the

extent necessary, the premiums for such insurance shall be paid from the Exit Facility.

9.     Litigation Trust Implementation

On the Effective Date, the Litigation Trust will be established and become effective for

the benefit of the Beneficiaries of the Litigation Trust entitled to distributions from the Litigation

Trust.  The Litigation Trust Agreement shall contain provisions similar to those contained in

trust agreements utilized in comparable circumstances, including, but not limited to, any and all

provisions necessary to ensure the continued treatment of the Litigation Trust as a grantor trust

for federal income tax purposes.  All parties shall execute any documents or other instruments as

necessary to cause title to the applicable assets to be transferred to the Litigation Trust.  In the

event of any conflict between the terms of the Plan and the Litigation Trust Agreement, the terms

of the Litigation Trust Agreement shall control.

10.    Termination of Litigation Trust

The Litigation Trust shall terminate after its liquidation, administration and distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth herein or in the Litigation Trust Agreement. The Litigation Trust shall terminate no later than the fifth anniversary of the Effective Date; provided, however, that within a period of six months prior to such termination date or any extended termination date, the Litigation Trustee may extend the term of the Litigation Trust if necessary to facilitate or complete the liquidation of Trust Assets administered by the Litigation Trust; provided further, however, that the aggregate of all such extensions shall not exceed three years, unless the Litigation Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a "liquidation trust" for federal income tax purposes within the meaning of Treasury Regulation Section 301.7701-4(d).

11.    Termination of the Trustee for the Litigation Trust

The duties, responsibilities, and powers of the Litigation Trustee will terminate upon termination of the Litigation Trust.

**F.    Treatment of Executory Contracts and Unexpired Leases**

**1.    Assumption/Rejection of Executory Contracts and Other Unexpired Leases**

The Debtor is not a party to any executory contracts or unexpired leases. However, to the extent any such contract or lease exists, each of the executory contracts or unexpired leases to which the Debtor was a party on the Petition Date, to the extent such contracts or leases are executory contracts or unexpired leases, shall, on the Confirmation Date, be deemed rejected, except to the extent that the Purchaser has designated any such Executory Contract or Unexpired Lease to be assumed and assigned to such Purchaser. Any Executory Contract or Unexpired Lease designated to be assumed and assigned to such Purchaser shall be specified as such in the

Plan Supplement, which shall be filed with the Bankruptcy Court three (3) days prior to the Confirmation Hearing. In the event that the Purchaser designates a Executory Contract or Unexpired Lease designated to be assumed and assigned to such Purchaser, the Purchaser shall be responsible for paying and performing any Cure Obligations (without any adjustment to the Purchase Price for such amounts) and for demonstrating adequate assurance of future performance under such Executory Contract or Unexpired Lease, as applicable.

Unless otherwise indicated in the Plan Supplement, all assumptions and assignments or rejections of the Debtor's Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date. Notwithstanding anything to the contrary in the Plan, the Plan Administrator reserves the right to designate an Executory Contract or Unexpired Lease as a rejected Executory Contract or Unexpired Lease at any time through and including the later of thirty (30) days after the Effective Date (or such later date as provided in Article V in the event of any objection by a counterparty to an Executory Contract or Unexpired Lease to the amount of any Cure Obligation or other matter relating to the proposed assumption and assignment).

Any Executory Contracts or Unexpired Leases to be assumed and assigned pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by the satisfaction of the Cure Obligations or by an agreed-upon waiver of the Cure Obligations on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Plan Administrator or the Purchaser and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or related Cure Obligations must be Filed, served, and actually received by the Plan Administrator by twenty-five (25) days after the Effective Date.

Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption and assignment of such Executory Contract or Unexpired Lease or such Cure Obligations will be deemed to have assented to such matters and shall be forever barred, estopped, and enjoined from asserting such objection against the Debtor, the Estate or the Plan Administrator.

In the event of a dispute regarding: (1) the Cure Obligations; (2) the ability of the Purchaser to provide "adequate assurance of future performance" within the meaning of Section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed and assigned; or (3) any other matter pertaining to assumption and/or assignment, then the applicable Cure Obligations shall be satisfied following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Plan Administrator, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Plan Administrator, may in consultation with and subject to the consent of the Secured Lender, settle any dispute regarding Cure Obligations without any further notice to any party or any action, order, or approval of the Bankruptcy Court. The Plan Proponents reserve the right to reject, or nullify the assumption and assignment of, any Executory Contract or Unexpired Lease no later than thirty (30) days after a Final Order determining the Cure Obligations, any request for adequate assurance of future performance required to assume and assign such Executory Contract or Unexpired Lease, and any other matter pertaining to assumption and/or assignment.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including

defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment. Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**2.      Bar Date for Rejection Damages**

**If the rejection of an executory contract or unexpired lease pursuant to Article V of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtor, the Debtor's Estate, the Secured Lender or their property unless the party files an original proof of Claim (with supporting documentation) with the Bankruptcy Court <u>by the later of thirty (30) days after the effective date of the rejection or thirty (30) days after the Effective Date.</u>**

There shall be no restriction on the rights of the Plan Proponents to object to any Claims relating to the rejection of executory contracts or unexpired leases, or to assert any defense or counterclaim to any such Claim, notwithstanding that such defenses or counterclaims may not have otherwise been identified in the Plan, Disclosure Statement or otherwise.

Any Allowed Claim arising from the rejection of an executory contract or unexpired lease shall constitute a Class 6 General Unsecured Claim.

**G.      Summary of Distributions and Claims Resolution Provisions**

**1.      Objections to Claims**

From and after the Effective Date, the Plan Administrator and Secured Lender shall have the right to object to the allowance of any Claim, and may file with the Court any appropriate